**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CEMENT-LOCK, an Illinois limited liability company, and RICHARD MELL, an individual,** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| v. ) ) | No. 05 C 0018 |
| **GAS TECHNOLOGY INSTITUTE, an Illinois corporation, INSTITUTE OF GAS TECHNOLOGY, an Illinois corporation, ENDESCO SERVICES, INC., an Illinois corporation, ENDESCO CLEAN HARBORS, LLC, an Illinois limited liability company, STANLEY S. BORYS, an individual, JAMES E. DUNNE, an individual, FRANCIS S. LAU, an individual, CEMENT-LOCK GROUP, LLC, a Delaware limited liability company and nominal defendant,** ) ) ) ) ) ) ) ) ) ) ) ) | Judge Rebecca Pallmeyer |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Cement-Lock, LLC and Richard Mell, as members of Cement-Lock Group, LLC, have filed an eleven-count derivative Amended Complaint against Defendants Gas Technology Institute ("GTI"), Institute of Gas Technology ("IGT"), Endesco Services, Inc. ("ESI"), Endesco Clean Harbors, LLC ("ECH"), Stanley S. Borys, James E. Dunne, Francis S. Lau, and nominal defendant Cement-Lock Group, LLC. On September 30, 2005, this court dismissed without prejudice Counts II and III of Plaintiffs' original complaint for failing to state a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. § 1962(c) & (d). *See Cement-Lock v. Gas Tech. Inst.*, No. 05 C 0018, 2005 WL 2420374, *23 (N.D. Ill. Sept. 30, 2005) (*Cement-Lock I*). Plaintiffs again allege violations of RICO sections 1962(c) and (d), claiming that they have addressed the shortcomings of their previous filing. Defendants have again moved this court to dismiss these counts pursuant to FED. R. CIV. P. 12(b)(6). Defendants have also for the first time

moved this court to dismiss Count IV (fraudulent concealment), Count V (fraudulent misrepresentation), and Count VI (negligent misrepresentation) against Defendant Francis S. Lau. For the reasons discussed here, the court denies Defendants' motion to dismiss.

**BACKGROUND**

The facts of this case, as set forth in Plaintiffs' original complaint, were presented at some length in this court's September 30, 2005 Memorandum Opinion and Order. As Plaintiffs largely restate these facts in their Amended Complaint, the court will assume the reader's familiarity with that decision and will recite only those facts relevant to Defendants' current motion to dismiss. *See Cement-Lock I*, 2005 WL 2420374, *1-10; *see also* "Blacklined" Comparison of Complaint and Amended Complaint, Ex. A to Plaintiffs' Mem. in Opp'n to Defs.' Partial Motion to Dismiss (hereinafter "Pl.'s Opp'n").[1]

In *Cement-Lock I*, this court dismissed without prejudice Counts II and III of Plaintiffs' original Complaint for failing to state a claim under RICO sections 1962(c) and (d). *See Cement-Lock I*, 2005 WL 2420374, *18. This court concluded that Plaintiffs sufficiently alleged that Defendants' conduct proximately caused Plaintiffs' injuries, as required by 18 U.S.C. § 1964(c), but had not alleged a RICO enterprise with sufficient structure. *Id.* at *16. Some members of the alleged enterprise were insufficiently described, and others were superfluous. *Id.* at *18-19. After removing these individuals and entities from the enterprise, the court concluded that Plaintiffs had failed to allege a common purpose among the remaining enterprise members "other than their individual gain." *Id.* (citing *Okaya (U.S.A.), Inc. v. Denne Indus., Inc.*, No. 00 C 1203, 2000 WL 1727785, *3 (N.D. Ill. Nov. 20, 2000)). Instead, the court concluded that, "so far as the complaint

---

[1] Plaintiffs have supplemented their original Complaint with some additional information and clarifications in response to factual gaps and ambiguities noted by this court in *Cement-Lock I*. *See, e.g.*, Am. Compl. ¶¶ 30-53 (identifying in greater detail entities and individuals related to the alleged RICO enterprise). And as discussed *infra*, Plaintiffs describe in greater detail the role that each enterprise member played in the alleged enterprise. *Id.* ¶¶ 114–125.

2

in this case reveals, Defendants' only purpose was to divert grant money meant for Cement-Lock Group." *Id.* Concluding that Plaintiffs had failed to plead a substantive RICO violation under section 1962(c), the court dismissed the RICO conspiracy claim under section 1962(d). *Id.* at *18 (citing *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000)).

The court denied Defendants' motion to dismiss the remaining counts of Plaintiffs' complaint. *Id.* at *23. Most relevant to the present decision, this court held that Plaintiffs had stated claims for fraudulent misrepresentation (Count IV), fraudulent concealment (Count V), and negligent misrepresentation (Count VI). *See id.* at *22-23. Specifically, this court held that Plaintiffs had "adequately stated 'with particularity' their claims of fraudulent concealment and fraudulent misrepresentation." *Id.* at *22 (quoting FED. R. CIV. P. 9(b)). Defendants' motion to dismiss Plaintiffs' claim for negligent misrepresentation, predicated on the same underlying facts, was likewise denied. *Id.* at *23. The court did not, however, specifically address Plaintiffs' reliance on Defendants' alleged misrepresentations and omissions.

Plaintiffs' Amended Complaint again alleges violations of RICO sections 1962(c) and 1962(d). *See* Am. Compl. ¶¶ 271-284. Some of the individuals and entities comprising the alleged enterprise have changed,[2] but Plaintiffs' theory of the case remains the same: Defendants misappropriated money that had been provided by various granting agencies for the purpose of developing the Cement-Lock Group's proprietary remediation process (hereinafter, the

---

[2] RPMS, Ethan Elden, Brian Hardy, and T. Robert Sheng are no longer part of the alleged enterprise; Environmental Monitors, Inc. ("EEM"), Homatex, Reaction Kinetics Consultants ("RKC"), ANE Research ("ANE") and Wayne & Associates have been added. *See* Am. Compl. ¶ 115; *cf. Cement-Lock I*, 2005 WL 2420374, *18 (noting that the original Complaint failed to adequately identify RPMS, Elden, Hardy and Sheng). Entities GTI, IGT, ESI, ECH, Barone Consulting, Molecular Thermoengines ("MTE"), as well as individuals Barone, Borys, Dunne, Goyal, Lau, Lee, Mensinger and Rehmat, reprise their roles in the alleged enterprise. Am. Compl. ¶ 115. In addition, Plaintiffs allege that others "unknown to Plaintiff[s]" may have played roles in the enterprise. *Id.*

3

"Technology."). *See id.* ¶ 114. Taking their cue from this court's previous decision,[3] Plaintiffs now further allege that the Defendants, through the alleged enterprise, "purposely suppressed development and commercialization of the Technology." *Id.* ¶ 114. Defendants again move to dismiss Counts II and III of Plaintiffs' Amended Complaint. *See* Motion of Defendants to Dismiss Counts II and III Entirely and Counts II-VI Against Francis Lau in the Amended Complaint (hereinafter, "Motion to Dismiss") ¶¶ 1, 4. In addition, Defendants move to dismiss Counts IV-VI against Defendant Lau, arguing for the first time that Plaintiffs have not sufficiently pleaded justifiable reliance on Lau's alleged misrepresentations and omissions. *Id.* at ¶ 5.

## DISCUSSION

The purpose of a Rule 12(b)(6) motion is to test the sufficiency of the plaintiff's complaint, not to decide its merits. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). On a motion to dismiss, the court accepts the plaintiff's well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 977-78 (7th Cir. 1999) (citation omitted). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Stated differently, a complaint will survive a Rule 12(b)(6) motion if it "narrates an intelligible grievance that, if proved, shows a legal entitlement to relief." *United States Gypsum Co. v. Indiana Gas Co.,* 350 F.3d 623, 626 (7th Cir. 2003) (citations omitted).[4] The court employs these standards in addressing Defendants' challenge to the RICO claims and the claims against Defendant Lau.

---

[3] In discussing whether the Plaintiffs had alleged a purpose for the enterprise beyond committing the predicate acts, this court noted that a common purpose to suppress the Technology "might well satisfy the enterprise requirement." *Cement-Lock I*, 2005 WL 2420374, at *19 n.28.

[4] As previously discussed, this court concluded in *Cement-Lock I* that Plaintiffs' fraud allegations met the heightened pleading requirements of Rule 9(b), a conclusion that Defendants have not asked the court to revisit. *See Cement-Lock I*, 2005 WL 2420374, *22.

## A. Plaintiffs' § 1962(c) Allegations

RICO section 1962(c) makes it unlawful "for any person employed by or associated with an enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). Accordingly, to state a claim under §1962(c), Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998) (citations and internal quotations omitted). In addition, to establish damages under § 1964(c), Plaintiffs must establish that Defendants' conduct proximately caused their injuries. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Plaintiffs allege that Defendants devised and executed numerous schemes to suppress the Technology's development and commercialization, and misappropriated funds earmarked for that development. *See* Am. Compl. ¶¶ 4, 140. In carrying out these schemes, Plaintiffs allege that Defendants violated federal mail fraud, wire fraud and money laundering statutes, violations constituting RICO predicate acts. *Id.* ¶ 140; *see* 18 U.S.C. § 1961(1)(B).

### 1. Proximate Causation

In ruling on Defendants' motion to dismiss Plaintiffs' original complaint, this court concluded that Plaintiffs had adequately alleged that Defendants' conduct proximately caused Plaintiffs' injuries. *See Cement-Lock I*, 2005 WL 2420374, *12 (citing *Holmes,* 503 U.S. at 268). On June 5, 2006, the Supreme Court issued its decision in *Anza v. Ideal Steel Supply Corp.*, __ U.S. __, 126 S. Ct. 1991 (2006), and Defendants ask this court to revisit its earlier decision in light of *Anza*. *See* Supp. Mem. of Defendants in Support of Their Motion to Dismiss RICO Claims (Counts I and II) of the Am. Compl. Pursuant to the Supreme Court Ruling in *Anza, et al. v. Ideal Steel Supply Corp* (hereinafter, "*Anza* Supp."). In *Anza*, the plaintiff, Ideal Steel Supply Corporation, and the defendant, National Steel Supply, Inc., conducted competing businesses selling steel mill products and related supplies and services. *Anza*, 126 S. Ct. at 1994. Ideal alleged that National adopted

5

a practice of not charging New York State sales tax to cash-paying customers, which allowed National to reduce its prices without impacting its profit margin. *Id.* In an effort to conceal their scheme, Ideal alleged that National submitted fraudulent tax returns to the New York State Department of Taxation. *Id.* Ideal alleged that the goal of this scheme was to give National a competitive advantage over Ideal, and sued National's owners, Joseph and Vincent Anza, under RICO § 1962(c). *Id.* at 1995.

The Supreme Court's analysis in *Anza* began and "largely end[ed]" with *Holmes v. Sec. Investor Prot. Corp.* *Id.* In *Holmes*, Securities Investor Protection Corporation ("SIPC"), a private corporation charged under the Securities Investor Protect Act with reimbursing the customers of registered broker-dealers who are unable to meet their financial obligations, alleged that the defendant conspired with others to manipulate stock prices. *Holmes*, 503 U.S. at 261-63. When the market discovered the fraud, the share prices plummeted, bankrupting two broker-dealers and forcing SIPC to cover their customers' claims. *Id.* at 262–63. The *Holmes* court held that a RICO plaintiff must demonstrate a "direct relation" between the alleged injury and the RICO defendant's conduct to recover damages under §1964(c). *Id.* at 269-70. SIPC's injury was too remote, "being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271.

Applying *Holmes* to Ideal's RICO claim, the Court held that the "direct victim" of the Anzas' scheme was the State of New York, which was defrauded of tax revenue, not Ideal. *Anza*, 126 S. Ct. at 1997. The appropriateness of this analysis was confirmed, the Court concluded, by the difficulty inherent in determining what portion of Ideal's damages were attributable to the alleged pattern of fraud. *Id.* National may have lowered prices, and Ideal may have lost sales, for reasons having nothing to do with National's alleged tax fraud. *Id.* Moreover, the risk that National's alleged misdeeds would go unpunished was reduced by the likelihood that the State of New York, the direct victim of National's scheme, would vindicate the law by pursuing its own claim against National. *Id.* at 1998.

Defendants argue, as they did in their motion to dismiss Plaintiffs' original complaint, that the only direct victims of their alleged scheme are the granting entities: GRI, BNL, the State of New Jersey and the State of Michigan. *Anza* Supp. at 3. While these entities may have been harmed by the alleged scheme, the court disagrees that these entities stand in the same relation to Cement-Lock Group, on whose behalf Plaintiffs have brought this action, as the direct victims in *Holmes* and *Anza* stood in relation to the plaintiffs in those cases. In the earlier opinion in this case, this court distinguished *Holmes*, noting that Cement-Lock Group was the intended recipient of the grant funds that Defendants allegedly misappropriated. *Cement-Lock I*, 2005 WL 2420374, at *12; *cf. Holmes*, 503 U.S. at 271 ("The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors."). This is in marked contrast to *Anza*, as well, as Ideal had no claim (direct or indirect) to the sales-tax proceeds that National improperly withheld. *Cf. Anza*, 126 S. Ct. at 1997 ("The cause of Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."); *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 403–04 (7th Cir. 2006) (dismissing RICO claim where plaintiff's injury was predicated on the speculative theory that it would have won construction contracts but for defendant's bid-rigging scheme). And as this court recognized in *Cement-Lock I*, Plaintiffs have alleged concrete, compensable damages flowing directly from Defendants' alleged scheme:

> [Plaintiffs] were harmed, they claim, by: (1) misappropriation of millions of dollars in grant money, which prevented the development of the Technology and results in the future loss of profits from the licensing of the Technology; (2) harm to Cement-Lock Group's business reputation; (3) lost business opportunities to market the Technology to other individuals, corporations, or governmental entities, including Taiwan, Hong Kong, and China; and (4) devaluation of Cement-Lock Group's intellectual property by wasted years in the lifespan of certain patents and confusion and infringement on the Technology's service mark and trademark.

*Cement-Lock I*, 2005 WL 2420374, at *13 (internal citations omitted). The fact that these damages may be difficult to prove is attributable to the nature of the alleged injuries, not, as Defendants

assert, to their remoteness from the Defendants' conduct. The court concludes that *Anza*, like *Holmes*, is distinguishable, and that Plaintiffs have sufficiently alleged that Defendants' conduct proximately caused Plaintiffs' alleged injuries.

### 2. The "Enterprise" Element

Plaintiffs have alleged a RICO "association-in-fact" consisting of nineteen entities and individuals. Am. Compl. ¶ 115. An association-in-fact enterprise is a "union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has described an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Structure is the hallmark of a RICO enterprise. *See Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995). That structure may be informal, but the enterprise "must have some continuity and some differentiation of the roles within it." *Id.*; *see also Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) (A RICO enterprise is "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making."); *see also Bachman v. Bear, Stearns & Co., Inc.*, 178 F.3d 930, 932 (7th Cir. 1999) (A criminal gang is the prototypical association-in-fact enterprise.). In addition, the enterprise's structure and goals must be "separate from the predicate acts themselves." *Id.*; *see also Jennings*, 910 F.2d at 1440 ("[A]n enterprise is defined by what it is, not what it does.").

#### a. Composition of the Alleged Association-in-Fact

As a threshold matter, Defendants ask the court to exclude six entities from the alleged enterprise: GTI, IGT, ESI, ECH, Barone Consulting and RKC. In *Cement-Lock I*, this court concluded that four of these entities—GTI, IGT, ESI, and ECH—were superfluous because the alleged enterprise included both subsidiaries and current and former employees of these entities. *See Cement-Lock I*, 2005 WL 2420374, *19 (citing *Bachman*, 178 F.3d at 932 (7th Cir. 1999)). Defendants argue that the same reasoning supports excluding Barone Consulting and RKC, entities

8

controlled by individual enterprise-members Peter Barone and Anthony Lee, respectively. *See* Am. Compl. ¶¶ 43, 47.[5] In *Bachman*, the plaintiff alleged an association-in-fact consisting of the defendant, Bear Stearns, and six other entities and individuals: two employees of a medical-imaging company, the company itself, and three affiliated corporations. *Bachman*, 178 F.3d at 931. In evaluating the sufficiency of the alleged enterprise, the Seventh Circuit first considered only Bear Stearns and the two individuals, excluding the four corporations, because "[a] firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself." *Id.* at 932. An enterprise consisting of Bear Stearns and the two individuals did not state a claim under RICO because the enterprise lacked the necessary "organization" to distinguish it from a run-of-the-mill conspiracy. *Id.* The Seventh Circuit then went on to assess whether the corporations might serve as the RICO enterprise, concluding, however, that Bear Stearns did not exercise any control over the corporations as required by RICO. *Id.* at 932–33.

Plaintiffs assert that *Bachman* is distinguishable, contending that its holding only applies to situations where the corporate entity is a "passive" rather than an "active" participant in the alleged scheme. Pls.' Opp'n at 6. The court sees no support in the case law for this distinction. *Bachman* builds on the principle that a defendant corporation (the RICO "person") is not liable under RICO for conducting the affairs of an enterprise consisting of itself and its employees. *See, e.g., Emery v. American General Finance, Inc.*, 134 F.3d 1321, 1324–25 (7th Cir. 1998); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997). Otherwise, the statutory distinction between the RICO "person" and the RICO "enterprise" is meaningless. *Emery*, 134 F.3d at 1324-25. *Bachman* applies this principle to the enterprise itself, noting that for purposes of defining the enterprise (as opposed to distinguishing between the "enterprise" and the "person"), adding a corporation to its employees "add[s] nothing." *Bachman*, 178 F.3d at 932. Applying *Bachman's* holding that a corporation is

---

[5] These two entities were not part of the enterprise as alleged in the original complaint, and, therefore, this court had no occasion to rule on their presence in the alleged enterprise.

superfluous to an alleged enterprise including its officers and subsidiaries, the court will again assess the sufficiency of the alleged enterprise excluding GTI, IGT, ESI, ECH, Barone Consulting and RKC.[6]  *See Bachman*, 178 F.3d at 932; *Cement-Lock I*, 2005 WL 2420374, *19.

Plaintiffs challenge this analysis, citing two cases in which courts recognized RICO enterprises that included a parent and its subsidiary. (Pl. Opp'n at 6.) *See Majchrowski v. Norwest Mortgage, Inc.*, 6. F. Supp. 2d 946 (N.D. Ill. 1998); *Butler v. Platte Valley Mortgage Corp.*, No. 94 C 3327, 1995 WL 875412 (N.D. Ill. 1995). Both cases predate the Seventh Circuit's clear statement in *Bachman* that "[a] firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself." 178 F. 3d 930, 932. Plaintiff has presented no post-*Bachman* authority to support its argument. The court recognizes that *Bachman* is not inconsistent with a finding that the association-in-fact enterprise is an association among the corporate Defendants as opposed to one comprised of only the individual Defendants. Based on the structure and hierarchy of the alleged enterprise as set forth in Plaintiffs' Amended Complaint, however, the court finds, consistent with its opinion in *Cement-Lock I*, that the enterprise here is more properly conceived of as one among the individual defendants. *See Cement-Lock I*, 2005 WL 2420374, *19. Plaintiffs describe a clear three-tier structure among the individual defendants with Borys and Dunne at the top, (Am. Comp. ¶¶ 118-120), revealing an organization "amenable to hierarchical or consensual

---

[6] The court must decline Defendants' request to pare the enterprise further, however. *See* Defs.' Reply at 8. Defendants argue that Anil Goyal, described in the Amended Complaint as one of the enterprise's foot-soldiers (*see* Am. Compl. ¶ 120), cannot be a member of the enterprise because he acted contrary to its interests. *See* Defs.' Reply at 8–9; Am. Compl. ¶ 216 (In 2003 and early 2004, GTI suspended, then fired Goyal allegedly for revealing the enterprise's "conspiratorial practices" and, contrary to the interests of the enterprise as a whole, Goyal was "committed to commercializing the Technology."). Defendants raised these arguments for the first time in their reply brief; indeed, Defendants stated in their memorandum supporting their motion to dismiss that Plaintiffs' alleged association-in-fact enterprise should be limited to a subset of the alleged enterprise *including* Goyal. *See* Defs.' Mem. at 7. *See Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 665 (7th Cir. 2005) (Arguments raised for the first time in a reply brief are waived.). Even if Defendants had not waived this argument, Goyal's alleged change of heart is not inconsistent with the allegation that he previously played an integral role in the enterprise. *See* Am. Compl. ¶ 120.

10

decision-marking." *Richmond*, 52 F.3d at 644. According to Plaintiffs, Borys and Dunne "direct and control the enterprise, using their positions at GTI, IGT, and Endesco Services to facilitate the activities of the Enterprise." Am. Compl. ¶ 118. The allegations make no reference to any organization or hierarchy for decision-making of an enterprise composed of the corporate Defendants.[7] The court concludes Plaintiffs' allegations are sufficient to state a claim against an enterprise comprised of the individuals, while recognizing that the record might support other interpretations, as well.

### b. Purpose of the Alleged Association-In-Fact

Defendants contend that the association-in-fact's sole purpose is to commit the predicate acts. *See* Defs. Mem. at 8. Plaintiffs assert that the enterprise served several purposes separate from the predicate acts, contending that Defendants conducted the enterprise to, among other things, suppress the Technology's development. *See* Pls.' Opp'n at 9. According to Defendants, this is just another facet of the scheme to misappropriate research grant funds, indistinguishable from the predicate acts of fraud. *See* Motion to Dismiss at 10. By preventing the Technology from developing beyond the research stage, Defendants ensured a steady stream of research-grant money, the grist for the enterprise's scheme to defraud plaintiffs. *See* Am. Compl. ¶¶ 129, 234-35. If the Technology were, instead, commercialized, the research grants would necessarily cease and Cement-Lock Group (rather than Defendants) would reap the benefit from "commercial licensees and users." *See id.* ¶ 129.

Although an integral part of the alleged scheme to defraud Plaintiffs, Defendants' effort to suppress the Technology is distinct from the predicate acts of mail fraud, wire fraud and money

---

[7] Nor have Plaintiffs specifically argued that Cement-Lock Group itself is the enterprise operated by Defendants through a pattern of racketeering—an argument perhaps most consistent with the complaint's factual allegations. *Cf. Bachman*, 178 F.3d at 932 ("Each of the four corporations is an enterprise, . . . and Bear Stearns is not their employee[,] [b]ut Bear Stearns cannot be thought to have been conducting, or to have agreed to conduct, the affairs of any of these corporations through a pattern of racketeering activity.")

11

laundering. *Cf. Banco Del Atlantico, S.A. v. Stauder*, No. 03 CV 1342, 2005 WL 1925830 (S.D. Ind. Aug. 11, 2005) (concluding that the enterprise's goal of defrauding plaintiff was not meaningfully distinct from its asserted goal to profit from the fraud). As the Seventh Circuit explained in *United States v. Rogers*, the RICO plaintiff is not required to allege that the enterprise served some "purpose" unrelated to the pattern of racketeering activity. 89 F.3d 1326, 1337 (7th Cir. 1996) ("[I]t would be nonsensical to require proof that an enterprise had purposes or goals separate and apart from the pattern or racketeering activity."). In *United States v. Masters*, the Seventh Circuit held that a jury was properly instructed that the alleged enterprise must have "existed as an organization with a structure and goals separate from the predicate acts themselves." 924 F.2d 1362, 1367 (7th Cir. 1991). As the *Rogers* court later explained, however, this is no more than to say that an "enterprise" and a "pattern of racketeering activity" are distinct elements of a RICO claim. *See Rogers*, 89 F.3d at 1336–37; *see also Turkette*, 452 U.S. at 583 ("enterprise" and "pattern of racketeering activity" are distinct elements, though the proof to demonstrate each element may "coalesce"); *Jennings*, 910 F.2d at 1440 ("[A]lthough a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise . . . ."). Accordingly, a group of persons whose sole purpose is to commit a pattern of racketeering activity may satisfy the enterprise requirement, provided that the plaintiff establishes the necessary organization. *See, e.g., United States v. Korando*, 29 F.3d 1114, 1118 (7th Cir. 1994) (jury properly instructed that an enterprise "may be established by evidence showing an ongoing organization, formal or informal, and by evidence that the people making up the association functioned as a continuing unit."). Here, Plaintiffs have alleged an association-in-fact distinct from the predicate acts.

### c. Structure of the Alleged Association-in-Fact

A RICO plaintiff must allege a structured enterprise, but "there need not be much structure." *Richmond*, 52 F.3d at 645. "The continuity of an informal enterprise and the differentiation among

roles can provide the requisite 'structure' to prove the element of 'enterprise.'" *Rogers*, 89 F.3d at 1337. Plaintiffs allege a multi-tiered enterprise, with Defendants Borys and Dunne exercising ultimate control. *See* Am. Compl. ¶ 117–125. At Borys' and Dunne's direction, enterprise members Barone, Lau and Lee "manag[ed] the administrative details of grant requests, falsely grant[ed] internal approvals required to transfer money, fraudulently obtain[ed] and grant[ed] licenses relating to the Technology," and hid the existence of the enterprise from Plaintiffs. *Id.* ¶ 119. At the next tier, Goyal, Mensinger, and Rehmat executed the details of the scheme: "writing the actual grant proposals, doing whatever work was necessary to maintain the illusion that there was active development of the Technology, and writing the fraudulent final reports sent to the granting agencies." *Id.* ¶ 120. Finally, "various subcontractors and consultants" accepted grant money for little or no work, and in turn kicked back portions of that money to Barone and Lee.[8] *Id.* ¶ 121. According to Plaintiffs, these entities "helped hide the existence of the Enterprise by making it appear that grant money was being spent in legitimate ways." *See id.*

The structure of the alleged enterprise breaks down at the level of these "subcontractors and consultants," however. Although these entities were allegedly controlled by relatives of enterprise members Rehmat and Lee, Plaintiffs have not alleged that these entities were within the enterprise's chain-of-command. *Cf. Richmond*, 52 F.3d at 644 (A RICO enterprise is "organized in a manner amenable to hierarchical or consensual decision-making."). Nor did these entities share a common purpose with the other members of the alleged enterprise. *Cf. Turkette*, 452 U.S.

---

[8] In their reply brief, Defendants point out that the "various subcontractors and consultants" are not explicitly identified. *See* Defs.' Reply at 6. It is reasonably clear from the context of paragraph 121 that "various subcontractors and consultants" refers to ANE, EEM, Homatex, MTE, Wayne & Associates, Barone Consulting and RKC. *Compare* Am. Compl. ¶ 121 (alleging that these entities were controlled by "members of the Enterprise or relatives of members of the Enterprise"), *with id.* at ¶¶ 42–48 (identifying these entities as controlled by either Barone and Lee or relatives of Lee and Rehmat); *see also* Pls.'s Opp'n at 14 n.13 (stating that the "subcontractors and consultants" are, indeed, the named entities discussed elsewhere in the complaint). As discussed further in the text, however, the court concludes these "subcontractors and consultants" are not part of the RICO enterprise.

13

at 583 (An association-in-fact is "a group of persons associated together for a common purpose of engaging in a course of conduct."). As far as the Amended Complaint reveals, these entities sought only to profit through transactions with GTI, IGT and Endesco Clean Harbors. *See* Am. Compl. ¶¶ 121, 181-82. The effect of entering into those transaction may have been to disguise the enterprise, as Plaintiffs allege, but "an enterprise is defined by what it is and not by what it does." *Jennings*, 910 F.2d at 1440. Plaintiffs further allege that these entities kicked-back a portion of the proceeds of these transactions to enterprise members Barone and Lee. But again, Plaintiffs have not alleged that this arrangement benefitted the enterprise as a whole; indeed, it appears to have benefitted Barone and Lee exclusively. Excluding these entities, the court concludes that Plaintiffs have alleged a viable RICO enterprise consisting of the following individuals: Borys, Dunne, Lau, Lee, Barone, Goyal, Mensinger and Rehmat.

### 3. The "Conduct" Element

Defendants contend that the Amended Complaint fails to satisfy RICO's "conduct" element with respect to Defendant Lau. To satisfy this element, Plaintiffs must "allege that the defendant 'participated in the operation or management of the enterprise itself,' and that the defendant played 'some part in directing the enterprise's affairs." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998) (quoting *Reves*, 507 U.S. at 179). Both upper-management and "lower-rung participants in the enterprise who are under the direction of upper management" may be liable under the statute. *See MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 977 (7th Cir. 1995) (citation and internal quotations omitted). Within the association-in-fact enterprise, Plaintiffs allege that Lau executed certain aspects of the scheme to defraud Cement-Lock Group "under the direction" of Defendants Borys and Dunne. Am. Compl. ¶¶ 118-19. Defendants argue that this general allegation is undermined by the allegation that Lau was voted a member of Cement-Lock Group's operating board in March 2003, after Plaintiffs learned that Barone and Lee had been fired because they were suspected of embezzling money. *See id.* ¶¶ 28, 211. The fact

14

that Lau was elected to the board after aspects of the scheme were exposed does not, by itself, preclude Lau from playing some part in directing the enterprise's affairs: Plaintiffs allege that Defendants continued to defraud Plaintiffs through 2004. *See id.* ¶ 199–205.

Construing the Amended Complaint liberally, the court concludes that Plaintiffs have sufficiently alleged Lau's participation in the conduct of the enterprise's affairs. First, Lau participated in the fraudulent scheme to attract research grants. In April 2003, Lau executed, on Cement-Lock Group's behalf, an amendment to ECH's license that increased the amount of sediment that ECH was permitted to process using the Technology. *See id.* ¶ 200. Plaintiffs allege that Lau and others concealed this transaction from Plaintiffs, and that Cement-Lock Group never received the compensation it was ostensibly due in exchange for the amendment. *Id.* According to Plaintiffs, this sham transaction was an integral part of the scheme because expanding ECH's license "entice[d] funding agencies and companies into granting more money for the ostensible purpose of developing the Technology." *Id.* ¶ 178. In late 2003, after Lau joined Cement-Lock's board and after he surreptitiously expanded ECH's license, ECH received another grant from GRI for Cement-Lock Group's benefit. *Id.* ¶ 203. In other words, Lau picked up the scheme right where Lee, his predecessor on Cement-Lock Group's board, left off. *See id.* ¶ 199.

Second, Lau helped suppress the Technology by thwarting Unitel's efforts to develop a commercial facility in Taiwan.[9] In 2001, Cement-Lock Group, which at that time possessed all rights to the Technology, granted Unitel a license to use the Technology to process a specified amount of sediment anywhere in the world except Alabama, Taiwan, and Kuwait. *Id.* ¶¶ 102, 192. In 2003, hoping to capitalize on its contacts in Taiwan, Unitel sought to amend its license to permit it to develop the Technology in that country. *Id.* ¶¶ 220, 223. According to Plaintiffs, this was the

---

[9] Unitel is a company controlled by Sarabjit and Surjit Randhava, members of Plaintiff Cement-Lock, LLC and two of the three individuals who initially developed the Technology. Am. Compl. ¶ 71.

15

best opportunity yet to realize the Technology's commercial potential. *Id.* ¶ 220. Unitel at first succeeded in persuading a majority of Cement-Lock's board to approve the amendment, *see id.* ¶ 223, before Borys, Dunne and Lau interceded. *Id.* ¶ 224. Lau sent Randhava and Unitel a letter claiming that this amendment "violated [ECH's] current license." *Id.* ¶ 224. Plaintiffs further allege that Lau (together with Borys and Dunne) sent another letter that same day "claiming that this amendment [to Unitel's license] was invalid because of the December 10, 2001 change to Cement-Lock Group's operating agreement, which gave Endesco Services veto power over any sale or license of Cement-Lock Group's intellectual property for less than $10 million." *Id.*; *see also id.* ¶ 191. Plaintiffs allege that Lee executed the 2001 amendment without their consent, *see id.* ¶ 191, an amendment that Lau later attempted to use as a sword to thwart Unitel's attempt to develop the Technology in Taiwan.[10] The court concludes that Plaintiffs have sufficiently pleaded Lau's participation in the conduct of the enterprise's affairs.

**B.     Plaintiffs' § 1962(d) Allegations**

In *Cement-Lock I*, this court dismissed Count III of Plaintiffs' complaint, alleging that Defendants violated RICO § 1962(d), because Plaintiffs' complaint had not stated a substantive RICO claim under § 1962(c). *Cement-Lock I*, 2005 WL 2420374, *18 (citing *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000)). Here, Defendants contend in their opening brief that Count III of the Amended Complaint should be dismissed for the same reason. Defs.' Mem. at 2, n.1. As previously discussed, however, this court concludes that Plaintiffs have

---

[10]     As an alternative basis for dismissing Counts II and III against Lau, Defendants argue in their reply brief that Plaintiffs have failed to allege that Lau committed at least two predicate acts. As previously discussed, *see supra* note 6, arguments raised for the first time in a reply brief are waived. *Hess*, 423 F.3d at 665. Moreover, the court notes that in addition to the two alleged mailings in connection with Lau's opposition to expanding Unitel's license, *see* Am. Compl. ¶ 224, GTI's Corporate Administrator sent unanimous-written consent forms to Plaintiffs via the United States Mail "on behalf of GTI and Borys, Dunne, and Lau." *Id.* ¶ 205. Plaintiffs claim that these consents, ratifying the "acts and deeds of the Board of Managers of Cement-Lock Group" for the years 2001–2003, were "fraudulently obtained." *Id.*

16

sufficiently pleaded a substantive RICO violation. Although the court has determined that the alleged association-in-fact enterprise for the purpose of the § 1962(c) violation consists only of the individual Defendants, *see supra* Section 2(a), this does not require dismissal of the conspiracy charge against the corporate Defendants. To state a claim under § 1962(d), Plaintiffs must allege that "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Slaney v. Int'l Amateur Athletic Fed.*, 244 F.3d 580, 600 (7th Cir. 2001). This standard does not preclude that a defendant could conspire with the enterprise whether or not the defendant is a part of the association-in-fact enterprise. Here, Plaintiff has sufficiently alleged a conspiracy against all Defendants—both individual and corporate—by alleging that all Defendants "conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the Enterprise through a pattern of Racketeering activity," Am. Compl. ¶ 281, "engaged in numerous and continuous" predicate acts, *id.* ¶ 275, and "agreed to the commission of [predicate] acts to further" racketeering activity. *Id.* ¶ 282.

In their reply brief, Defendants also contend that the Amended Complaint insufficiently pleads an agreement by Defendant Lau to violate the RICO statute, and therefore Count III should be dismissed without regard to Plaintiffs' § 1962(c) claim. Defs.' Reply at 15–16. The Amended Complaint alleges that the "Defendants . . . agreed to directly and indirectly conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity." Am. Compl. ¶ 281. Defendants contend that this blanket statement is insufficient to allege an agreement by Lau to participate in the enterprise's affairs. Defs.' Opp'n at 21. Contrary to Defendants' suggestion, Plaintiffs need only plead that Lau "agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity," and that Lau also "agreed that someone would commit at least two predicate acts to accomplish those goals."

17

*Slaney*, 244 F.3d at 600. Plaintiffs specifically allege that Lau knew the enterprise existed and knowingly acted to further its objectives. Am. Compl. ¶¶ 119-20. Moreover, the Amended Complaint alleges that Lau personally performed at least two predicate acts under the direction of the enterprise's ringleaders, Defendants Borys and Dunne. *Id.* ¶¶ 118-19, 205, 224. This is more than "mere association" with the enterprise, *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 965 (7th Cir. 2000), and it is in stark contrast to the insufficient allegations in *Slaney*, where the alleged conspiracy hinged on a single transaction without "even a hint" that it was motivated by a desire to further the ends of the alleged enterprise. *Slaney*, 244 F.3d at 600; *see also Soranno v. New York Life Ins. Co.*, No. 96 C 7882, 2000 WL 748145, at *9 (N.D. Ill. May 31, 2000) (dismissing a § 1962(d) claim where the complaint did not contain "any facts indicating an act of agreement among the alleged conspirators as to an agreed upon goal or as to what roles the various defendants played in the conspiracy"). The court concludes that Plaintiffs have sufficiently pleaded a RICO conspiracy claim against all Defendants, including Defendant Lau.

**C.    Common Law Fraud Claims Against Defendant Lau**

Counts IV, V, and VI allege fraudulent concealment, fraudulent misrepresentation, and negligent misrepresentation, respectively, against all the Defendants, including Defendant Lau. With respect to Defendant Lau only, Defendants contend that Plaintiffs fail to allege justifiable reliance, *see* Defs.' Mem. at 18, an element of each claim. *See Board of Educ. of City of Chicago v. A,C & S, Inc.*, 131 Ill. 2d 428, 452, 546 N.E.2d 580, 591 (1989) (fraudulent and negligent misrepresentation); *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 707, 767 N.E. 2d 376, 384 (1st Dist. 2002) (fraudulent concealment).[11] Essentially, Defendants argue that Plaintiffs could

---

[11]    Citing this court's decision in *State Farm Mut. Auto. Ins. v. Abrams*, No. 96 C 6365, 2000 WL 574466, *16 (N.D. Ill. May 11, 2000), Defendants also contend that "justifiable reliance" is an element of the civil RICO claim predicated on mail fraud. *See* Defs.' Mem. at 19. Because the court concludes that Plaintiffs have sufficiently alleged "justifiable reliance," the court need not address whether Plaintiffs were required to do so. *Cf. Anza*, 126 S. Ct. at 2007 (Thomas, J.,
(continued...)

not have justifiably relied on representations made by Defendant Lau because, at the time Lau was appointed as a Cement-Lock Group manager, Plaintiffs were aware of active investigations into the conduct of former GTI employees Rehmat, Barone, and Lee. Defs.' Mem. at 19–21.[12]

As previously discussed, dismissal is appropriate only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley*, 355 U.S. at 45–46. Plaintiffs awareness that *other employees* were suspected of fraud involving Cement-Lock Group does not preclude their demonstrating justifiable reliance on representations made *by Lau*. *Cf. Quinn v. McGraw-Hill Companies, Inc.*, 168 F.3d 331, 336 (7th Cir. 1999) (no reasonable reliance as a matter of law where defendant explicitly alerted plaintiff to the risks of plaintiffs' investment, and plaintiff was independently aware of other, specific financial risks); *Weyerhaeuser Co. v. Edward Hines Lumber Co.*, No. 91 C 623, 1991 WL 169385, *3 (N.D. Ill. 1991) (no reliance on non-disclosure as a matter of law where only alleged opportunity to reveal information occurred after the contract at issue was executed). Presumably, Lau was voted to the board with the expectation that he would acquit his duties in a manner consistent with his fiduciary obligations. The fact that his predecessor on the board disregarded his own obligations does not somehow grant Lau carte blanche to do the same. Likewise, it would be premature at this stage of the litigation to accept Defendants' representations about the scope of Plaintiffs' access to Cement Lock Group's records. *See* Defs.' Mem. at 20–21. It is enough at this stage that Plaintiffs

---

[11](...continued)
concurring in part and dissenting in part) (concluding that RICO does not require that the plaintiff rely on the defendant's misrepresentations).

[12] The parties dispute the timing of Lau's election to the board. Plaintiffs insist that the proper date is January 30, 2003, when Cement-Lock Group's operating board voted to remove Lee and replace him with Lau. *See* Pls.' Opp'n at 16. Defendants maintain that the Lau joined the board on March 16, 2003, when Cement-Lock Group's managers ratified the operating board's earlier decision. *See* Defs.' Mem. at 16. But whether the proper date is in January or March of 2003 is irrelevant to Defendant's argument that as of January 30, 2003 Plaintiffs were aware of ongoing investigations into Barone's, Lee's and Rehmat's conduct. *See* Am. Compl. ¶¶ 211–212.

have alleged reliance on Lau's representations and omissions, without otherwise pleading themselves out of court.

## **CONCLUSION**

Defendants' motion to dismiss (64) is denied.

ENTER:

November 1, 2006

_____
REBECCA R. PALLMEYER
United States District Judge