**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CEMENT-LOCK, an Illinois limited liability company, and RICHARD MELL, an individual,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 05 C 0018** |
| **GAS TECHNOLOGY INSTITUTE, an Illinois corporation, INSTITUTE OF GAS TECHNOLOGY, an Illinois corporation, ENDESCO SERVICES, INC., an Illinois corporation, ENDESCO CLEAN HARBORS, LLC, an Illinois limited liability company, STANLEY S. BORYS, an individual, JAMES E. DUNNE, an individual, FRANCIS S. LAU, an individual, CEMENT-LOCK GROUP, LLC, a Delaware limited liability company and nominal defendant,** | ) ) ) ) ) ) ) ) ) ) ) ) ) | **Judge Rebecca Pallmeyer** |
| **Defendants.** | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

The "Cement-Lock" technology (hereinafter, "the Technology") at the heart of this litigation is a process by which contaminated wastes are used to make a decontaminated, beneficial cement additive. Cement-Lock Group, LLC ("CLG") was the owner of certain intellectual property and rights to the Cement-Lock Technology. This Technology, however, did not prove as profitable as its inventors hoped, and this lawsuit is the result. Plaintiffs Cement-Lock, LLC ("CL") and Richard Mell are Members of CLG who filed this derivative action on behalf of CLG, claiming that the Defendants' actions devalued CLG's intellectual property, harmed CLG's business reputation, and deprived CLG of opportunities to market and develop the Cement-Lock Technology. In their eleven-count Amended Complaint, Plaintiffs have named as Defendants a number of entities and individuals connected to the Cement-Lock Technology: Defendants Gas Technology Institute ("GTI"), Institute of Gas Technology ("IGT"), Endesco Services, Inc. ("ESI"), Endesco Clean

Harbors, LLC ("ECH"), Stanley S. Borys, James E. Dunne, Francis S. Lau, and nominal defendant Cement-Lock Group, LLC ("CLG"). Defendants now move to for summary judgment on Counts I through VIII of that Complaint, which allege that each Defendant violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c) & (d) (2000); committed common law breach of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, and negligent misrepresentation; and seek to recover unjust enrichment and an accounting. For the reasons explained here, Defendants' motion is granted in part and denied in part.

## BACKGROUND

### I.      The Parties

The Cement-Lock Technology is a process that takes contaminated wastes–such as dredged sediment–decontaminates those wastes, and converts the wastes into a beneficial cement additive. (Pls.' Resp. to Lau's 56.1 ¶ 7.) CLG owns the intellectual property rights to that process, including patents, trademarks, and service marks. The parties to this action have played various roles in attempting to develop and commercialize the Technology. The Plaintiffs are CL and Mell (together, the "Plaintiffs"). CL is a limited liability company whose members include Surjit Randhava ("Serge"), Sarabjit Randhava, Richard Kao, Wayne & Associates, and Jinnet Hemani. (Pls.' Resp. to Corps.' 56.1 ¶ 5.)[1]  Mell is a CLG Member as well as a Manager on CLG's Operating Board. (Pls.' Resp. to Lau's 56.1 ¶ 2.) At all relevant times, Mell was a Chicago Alderman. (Pls.' Resp. to Corps.' 56.1 ¶ 7.) Plaintiffs have brought this derivative action on behalf of nominal defendant CLG, a limited liability company, which ESI, CL, and Mell formed in 1997. (*Id.* ¶ 8.)

The Defendants in this action–GTI, IGT, ESI, ECH, Borys, Dunne, Lau, and CLG (together,

---

[1]      GTI, IGT, ESI, and ECH have submitted a joint Local Rule 56.1 statement and motion for summary judgment on behalf of the Corporate Defendants. Here, they will be referred to as the "Corps.' 56.1" and "Corps.' Mem."

the "Defendants")–are interrelated in significant ways. IGT is a not-for-profit entity based in Illinois that engages in natural gas research and related development projects. (Pls.' Resp. to Corps.' 56.1 ¶ 1.) Gas Research Institute ("GRI"), too, is a not-for-profit entity based in Illinois that engaged in natural gas research and related development projects. (*Id.* ¶ 2.) GRI's principal source of funding was derived from a surcharge imposed by the Federal Energy Regulatory Commission ("FERC") on the transport of natural gas through interstate pipelines and then transmitted to GRI. (*Id.*) GRI also ran programs unrelated to FERC and, as part of these programs, awarded almost $2 million in funding relating to the Cement-Lock Technology to GTI and almost $500,000 in funding relating to the Technology to ECH. (Defs.' Answers to Pls.' Initial Interrogs. at No. 5, Pls.' Ex. 23.) According to Defendants, in April 2000, IGT and GRI combined their boards of directors and elected common officers; from that point forward GRI continued to operate as an entity, but IGT operates distinctly from it. (*Id.* at No. 10; *see also* Pls.' Resp. to Corps.' 56.1 ¶ 2.) IGT now operates under the name GTI. (Pls.' Resp. to Corps.' 56.1 ¶ 2.)[2] There is no further information in the records regarding the structure or purpose of this combination.

ESI is a wholly-owned subsidiary of IGT. (*Id.* ¶ 1.) ECH is a Delaware LLC with a stated mission to "design, construct, and operate a 100,000 ton cement manufacturing facility to process contaminated harbor sediment from the New York/New Jersey harbor area using the proprietary Cement-Lock Technology of the Institute of Gas Technology." (*Id.* ¶ 3.) GRI International, LLC and ESI own ECH, and Plaintiffs contend that GRI holds debentures convertible to a 70% ownership interest in ECH. (*Id.*) Together, GTI, IGT, ESI, and ECH refer to themselves as the "Corporate Defendants."

The individual Defendants have served, variously, as officers or directors of the Corporate Defendants. Though Plaintiffs suggest that he held other titles as well, Borys served at least as

---

[2]     The names GTI and IGT will be used interchangeably in this opinion.

Senior Vice President of IGT until September 1, 1998; then as Executive Vice President of IGT until November 10, 1999; and as Executive Vice President and Chief Operating Officer of IGT after that. (Corps.' 56.1 ¶ 10.) Borys also served on ESI's Board of Directors beginning on November 8, 1999 and as ESI's President except between August 10, 2000 and March 22, 2001. (*Id.*) Finally, he served on the CLG Board of Managers from December 1, 1997 until July 1, 2004 and again beginning on January 5, 2005. (*Id.*) Though Plaintiffs suggest that he held other titles as well, Dunne served at least as Vice President for Administration and Secretary of IGT between 1997 and June 15, 2000 and as Vice President for Administration and Chief Financial Officer of IGT from June 15, 2000 through 2005. (*Id.* ¶ 11.) He ran the administrative section of IGT, which included its contracts division. (Defs.' Resp. to Pls.' 56.1 ¶ 36.) After 2001, all CLG licenses were supposed to be prepared by GTI's legal or contracts department, each of which were part of Dunne's Administrative Division. (*Id.* ¶ 42.) Dunne also served on the CLG Board of Managers and as its Secretary from February 6, 2002 until July 1, 2004 and again beginning on January 5, 2005. (Pls.' Resp. to Corps.' 56.1 ¶ 11.) Though Plaintiffs suggest that he held other titles as well, Mr. Lau was at least the Managing Director of IGT from 1997 until June 15, 2000; its Director until June 1, 2001; its Associate Director until December 1, 2003; its Executive Director until April 1, 2005; and then its Director through 2005. (*Id.* ¶ 12.) Mr. Lau first served on the CLG Board of Managers from January 30, 2003 until July 1, 2004 and again beginning on January 5, 2005. (*Id.*) He was President of CLG between March 17, 2003 and July 1, 2004. (*Id.*)

In addition, several other individuals played a significant role in the various entities. S. Peter Barone was President of ECH and Vice President of ESI from February 2002 until January 2003; he also worked for GRI and/or GTI from 1981 until January 2003. (Pls.' Resp. to Corps.' 56.1 ¶ 17.) Anthony Lee held the title of CLG President at IGT from February 2001 to January 2003; he was also an IGT employee from 1961 until January 2003 and was the project manager for certain Cement-Lock Technology subcontracts. (*Id.* ¶ 13.) Amirali Rehmat was a GTI employee

and the ECH President from March 1999 through January 2002; he was also the project manager for certain Cement-Lock Technology related subcontracts. (*Id.* ¶ 15.) There is no dispute among the parties to this action that, acting together, Barone, Lee, and Rehmat perpetrated a fraud related to the Cement-Lock Technology (the "BLR Fraud"). (Pls.' Opp'n 1; Corps.' Mem. 6; Borys' Mem. 2; Lau's Mem. 3; Dunne's Mem. 2.) Plaintiffs define the BLR Fraud as the "fraudulent and criminal conduct of Barone, Lee and Rehmat," which they claim benefitted the officers and employees through increased salaries and bonuses. (Pls.' Resp. to Corps.' 56.1 ¶ 38.) The GTI management learned of the BLR Fraud in October 2002. (Resp. to Lau's 56.1 ¶ 44.) Soon thereafter, in late 2002, GTI began an investigation into the BLR Fraud. (*Id.* ¶ 45.) In late 2002, GTI notified the FBI of the BLR Fraud. (*Id.* ¶ 46.) That fraud is the subject of another civil lawsuit pending in this court: *Gas Technology Institute v. Rehmat*, No. 05 C 2712. In addition, Barone, Lee, and Rehmat, as well as Zulfikar Rehmat and Minazali Rehmat, were indicted on September 5, 2007. *See* Indictment at 1*, United States v. Barone*, No. 07 CR 0574 (N.D. Ill. Sept. 5, 2007).

## II.     ECH Licenses and Promissory Notes

Plaintiffs' allegations against the Defendants in this action largely revolve around various licenses from CLG to ECH of the right to practice the Cement-Lock Technology. On December 1, 1997, Borys, on behalf of the CLG Operating Board, and Rehmat, on behalf of ECH, signed a License Agreement. (Defs.' Resp. to Pls.' 56.1 ¶ 3; Borys' Resp. to Pls.' 56.1 ¶ 3.) In it, CLG granted ECH a limited, royalty-free, exclusive license to practice the Technology in New York and New Jersey through construction and operation of a full-scale plant to demonstrate the effectiveness of the Technology. (*Id.*) The License permitted ECH to process a maximum of 100,000 tons per year of sediments and soils. (*Id.*) The License did not give ECH the right to grant sublicenses. (*Id.*)

Next, on August 25, 1999, Borys and Rehmat signed a License Agreement giving ECH the exclusive right to practice the Technology anywhere in the world, on any waste stream up to

600,000 tons per year. (Defs.' Resp. to Pls.' 56.1 ¶ 4.) The 1999 License also gave ECH the right to sublicense the Technology. (*Id.* ¶ 5.) The 1999 License purported to be royalty-bearing, though it contained no royalty rate and the parties dispute whether there was genuine intent from either party that ECH would make royalty payments. (*Id.*) It is undisputed, however, that ECH paid CLG $150,000 in consideration for the 1999 License. (*Id.* ¶ 6.) On September 27, 1999, $150,000 was wired into CLG's bank account and $111,209 was wired out of that account. (*Id.* ¶ 7.) The parties offer no further detail on those transactions. It is undisputed, however, that only GTI employees were the signatories to the CLG bank account, and the CLG bank account statements were sent only to GTI's office. (*Id.* ¶ 8.) Plaintiffs claim that they rarely, if ever, saw CLG bank account statements. (*Id.* ¶ 24)

Then, on February 2, 2001, Lee, on behalf of CLG, and Rehmat, on behalf of ECH, signed a License Agreement giving ECH the exclusive right to practice the Technology anywhere in the world, on any waste streams up to 1,100,000 tons per year. (Defs.' Resp. to Pls.' 56.1 ¶ 9; License Agreement at G053409, Pls.' Ex. 7.) ECH was not required to pay any royalties under the 2001 License, but enjoyed the right to sublicense the Technology. (*Id.* ¶ 9.) The 2001 License also significantly extended the date by which ECH was required to complete the demonstration plant. (*Id.*) In consideration for the 2001 License, ECH was to pay CLG $150,000. (*Id.* ¶ 10.) On May 25, 2001, $150,000 was wired into and out of CLG's bank account. (*Id.* ¶ 11.) Again, the parties offer no further detail on those transactions.

Meanwhile, CLG was incurring debt to IGT and ESI. According to IGT records, as of March 27, 2001, CLG owed IGT and ESI more than $200,000. (Defs.' Resp. to Pls.' 56.1 ¶ 12.) Plaintiffs claim that, as far as CL and Mell were told, the sum was owed because of patent protection costs and expenses. (*Id.* ¶ 13.) Defendants counter that the sum was owed at least in part because of work the companies did on CLG projects, and that Plaintiffs were told as much. In other words, the parties agree that IGT and ESI were charging CLG for certain services but

dispute whether CL or Mell was properly informed of these debts. (*Id.* ¶ 14; Borys' Resp. to Pls.' 56.1 ¶ 14.)

On April 1, 2001, ECH loaned CLG $100,000, and CLG executed a promissory note in that amount. (Defs.' Resp. to Pls.' 56.1 ¶ 15.) In the event of default CLG agreed to grant ECH "a non-exclusive, world wide royalty free license, with the right to sublicense, to the Cement Lock Technology for up to 500,000 tons per year of processing capacity in addition to the licensed processing capacity [ECH] then has a right to use." (Promissory Note ¶ 4, Pls.' Ex. 11.) According to CLG's designated corporate representative, as of April 1, 2001 CLG did not have any revenues other than those license fees from ECH. (O'Laughlin Dep. 97, Pls.' Ex. 12.) CLG eventually defaulted on the loan and therefore executed an amendment to the February 2001 license granting ECH an additional 500,000 tons of processing capacity. (Defs.' Resp. to Pls.' 56.1 ¶ 17.)

On April 1, 2002, ECH again loaned CLG $100,000 and CLG executed a second promissory note. (Defs.' Resp. to Pls.' 56.1 ¶ 18.) In the event of default on this $100,000 note, CLG agreed to grant ECH "a non-exclusive, world wide royalty free license, with the right to sublicense, to the Cement Lock Technology for up to 500,000 tons per year of processing capacity in addition to the licensed processing capacity [ECH] then has a right to use." (Promissory Note ¶ 4, Pls.' Ex. 14.) At that time, ECH's designated corporate representative testified that, as in April 2001, CLG did not have any licensing revenues other than those license fees from ECH. (Chromek Dep. 126, Pls.' Ex. 16.) CLG eventually defaulted on this loan, as well, and CLG therefore executed an amendment to the February 2001 license granting ECH an additional 500,000 tons of processing capacity. (Defs.' Resp. to Pls.' 56.1 ¶ 21.) The second Amendment clarified that the first 1,100,000 tons per year of process plant capacity would be exclusively licensed to ECH, while the remaining one million tons per year of process plant capacity would be subject to a non-exclusive license to ECH. (*Id.*) Lau signed this Amendment on behalf of CLG. (*Id.*)

ECH was able to parlay these licenses into researching funding. In total, the parties agree

that ECH received approximately $17 million in funding pursuant to research contracts with specific objectives related to the Cement-Lock Technology. (Defs.' Resp. to Pls.' 56.1 ¶ 33.) A May 1, 2003 e-mail from Dunne to Lau, Borys, and others explains that, as of that date, ECH and GTI had received $20.3 million in Cement-Lock contract funding from various sources, $2.9 million of which remained unspent. (*Id.* ¶ 47; E-mail from Dunne to Lau et al. of 5/1/03, Pls.' Ex. 39.) According to a March 2003 calculation, almost $3.5 million of this funding came from GRI, in the form of capital contributions and research contracts. (E-mail from Dunne to Lau et al. of 5/1/03, Pls.' Ex. 39.)

In April 2003, Dunne e-mailed Lau, asserting that "the ECH project is completely out of money we are paying bills with GTI money. This is not good." (E-mail from Dunne to Lau et al. of 4/24/03, Pls.' Ex. 87.) Dunne requested a proposal for the estimated costs cost to complete the project, so that money could be moved "into the FERC pot and subsequently into ECH to fund this work." (*Id.*) Lau submitted to GRI in May 2003 a Proposal in which ECH requested a total of $2,697,088 in additional funding. (Proposal, Pls.' Ex. 88.) In June 2003, GTI expressed its intent to seek from GRI approximately $500,000 "to manage and support the Cement Lock Demonstration plant in New Jersey." (E-mail from Vitalo to Dunne of 6/11/03, Pls.' Ex. 89.) Without fully explaining the mechanics of the scheme, Plaintiffs assert that this proposal was a "ruse" for GTI to reimburse GRI, a funder of the Cement-Lock Technology, for the BLR Fraud with GRI's own assets. (Pls.' 56.1 ¶ 110.) To support this theory, Plaintiffs cite to e-mail correspondence and meeting notes regarding this reimbursement of GRI's FERC program, from its non-FERC cash. (E-mail from Momot to Dunne et al. of 4/9/04, Pls.' Ex. 90; Meeting Notes of 4/15/04, Pls.' Ex. 91.) As the court understands their position, Plaintiffs claim that GRI paid its FERC program back by transferring money internally. Neither document draws any explicit connection to ECH's proposal. (*Id.*)

In July 1998, IGT submitted a Cement-Lock Technology Statement of Work to Brookhaven National Laboratory, which Borys signed on behalf of IGT. (Cement-Lock Technology TM Statement of Work, dated 7/97, Pls.' Ex. 25.) In February 1999, IGT submitted a Proposal to the Gas Research Institute, which Borys again signed on behalf of IGT. (Proposal, Pls.' Ex. 26.) In June 1999, IGT submitted a Proposal to the Michigan Department of Environmental Quality surface Water Quality Division, which Borys signed on behalf of IGT. (Proposal, Pls.' Ex. 27.) In December 1999, IGT submitted a Proposal to Brookhaven National Laboratory, which Borys signed on behalf of IGT. (Proposal, Pls.' Ex. 28.) In September 2001 and again in September 2003, Gas Research Institute and IGT entered into a Contract for Research, each of which Dunne signed on behalf of IGT. (Contract, Pls.' Ex. 29; Contract, Pls.' Ex. 30.)

The parties dispute whether GTI had any right to practice the Cement-Lock Technology, but it is agreed that IGT never entered into a written license agreement with CLG. (Defs.' Resp. to Pls.' 56.1 ¶ 34.) They agree, however, that in total, GTI secured over $6 million in connection with research and development contracts relating to the Cement-Lock Technology and entered into subcontracts with ESI related to the Cement-Lock Technology. (*Id.*) Plaintiffs assert that IGT thus misappropriated CLG's rights to the Technology for its own purposes; Defendants counter that the fundraising and subcontracts furthered ECH's rights to the Technology. (*Id.*)

## IV.     Unitel License

Plaintiffs also argue that the exclusive license which ECH eventually precluded other–potentially profitable–licenses CLG could have issued. In an April 18, 2003 memorandum to the CLG Board, Lau reported that the exclusive license CLG had granted ECH appeared to conflict with later, non-exclusive licenses granted by CLG to other entities, though the parties do not specify to whom. (Defs.' Resp. to Pls.' 56.1 ¶ 45.) The CLG Board made no decision regarding whether ECH's license was exclusive and therefore in conflict with later licenses granted by CLG.

(O'Laughlin Dep. 228-29, Pls.' Ex. 12.) The CLG Operating Board did, however, terminate existing Tefes Pure Tech and RenuTech licenses. (*Id.*) Soon after, the question of whether ECH's exclusive license rights barred CLG from awarding licenses to other entities became significant.

CLG and Unitel Technologies, Inc. ("Unitel") had previously entered into an agreement, dated December 3, 2001, which allowed Unitel to practice the Cement-Lock Technology throughout the world, except for in the State of Alabama, USA; Taiwan; and Kuwait. (License Agreement, Pls.' Ex. 78.) That contract was royalty-bearing. (Defs.' Resp. to Pls.' 56.1 ¶ 90.) On September 5, 2003, Serge sent Lau and Borys a fax on Unitel letterhead, asking Lau to delete the Taiwan restriction on Unitel's license. (Fax from Serge to Borys of 9/5/03 & Fax from Serge to Lau of 9/5/03, Pls.' Ex. 77.) In the letter itself, Serge provided no explanation for the request, but Plaintiffs contend that this was an "enormous revenue-generating possibility" for CLG. (Defs.' Resp. to Pls.' 56.1 ¶ 89.) No one requested additional information from Serge regarding the license or his contact in Taiwan. (Pls.' Resp. to Corps.' 56.1 ¶ 68; Defs. Resp. to Pls.' 56.1 ¶ 89.) Serge has estimated that the opportunity in Taiwan would involve the processing of more than five million tons of sediments and other wastes per year. (Randhava Aff. ¶ 30, Pls.' Ex. 1.)[3]

Nevertheless, on September 26, 2003, Borys, Lau, Dunne, and Mell all communicated to Serge, denying his request for expansion of Unitel's license. (Defs.' Resp. to Pls.' 56.1 ¶ 91.) Borys, Lau, and Dunne explained that this denial was based on concerns about conflict with the ECH license. (Letter from Lau to Serge of 9/26/03; Letter from Borys, Lau, and Dunne to Serge of 9/26/03; & Letter from Mell to Serge of 9/26/03, Pls.' Ex. 79.) In one letter, dated September 26, 2003, Lau, writing on ECH letterhead, identified the "clear conflict" between Unitel's license and

---

[3]     Defendants respond that they were not made aware of the scope of the opportunity or of the fact that it would have been revenue-generating. (Defs.' Resp. to Pls.' 56.1 ¶ 89.) Defendants also point out that Plaintiffs have failed to point to more detail regarding the project, and therefore question Serge's representation that Unitel had an "actual opportunity" in Taiwan. (*Id.*) But they do not point to any evidence, so the affidavit submitted by Plaintiffs is unrebutted.

ECH's "worldwide royalty free exclusive rights for 1,100,000 tons per year." (Letter from Lau to Serge of 9/26/03, Pls.' Ex. 79.) In a letter to Serge withdrawing his approval, Mell cited the ECH conflict as well as the failure to consider consolidation of intellectual property rights. (Letter from Mell to Serge of 9/26/03, Pls.' Ex. 79.) Mell has testified, however, that Borys wrote that letter. (Mell Dep. 306, Pls.' Ex. 80.) He further testified that the actual reason he refused to approve the license was that Serge and Ravi Randhava, Unitel's President, were under investigation by the FBI, and he was concerned that CLG not get caught up in any illegal activity. (*Id.* at 305-306.)

## V.    Equipment

On December 1, 1997–also the date of the first ECH-CLG subcontract–GRI agreed in a Purchase Agreement with ECH to invest $4.5 million "for the costs involved in the formation of" ECH, a company formed to "design, construct and operate a 100,000 ton cement manufacturing facility." which will process contaminated harbor sediment . . . using the proprietary cement-lock technology of the Institute of Gas Technology." (Defs.' Resp. to Pls.' 56.1; Purchase Agreement at Recitals Paragraph, Pls.' Ex. 74.) Barone testified that the contract specified that the $4.5 million could only be used to purchase equipment. (Barone Dep. 302, Pls.' Ex. 83.) Neither party points to a contractual provision specifying this restriction. In any case, it is clear that not all of the $4.5 million investment was spent on equipment: approximately $1.1 million was subcontracted to ESI, IGT, and Homatex. (E-mail from F. Vitalo to J. Dunne of 3/11/98, Pls.' Ex. 82.)

In fact, Plaintiffs have suggested that the purchase of inadequate equipment crippled the Cement-Lock Technology. Richard Kao testified that the demonstration plant was built incorrectly. (Kao Dep. 67, Pls.' Ex. 84.) GTI opted to use a less-expensive used kiln, which Kao estimated was ten to twenty years old. (*Id.* at 67-69.) In addition, it was a non-slagging kiln–that is, it could not be run at very high temperatures and was therefore less effective than a slagging kiln. (*Id.* at 67; Douglas Dep. 220-221, Defs.' Resp. Ex. 49.) According to Kao, using this improper equipment undermined attempts to commercialize the Technology. (Kao Dep. 67-68, Pls.' Ex. 84.)

Defendants dispute the impetus for purchasing the used, non-slagging kiln but do not dispute that it "could not sustain continuous production to meet the specified tonnage." (Defs.' Resp. to Pls.' 56.1 ¶ 99.)

**VI.      Procedural History**

Plaintiffs have brought this derivative action to enforce the rights of the company. *See* FED. R. CIV. P. 23.1. In that capacity, they have filed eleven claims against Defendants. In *Cement-Lock I,* the court granted Defendants' motion to dismiss Counts II and III of Plaintiffs' original complaint for failing to state a claim under RICO, 18 U.S.C.A. § 1962(c) & (d). *See Cement-Lock v. Gas Tech. Inst.*, No. 05 C 0018, 2005 WL 2420374, *23 (N.D. Ill. Sept. 30, 2005). Plaintiffs re-alleged their RICO claims in an Amended Complaint, filed November 30, 2005. In *Cement-Lock II*, the court denied Defendants' motion to dismiss the Plaintiffs' re-articulated RICO claims as well as Count IV (fraudulent concealment), Count V (fraudulent misrepresentation), and Count VI (negligent misrepresentation) against Lau. *Cement-Lock LLC v. Gas Tech. Inst.*, No. 05 C 00018, 2006 WL 3147700, *11 (N.D. Ill. Nov. 1, 2006). Defendants have now moved for summary judgment on eight of Plaintiffs' claims, each of which is asserted against all of the named Defendants: Count I (breach of fiduciary duty); Count II (RICO); Count III (RICO conspiracy); Count IV (fraudulent concealment); Count V (fraudulent misrepresentation); Count VI (negligent misrepresentation); Count VII (unjust enrichment); and Count VIII (accounting). For the reasons explained below, Defendants motion is granted with regard to Count VII as to all Defendants and denied as to Counts I-IV and VIII with regard to all Defendants. With regard to Counts V and VI, the motion is granted with regard to Lau and denied as to Borys, Dunne, and the Corporate Defendants. Defendants have not moved for summary judgment on Count IX (trademark infringement, asserted against GTI, IGT, ESI, and ECH), Count X (unfair competition, asserted against GTI, IGT, ESI, and ECH), or Count XI (deceptive trade practices, asserted against GTI, IGT, ESI, and ECH), and the court therefore does not consider those claims.

12

## DISCUSSION

### I.  Jurisdiction

The court has federal question jurisdiction over this civil action because there are claims arising under section 1964 of RICO, 28 U.S.C. §§ 1331, and under the United States Trademark Act, 15 U.S.C. §§ 1501 *et seq.*  15 U.S.C. § 1121(a); 28 U.S.C. § 1338(a).  The court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 and 28 U.S.C. § 1338(b).

### II.  Legal Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Summary judgment is not appropriate if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  As the moving parties, the Defendants bear the initial burden of proving that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 651 (7th Cir. 2007).  The Plaintiffs retain the burden of producing evidence sufficient to support a reasonable jury verdict in their favor. *Id.*

Under this court's Local Rule 56.1, Defendants were required to serve and file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law. . . ." L.R. 56.1(a)(3).  In response to such a statement, Local Rule 56.1(b)(3)(B) requires Plaintiffs to serve and file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon . . . ."  Thus, Plaintiffs were required to deny with particularity, and citation to the record of the case, any factual allegations that they dispute.  "An answer that does not deny the allegations in

13

the numbered paragraph with citations to supporting evidence in the record constitutes an admission." *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000) (quoting McGuire v. United Parcel Serv., 152 F.3d 673, 675 (7th Cir. 1998)). Accordingly, the court will accept as true any properly-supported factual allegations in Defendants' 56.1(a) statements of material fact that are not rebutted with citation to the factual record of the case. *Michas*, 209 F.3d at 689; *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (holding that party failing to comply with Local Rules has admitted the uncontroverted facts in moving party's Local Rule 56.1(a) submission). For example, where a stated fact is based on an accurate characterization of deposition testimony, and Plaintiffs provide no contrary evidence, the court will accept that statement as true. The court will, however, view all of the facts in the light most favorable to Plaintiffs, as the non-moving parties. *Michas*, 209 F.3d at 689.

## III.    Standing

Plaintiffs have brought their claims as a derivative action, rather than in their individual capacities. Rule 23.1 permits members of a company to bring a derivative action to enforce the rights of that company. "The derivative form of action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties. Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (internal quotation marks and citation omitted). There appears to be no dispute in this proceeding that CLG owned rights to license the Cement-Lock Technology, as well as various intellectual property rights in the Cement-Lock Technology. In this derivative action, Plaintiffs contend that the members and managers of CLG misappropriated research grants and funding, which precluded development of the Technology and ultimately devalued it and the associated intellectual property rights, injured CLG's business reputation, and wasted corporate opportunities.

14

(Pls.' Opp'n 23.)   More specifically, Plaintiffs argue that steering research funds to entities other than CLG; actively suppressing development of the technology to avoid triggering the obligation to repay GRI; granting expansive licenses to ECH, and particularly the exclusive license; and purchasing inadequate equipment for the demonstration plant are compensable injuries.  (Pls.' Opp'n 24.)[4]  On this basis, Plaintiffs do have standing, as the court explained in *Cement-Lock I*, 2005 WL 2420374, at *13-16.

## IV.     Substantive Claims

In this case, Plaintiffs claim that the Defendants' misconduct consists of "false promises, self-dealing, and suppression of the Cement-Lock Technology."  (Pls.' Opp'n 1.)  Plaintiffs seek to remedy what they consider to be a fraud, as a part of which the Defendants allegedly collected $25 million to develop the Technology but failed to fund CLG or develop the Technology as promised, thereby rendering it worthless.  (Pls.' Opp'n 1.)  The court will consider each of Plaintiffs derivative claims in turn.

### A.     Count I (breach of fiduciary duty)

The individual Defendants allege that Delaware law applies to this claim, and Plaintiffs also analyze the claims under Delaware law.  (Lau's Mem. 10; Dunne's Mem. 10; Borys' Mem. 10-12; Pls.' Resp., 34-35.)  The court is less certain, in light of the choice of law provision dictating that the agreement be construed under Illinois law (CLG Operating Agreement §13.10, Corps.' Ex. 47), but for purposes of this motion will accept the parties' agreement.  Under Delaware law, the actions of a director are protected by the business judgment rule unless a plaintiff proves that the director

---

[4]       Plaintiffs' proffered expert, Ron Vollmar asserts that the CLG Technology has no value, but his conclusion in this regard is largely unsupported.  For purposes of this decision, the court declines to consider that conclusion.  Nor will the court entertain, at this state, Plaintiffs' speculative argument that because the patent life is more than half-expired, potential licensees will wait until the patents expire to license the Technology.  It is Plaintiff's allegations of lost business opportunities, such as the Unitel license, and harm to its business reputation, that constitute injuries supporting standing in this case.

breached her fiduciary duty of loyalty, good faith, or due care.  *McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000).

In addition, Delaware law permits a limited liability company agreement to expand, restrict, or eliminate a manager's or member's duties, with certain exceptions not relevant in this case.  DEL. CODE ANN. tit. 6 § 18-1101.  Apparently pursuant to this law, the CLG Operating Agreement contains a Limitation on Liability Clause:

> A Manager shall perform his duties as a member of the Operating Board in good faith, in a manner he reasonably believes to be in the best interest of the Company and the Members, and with similar care as an ordinarily prudent person in a like position would use under such circumstances.  A person who so performs his duties shall not have any liability by reason of being or having been a Manager of the Company.  The Operating Board shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member for any action taken or failure to act on behalf of the Company within the scope of authority conferred on the Operating Board under this Agreement or the Act, except where the claim at issue is based on the fraud, gross negligence or bad faith of the Operating Board.

(CLG Operating Agreement § 5.3, Corps.' Ex. 47.)  The CLG Operating Agreement also defines Managers to include Members of the Operating Board as well as any successors or additional Members.  (*Id.* § 1.15, Corps.' Ex. 47.)  Thus, the CLG Operating Agreement makes explicit that Members (and therefore Managers) are liable for any fraud, gross negligence, or bad faith.  It also imposes on Managers an affirmative duty of good faith and care.  Finally, moreover, the duty to act in the best interest of the Company, articulated in § 5.3, constitutes the managers' duty of loyalty.  *See Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (1993), *modified on reh'g on other grounds*, 636 A.2d 956 (Del. 1994) ("the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally").  Thus, each Defendant had fiduciary duties to CLG during his tenure as a Member or Manager of the company.

The court will first consider the categories of conduct Plaintiffs claim violate those fiduciary duties generally, before turning to the question of whether particular Defendants can be held liable

for those actions.

### 1. Alleged Improper Conduct

*Self-dealing:* There appears to be no dispute that GTI and ESI employees charged employee time to CLG when they performed work for CLG. (Defs.' Resp. to Pls.' 56.1 ¶¶ 14, 26, 27.) Defendants contend that these charges were proper, authorized, and disclosed. (*Id.* ¶ 28.) Plaintiffs argue that, since ECH was the only source of CLG's revenue, CLG could not pay from any other source, which resulted in CLG being forced to accept unfavorable contracts with ECH. (Pls.' Opp'n 4-5.) For example, CLG granted an exclusive license to ECH, and lost the opportunity to license the Technology to other entities until ECH's processing rights were exhausted. (*Id.* at 6.) And because ECH was not able to process 30,000 tons of waste at its demonstration plant (Defs.' Resp. to Pls' 56.1 ¶ 46), granting ECH an exclusive license on the first 1,100,000 tons of processing capacity effectively precluded CLG from licensing to others. (Pls.' Opp'n 6.) Finally, Plaintiffs contend that these actions were undertaken to ensure that ECH, ESI, and GTI would receive a continuous stream of research contract revenue. (*Id.*)

*Misappropriation of intellectual property:* Plaintiffs contend that Defendants permitted GTI to secure funding for the Technology despite knowledge that GTI had no license to use the funding, and then kept that funding a secret from CLG. (Pls.' Opp'n 8-9.) There is no dispute that GTI had no written license for the Technology, and Plaintiffs have raised a genuine issue of material fact as to the question of whether it was improper for GTI to seek out and receive funding in connection with the Cement-Lock Technology. There is also a genuine issue of material fact as to whether GTI misrepresented itself as the owner of the Cement-Lock Technology. (Defs.' Resp. to Pls.' 56.1 ¶ 57.) For example, Plaintiffs point to a 1999 Proposal, signed by Borys, in which IGT represents that it "has developed the Cement-Lock™ Technology." (Proposal at G018470, Pls.' Ex. 27.) In addition, Plaintiffs have provided evidence that ECH and IGT sought to commercialize the Technology without referencing CLG's rights in that Technology. (Defs.' Resp. to Pls.' 56.1

¶ 57.)

***Internal controls:*** Next, Plaintiffs argue that Defendants failed to implement internal controls, which laid the groundwork for the BLR Fraud and hindered detection of that fraud. (Pls.' Opp'n 9-11.) Delaware courts have grappled with the question of what internal controls a board must implement "with respect to the organization and monitoring of the enterprise to assure that the corporation functions within the law to achieve its purposes." *In re Caremark Int'l*, 698 A.2d 959, 969 (Del. Ch. 1996). The *Caremark* court concluded that "a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards." *Id.* at 970; *see Stone v. Ritter*, 911 A.2d 362, 365 (Del. 2006) ("*Caremark* articulates the necessary conditions for assessing director oversight liability"). Meeting the *Caremark* standard for liability is no easy task, as "the [*Caremark*] decision premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs." *Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 506 (Del. Ch. 2003); *see also Buckley v. O'Hanlon*, C.A. No. 04-955 (GMS), 2007 WL 956947, at *5 (D. Del. March 28, 2007) (holding that officers and directors may not "consciously disregard visible 'red flags' "or otherwise act with gross negligence). Under this standard, Defendants are liable not only if they were aware of the BLR fraud but also if they should have been aware of it.

Here, Plaintiffs note that the failure of internal controls allowed Cement-Lock funding to be siphoned away in the BLR fraud, which indirectly benefitted the individual Defendants through increased salaries and bonuses. (Pls.' Opp'n 11.) In support, Plaintiffs point to the expert opinion of Ronald Vollmar that there were insufficient internal controls set up by the Defendants. (*Id.* at 10.) An expert conclusion regarding internal controls may not, alone, be enough to defeat summary judgment, but in this case the expert has provided "evidence of the factual basis for his

conclusion," *see Vollmert v. Wis. DOT*, 197 F.3d 293, 299-300 (7th Cir. 1999), including particular incidents and applicable business standards, rather than merely a bare conclusion. (Expert Report of Ronald G. Vollmar, dated 3/23/07, Pls.' Ex. 81.)[5]  The court deems Vollmar's opinion sufficient to permit Plaintiffs' internal-controls theory to survive summary judgment.

*Willful suppression:* In addition, Plaintiffs suggest that Defendants purposefully suppressed development of the Cement-Lock Technology. (Pls.' Opp'n 12.)  Plaintiffs claim that Defendants orchestrated a contractual arrangement with ECH that encouraged suppression of the Cement-Lock Technology by delaying ECH's obligation to repay the funding it received from GRI until "Plant Startup." (Defs.' Resp. to Pls.' 56.1 ¶ 87.)  This contract term is undisputed, and could lead a jury to conclude that Defendants created incentives to stall or delay efforts to commercialize the Cement-Lock Technology, which was CLG's asset.  Likewise, the jury could conclude that ECH's purchase of a used, non-slagging kiln suppressed development of the Cement-Lock Technology. (*See* Kao Dep. 67-69, Pls.' Ex. 84.)

*Unitel license:* Plaintiffs argue that Defendants subordinated CLG's interests to those of ECH in 2003, by refusing to expand Unitel's royalty-bearing license. (Pls.' Opp'n 13.)  There is no dispute that, at least overtly, this refusal was predicated on the conflict it would create with ECH's exclusive license. (Letter from Lau to Serge of 9/26/03; Letter from Borys, Lau, & Dunne to Serge of 9/26/03; Letter from Mell to Serge of 9/26/03, Pls.' Ex. 79.)  There is also no dispute that the

---

[5]     Vollmar considers that: (1) At GTI, it was "not unusual" for one person to request a purchase order and then approve it; (2) Rehmat repeatedly signed purchasing requests as project manager and approved them as President of ECH; (3) Barone signed a proposal on behalf of GTI and then submitted it to himself to review on behalf of GRI; (4) Lee submitted purchase requisitions to Dunne, who was also the head of the Contracts Department; (5) Subcontractors' proposals and invoices were never audited; (6) GTI sometimes paid invoices with no second signature approval, or even with no approval at all; (7) There was not a sufficient segregation of duties; and (8) Review of contractors was cursory at best. (Expert Report of Ronald G. Vollmar, dated 3/23/07, at 13-14, Pls.' Ex. 81.)  Vollmar analyzes these facts based on the American Institute of Certified Public Accountants' Statement on Auditing Standards; the Committee of Sponsoring Organizations' statement regarding internal controls; and the Association of Certified Fraud Examiners' Fraud Manual. (*Id.*)

Unitel license was royalty-bearing (Defs.' Resp. to Pls.' 56.1 ¶ 90,) while the 2001 ECH License was not. (*Id.* ¶ 9.) Thus, licensing Unitel in Taiwan, where there were arguably significant processing opportunities (Randhava Aff. ¶ 30, Pls.' Ex. 1), might have generated revenue to CLG. Although there is no evidence that the individual Defendants were told how much processing capacity and profit might result from expanding the Unitel license (Defs.' Resp. to Pls.' 56.1 ¶ 89), a reasonable jury could conclude that they breached fiduciary duties simply by failing to seek out that information. In addition, according to Mell, Borys told him that Serge and Ravi were under investigation by the FBI, which was the true motivation for his decision to withdraw his approval. (Mell Dep. 305-306, Pls.' Ex. 80.) Mell claims that he "didn't want to . . . be part of anything that could have been not in compliance with the law." (*Id.* at 306.) Plaintiffs believe this testimony creates a dispute of fact as to whether Defendants induced Mell to withdraw his support based on extraneous circumstances.[6]

_____

[6] As a matter of law, however, certain conduct to which Plaintiffs point cannot constitute a breach of fiduciary duty. For example, Plaintiffs claim that Defendants secured funding related to the Cement-Lock Technology for themselves, in violation of a handwritten note. In September 1997, Borys, as President of ESI; Serge, on behalf of CL; and Mell met to discuss formation of CLG. (Defs.' Resp. to Pls.' 56.1 ¶ 1.) Borys, Serge, and Mell signed a handwritten memorandum, which dictates a "45/45/10 split on all revenues" and that ownership would be allocated 51% to ENDESCO, 39% to Serge, and 10% to Mell. (*Id.* ¶ 2; Corps.' Ex. 49.) According to Plaintiffs, the reference to "revenues" includes and refers to funding received to commercialize and develop the Cement-Lock Technology. (*Id.* ¶ 2.) Notably, however, the CLG Operating Agreement, which was executed on December 1, 1997, does not allocate revenue; instead, it provides that, once each Member's profits equal their losses, the balance of profits (or revenues less expenditures) shall be allocated 45% to ENDESCO; 45% to CL, and 10% to Mell. (CLG Operating Agreement § 4.2(a), Corps.' Ex. 47.)

The language of an unambiguous contract "speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291, 186 N.E.2d 285 (1962)). Even beyond this basic principle of contract interpretation, the CLG Operating Agreement contains an integration clause (CLG Operating Agreement § 13.5, Corps.' Ex. 47), which renders the September 1997 note irrelevant. *In re Kmart Corporation,* 434 F.3d 536, 541 (7th Cir. 2006) (where contract contains an integration clause, words exchanged before the contract was signed, even when reduced to writing, do not govern the relationship between the parties). The CLG Operating Agreement's integration clause reinforces the parties' intention that contract language alone govern
(continued...)

## 2.    Liability of Defendants

The court turns, then, to the question of which of the Defendants may be liable for the wrongdoing.

### a.    Corporate Defendants

#### i.    ESI

There appears to be no dispute that ESI, as a CLG Member, owed CLG fiduciary duties. (Corps.' Mem. 17.)   Neither IGT nor ECH, on the other hand, was a Member of CLG.  Thus, they only owe CLG fiduciary duties if the corporate veil is pierced.

*IGT:* ESI is a wholly-owned subsidiary of IGT (Pls.' Resp. to Corps.' 56.1 ¶ 1), so IGT would owe CLG fiduciary duties only if it is appropriate to pierce the corporate veil between ESI and its parent.   Because ESI is an Illinois corporation, the law of Illinois governs whether to pierce its corporate veil.  *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996). Under Illinois law, the corporate veil is pierced if a two-part test is satisfied: "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual or other corporation no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice."  *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 520 (7th Cir. 1991) (quoting *Van Dorn Co. v. Future Chem. and Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985)) (internal punctuation and other citations omitted).   To decide whether there is a unity of interest and ownership, Illinois law focuses "on four factors: '(1) the failure to maintain adequate corporate

---

[6](...continued)
their dealings.  *Air Safety*, 185 Ill. 2d at 464, 706 N.E.2d at 885 ("where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence").   Plaintiffs' argument that the note evidences that Plaintiffs were to have an "equal role in the development of the Technology," (Pls.' Opp'n 8 n.7), is thus unfounded.  The CLG Operating Agreement did not include a clause directing the distribution of revenues, and the court will not create one.

records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own.'" *Sea-Land*, 941 F.2d at 521, quoting *Van Dorn*, 753 F.2d at 570 (citations omitted).

The mere fact that ESI is a subsidiary of IGT is not sufficient to meet the test for piercing. As a general rule, "a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citation omitted). In fact, "the exercise of the control which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary. That control includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal." *Id.* at 61-62 (internal quotation marks and citation omitted). Under this rationale, the fact that IGT performed billing, accounting, and personnel functions for ESI, including maintaining ESI's financial records and accounting entries (Defs.' Resp. to Pls.' 56.1 ¶ 100), and that the entities had several officers in common (*id.* ¶ 102), is not in and of itself a basis for piercing. *See also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 476 F. Supp. 2d 913, 934 (N.D. Ill. 2007) (refusing to pierce corporate veil where parent and subsidiary shared oversight and day-to-day functions because this is common practice).

Still, in order for the law to recognize a subsidiary as a separate corporate entity, the subsidiary must maintain some independence. On this score, Defendants emphasize the testimony of Kenneth Wicherek, who conducted the financial matters of ESI, that IGT and ESI kept separate accounting entries, tax returns, financial statements, corporate record books, board minutes, and operating agreements. (Pls.' Resp. to Corps.' 56.1 ¶ 4.) On the other hand, while Wicherek also attests that ESI did not have joint board meetings with ECH or IGT (*id.* 56.1 ¶ 4), there is in fact no evidence that ESI held any board meetings whatsoever. The only relevant testimony provided to

the court was from Barone, who was "never aware of any board meetings." (Barone Dep. 286, Ex. H to Pls.' Resp. to Corps.' 56.1.)  In addition, Borys signed CLG Unanimous Written Consents under the IGT name, thought it was ESI rather than IGT who was a CLG Member.  (Defs.' Resp. to Pls.' 56.1 ¶ 103.)  In other words, there is a dispute of fact as to whether corporate formalities were observed.

Plaintiffs also contend that ESI was "thinly capitalized." (Pls.' 56.1 ¶ 101.)  The financial documents on which they rely show that ESI's liabilities were greater than its assets in August 1999, and several times greater than its assets in July 2000 and August 2000.  (ESI Financials, Pls.' Ex. 85.)  By December 2003, ESI's assets were far greater than its liabilities, but the balance sheets provided to the court do not explain this turn-around.  Defendants claim that capital contributions from GTI kept ESI running and were reflected in its financial records.  (*See* Defs.' Resp. to Pls.' 56.1 ¶ 101.)  At this stage, this evidence, and the utter lack of documentation–all within ESI's control–of any corporate formalities maintained, suggests Plaintiffs will be able to show a unity of interest and ownership.

Thus, the court must ask whether the corporate form was "misused to accomplish certain wrongful purposes, most notably fraud," on behalf of the corporations' owners. *Bestfoods*, 524 U.S. at 62.  Plaintiffs argue that ESI was intended to insulate GTI from fiduciary obligations to CLG and thereby enable the corporation to direct funding to other entities.  (Pls.' Opp'n 27-8.)  More specifically, GTI directed Cement-Lock funding to itself or to ECH so that ESI, a fiduciary of CLG, would never be under a duty to disclose that funding.  A reasonable fact-finder could conclude that CLG operated ESI as a sham in this way.   Accordingly, the jury is entitled to consider whether ESI's corporate veil should be pierced.

### ii.    ECH

ECH is a Delaware limited liability company owned by GRI and IGT.  (Pls.' Resp. to Corps.' 56.1 ¶ 3.)  Under the law of Delaware, which governs the issue as to ECH, *Stromberg*, 77 F.3d at

933, Plaintiffs must present facts "supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003); *see also Mason v. Network of Wilmington, Inc.*, No. 19434-NC, 2005 Del. Ch. LEXIS 99, at *10-11 (Del. Ch. July 1, 2005) (piercing the corporate veil is only appropriate where "the corporation . . . is] a sham and exist[s] for no other purpose than as a vehicle for fraud") (citation omitted); *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."). In other words, the purpose of the entity must be to defraud. Some authority suggests, further, that the fact that corporate formalities were not observed may not be as significant for purposes of piercing the corporate veil of an LLC as it is for a corporation:

> it seems unlikely that failure to comply with statutory formalities will be a problem for many limited liability companies, since the state statutes impose few formal requirements on LLCs as compared to business corporations . . . . Nonetheless, veil-piercing may be necessary where an LLC is grossly undercapitalized at the time of formation. The theory may also apply, for example, when actual fraud has occurred, when LLC assets have been depleted to avoid payment to creditors, or when the LLC has been formed to circumvent statutory or common-law duties.

2-33 BUSINESS ORGANIZATIONS WITH TAX PLANNING § 33.06 (2007).

Even under this arguably more-rigorous standard, the court concludes Plaintiffs' veil-piercing evidence is sufficient to survive summary judgment. There is evidence that GTI operated ECH as a sham, to enable GTI to claim the incoming revenues associated with the Cement-Lock Technology. (Pls.' Opp'n 29.) Plaintiffs contend that GTI treated ECH's assets as its own, even claiming that it had the right–with no signed license agreement–to seek funding for the development of the Cement-Lock Technology. The Corporate Defendants do not contest that GTI secured over $6 million in funding to develop the Technology without a written license. (Defs.' Resp. to Pls.' 56.1 ¶ 34.) GTI thus treated ECH's license rights–its primary asset–as GTI's own. At the same time, Plaintiffs allege, GTI manipulated ECH's and CLG's finances to secure an expansion of ECH's license rights. (Pls.' Opp'n 29.) If this is true, ECH was intended to and did

in fact serve precisely the sort of fraudulent purpose that would render it an alter ego under Delaware law: GTI used CLG to hold funding for the Cement-Lock Technology so as to avoid liability.

### b. Borys

Borys held a variety of positions with the various entities involved in this litigation. He served on the CLG Operating Board at least from December 1997 to August 2000 and again from March 2001 until July 2004. (Pls.' Resp. to Borys' 56.1 ¶ 22.) Thus, his fiduciary duties to CLG date back to 1997. Borys also served as a Manager of ECH from December 1997 through December 2005. (*Id.*) He served as President of ESI from July 1996 until August 2000 and again from March 2001 through December 2005. (*Id.* ¶ 21.) In addition, he was a Senior Vice President of GTI from January 1997 through September 1998, an Executive Vice President of GTI from September 1998 through November 1999, an Executive Vice President and Chief Operating Officer of GTI from November 1999 through December 2005, and an Executive Vice President and Chief Operating Officer of GRI from August 2000 through December 2005. (Borys' Resp. to Pls.' 56.1 ¶ 60.) For many of these entities, particularly ECH and GTI, Plaintiffs accuse Borys of prioritizing their interests above those of CLG's, in violation of his fiduciary duties.

Borys is not entitled to summary judgment on the breach of fiduciary duties claim against him. With regard to the allegations of self-dealing, for example, Borys' signed both the1997 ECH License Agreement and the 1999 License Agreement on behalf of CLG during the time that he was a manager of ECH. (Borys' Resp. to Pls.' 56.1 ¶¶ 3, 4.) As described above, Plaintiffs have presented evidence suggesting that the ever-expanding ECH licenses may have been part of a scheme to vault ECH's interests above CLG's, and used to pay back a debt to ESI and GTI, improperly run up by CLG's Managers. The evidence also supports the inference that Borys signed these licensing agreements to ensure that the other companies with which he was affiliated could continue to collect research contract revenue.

Similarly, Plaintiffs can make a case for breach of fiduciary duties against Borys because of his signature on a 1999 Proposal, in which IGT represents that it "has developed the Cement-Lock™ Technology." (Proposal at G018470, Pls.' Ex. 27.) This Proposal was submitted at a time when Borys owed fiduciary duties to CLG, and his failure to credit or involve the company could also constitute a breach of those duties. Thus, there is ample evidence that Borys misappropriated CLG's intellectual property.

Borys is also arguably liable on the theory that he failed to set up internal controls sufficient to ferret out the BLR Fraud. Under the standard described in *Caremark*, Borys was responsible for ensuring that the company had an adequate "corporate information and reporting system." 698 A.2d at 969. Although *Caremark* sets a high bar for finding a defendant liable for failing to do so, Plaintiffs have set forth facts which might reasonably lead to the conclusion that there were visible red flags that Borys disregarded. Plaintiffs point to an expert opinion that there were inadequate internal controls as well as the observation of one insider that "lack of oversight" caused the BLR Fraud. (Mensinger Dep 207-08, Pls.' Ex. 38.) Significantly, Borys himself has been linked to this lack of oversight: Borys appointed first Rehmat, and later Barone, as President of ECH and supervised Lee and Barone at various times. (Borys' Resp. to Pls.' 56.1 ¶ 64.) This presents a genuine issue of material fact as to whether the lack of internal controls in ESI, ECH, GTI, and CLG injured CLG.

Plaintiffs' claims that Borys' actions suppressed development of the Cement-Lock Technology also survive, for the reasons discussed above. Borys has offered no argument that the structure of the licensing contracts did not operate as Plaintiffs have described, with ECH being obligated to repay funding it received from GRI only after the Cement-Lock Technology was successfully commercialized. (Borys' Resp. to Pls.' 56.1 ¶ 87.) Although the parties have not specifically addressed the matter, it is reasonable to conclude that as Executive Vice President and COO of GRI, Borys played a role in structuring those contracts. Similarly, given his roles at GTI

and ECH, it is reasonable to believe that he was involved in the decision to purchase a used, non-slagging kiln.

Finally, the court takes note of Borys' role in denying the expansion of the Unitel License. Plaintiffs have pointed to evidence that Borys told Mell that there was an FBI investigation into certain individuals, which prompted him to withdraw his approval of the expansion. (Mell Dep. 305-306, Pls.' Ex. 80). Following this, Mell testified, Borys himself drafted the letter by which Mell withdrew his approval. (*Id.*) Though Borys denies this (Borys' Resp. to Pls.' 56.1 ¶ 93), a genuine issue of fact exists as to whether Borys was acting in good faith during this transaction. Accordingly, Borys' motion for summary judgment on this claim is denied.

In defense, Borys notes that he was ESI's representative to the CLG Operating Board rather than a member in his individual capacity. (Borys' Reply at 12.) He argues, in effect, that ESI was the Member and therefore the entity that owed fiduciary duties to CLG. But the CLG Operating Agreement states that it is to have seven authorized members: three representatives designated by ESI, three representatives designated by CL, and one representative designated by Mell. (CLG Operating Agreement § 5.1(a), Corps.' Ex. 47.) Borys' attempt to evade liability disregards this contractual provision and therefore must be rejected.

### c. Dunne

While Dunne did participate in CLG activities at least as early as 1998, he was appointed to the CLG Operating Board on February 6, 2002. (Pls.' Resp. to Dunne's 56.1 ¶¶ 3, 15.) He served on the CLG Board of Managers and as its Secretary from February 2002 until July 2004 and was on its Board of Managers again from January 2005 through December 2005. (Ex. A to Pls.' Resp. to Dunne's 56.1; Pls.' Resp. to Dunne's 56.1 ¶ 11.) Plaintiffs claim that as a member of the Operating Board and an Officer, Dunne owed CLG a fiduciary duty. (Pls.' Opp'n 3.) Because Plaintiffs have not asserted that Dunne owed any fiduciary duty to CLG until February 2002, the court need not consider any actions Dunne took before that time when determining whether he

breached his fiduciary duties to CLG. For example, Plaintiffs claim that CLG granted the 1997 ECH license based on Dunne's representations and promises to develop and commercialize the Cement-Lock Technology. (*Id.*) But the statement of facts to which Plaintiffs cite never mentions Dunne at all, and, indeed, the license was granted before Dunne owed any fiduciary duties to CLG. (*See id.* ¶¶ 1, 3.) Likewise, Plaintiffs claim that Defendants misappropriated CLG's intellectual property by permitting IGT to hold itself out as the inventor of the Cement-Lock Technology. The only relevant document bearing Dunne's name is dated nearly four years before Dunne's fiduciary duties were triggered (Letter from Dunne to Clarke of 7/16/98, Pls.' Ex. 55), and thus cannot be considered evidence that Dunne breached his fiduciary duties.

Dunne does not dispute that he owed CLG fiduciary duties, as defined by the CLG Operating Agreement, beginning in February 2002. (Dunne's Mem. 8.) At that time, Dunne was Secretary of ECH, a position he held until March 2004. (Pls.' Resp. to Dunne's 56.1 ¶ 12.) There is at least some evidence that Dunne breached his fiduciary duties to CLG. For example, as explained above, Delaware law requires officers and directors to establish internal controls rather than turn a blind eye to misconduct occurring within an entity. Even if Dunne was not aware that the BLR Fraud was being perpetrated, Plaintiffs are entitled to introduce evidence that he turned a blind eye to red flags, thus breaching his fiduciary duties to CLG. In addition, Dunne signed on behalf of ECH the second Amendment to the ECH licensing agreement, which afforded ECH certain exclusive licensing rights in the Cement-Lock Technology. (Pls.' Resp. to Dunne's 56.1 ¶ 37.) This could give rise to an inference that Dunne was operating in the interests of ECH rather than CLG during that transaction. Thus, Plaintiffs' breach of fiduciary duty claims against Dunne survive summary judgment.

### d.      Lau

Plaintiffs claim that, as President of CLG and a member of its Operating Board, Lau owed CLG a fiduciary duty. (Pls.' Opp'n 3.) Lau was appointed President of CLG and to its Operating

Board on March 17, 2003 (Pls.' Resp. to Lau's 56.1 ¶¶ 3, 6), and had only the most limited connection to the Technology before 2003.  From 1996 through 2002, Lau's only involvement in the Cement-Lock Technology projects was as Vice President of process development in 1996; aside from that, he did not manage, supervise, or work on CLG or the CLG Technology projects, he was not involved with the submission of proposals to obtain funding for the Technology project, and he played no role in the negotiation or issuance of any licenses to the Technology by CLG. (*Id.* ¶¶ 14-16.)  Nor did Lau have any knowledge, prior to February 2003, of the transfers of funds from ECH to GTI, IGT, or ESI.  (*Id.* ¶ 18.)  Finally, it is undisputed that after January 1996, Lau did not supervise Tony Lee, Barone, or Amir Rehmat.  (*Id.* ¶ 14.)

Lau does not dispute that he owed CLG fiduciary duties, as defined by the CLG Operating Agreement, beginning in March 2003.  (Lau's Mem. 2.)  During that time, a reasonable jury could conclude that Lau breached his fiduciary duties to CLG.  From March 17, 2003 through July 1, 2004 Lau served as President of both CLG and ECH.  (Defs.' Resp. to Pls.' 56.1 ¶ 62.)  Lau was ECH's only officer during those years.  (Pls.' Resp. to Lau's 56.1 ¶ 17.)  It is therefore noteworthy that many allegations in this case relate directly to the conflicting interests between ECH and CLG: For example, it was Lau who directed that the second amended ECH license–and its exclusivity provisions–be reviewed for conflict with other CLG-issued licenses.  (Letter from Lau to Serge of 9/26/03, Pls.' Ex. 79.)  In particular, he suggested that the United license might conflict with "my" (i.e. ECH's) license.  (Lau Dep. 156, Pls.' Ex. 76 ("My understanding is that ECH has 1.1 million tons exclusive worldwide so everything else is in conflict with my license.").)  Given his overlapping roles at the two involved entities, and the potential benefit to CLG from expanding Unitel's license to Taiwan, a reasonable jury might find that Lau breached his fiduciary duties during this period.

Summary judgment on Count I is denied as to all the Defendants.

### B.    Count II (RICO)

RICO prohibits "any person employed by or associated with any enterprise engaged in . . .

interstate or foreign commerce, to conduct . . . such enterprise's affairs through a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c). In other words, to state a claim under section 1962(c), a plaintiff must show: "(1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Richmond v. Nationwide Cassel, L.P.*, 52 F.3d 640, 644 (7th Cir. 1995). Here, Plaintiffs claim that the Defendants' alleged fraud constitutes racketeering.

To sustain a RICO claim, Plaintiffs must present evidence that an enterprise existed. RICO defines an enterprise to include "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961 (4). In order for an association to be considered a RICO enterprise, the individuals must have conducted the affairs of the enterprise itself rather than merely acting to benefit themselves. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). In addition, "[t]he hallmark of an enterprise is a structure." *Richmond,* 52 F.3d at 645 (internal quotation marks and citation omitted). The enterprise may be informal and "there need not be much structure, but the enterprise must have some continuity and some differentiation of the roles within it." *Id.*

Structure requires more than basic organization: "To establish structure, the plaintiff must show that the association is 'joined in purpose and organized in a manner amenable to hierarchical or consensual decision-making.'" *See Starfish Inv. Corp. v. Hansen*, 370 F. Supp. 2d 759, 769-70 (N.D. Ill. 2005) quoting *Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 962 (N.D. Ill. 2002) (additional citation omitted)). Thus, the group of individuals alleged to be an enterprise must have a "common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Indeed, that common purpose is "an essential ingredient" of a RICO enterprise. *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004).

In *Cement-Lock II*, the court found that Plaintiffs' Amended Complaint adequately alleged an enterprise consisting of individuals. *Cement-Lock II,* 2006 WL 3147700, at *6. In the Amended Complaint, Plaintiffs alleged that "Borys and Dunne direct and control the Enterprise." (Am. Compl.

¶ 118.) They further asserted that Barone, Lau, and Lee operated as the "next layer of the Enterprise," managing various administrative, licensing, and fund-raising functions. (Am. Compl. ¶ 119.) Finally, Anil Goyal, Michael Mensinger, and Amirali G. Rehmat acted at the direction of Borys, Dunne, Barone, Lau, and Lee, "writing the grant proposals, doing whatever work was necessary to maintain the illusion that there was active development of the Technology, and writing the fraudulent final reports sent to the granting agencies." (Am. Compl. ¶ 120.) Thus, Plaintiffs claim that the enterprise in this case included Defendants Borys, Dunne, and Lau, as well as Barone, Lee, Rehmat, Goyal, and Mensinger (together the "putative Enterprise"). The court held in *Cement-Lock II* that the purpose of this putative Enterprise was to suppress development of the Cement-Lock Technology. Now that discovery is completed, the court will revisit whether this group of individuals can be considered an enterprise.

### 1. The BLR Fraud

Certain facts are undisputed in this lawsuit, with respect to the BLR Fraud. Barone and Lee subcontracted work to Almal Engineering, Research & Service, Inc.; Homatex, Inc.; and Wayne and Associates (whose principals were Lee's son-in-law Charles Wayne Jones and daughter Kathreen Lee Jones) and to Molecular Thermophysics Engineering and Molecular Thermophysics, Inc. (whose principal was Lee's brother, Lloyd Lee)–all subcontractors not qualified to perform the work for which they were hired. (Pls.' Resp. to Corps.' 56.1 ¶¶ 6, 39-40.) Lee controlled Almal, Wayne and Associates, and Homatex with respect to the subcontracts issued. (Pls.' Resp. to Corps.' 56.1 ¶ 41.) Lee directed the subcontractors to submit invoices, which he approved; but the work either was not being performed at all, or was performed by Lee and others. (*Id.* ¶¶ 42.) Barone and Lee each retained 45% of the proceeds from this scheme, with the remaining 10% being paid to Kathreen Jones, Charles Jones, or Lloyd Lee. (*Id.* ¶¶ 43.)

Around 1999, the fraud expanded: Rehmat joined the scheme, and the perpetrators began using additional subcontractors, none of whom was qualified to do the work. (Pls.' Resp. to Corps.'

56.1 ¶¶ 44-45.) Lee and Rehmat directed that subcontractors submit invoices that were approved, even though the work was either never performed or was performed by Lee, Rehmat, and others. (Pls.' Resp. to Corps.' 56.1 ¶¶ 47.) Barone, Lee, and Rehmat used their own companies to funnel the money back to themselves, with each of the three retaining 30% and the subcontractor being paid 10%. (Pls.' Resp. to Corps.' 56.1 ¶¶ 48.)

As noted, this evidence of the BLR Fraud is largely undisputed. The question, on these motions, is whether the individual Defendants were aware of the BLR Fraud when it was being perpetrated, or whether they received direct payments from it. (Pls.' Opp'n 22 n.12.) There is no evidence of this nature in the record, and, therefore, no basis on which the court could find that any of the Defendants in this case participated in the "management or operation" of the putative enterprise, a finding necessary to establish RICO liability. *Slaney v. Int'l Amateur Ath. Fed'n*, 244 F.3d 580, 598 (7th Cir. 2001) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). To have liability under section 1962(c) of RICO, "the person charged must have had some part in directing those affairs." *Id.* (citing *Reves*, 507 U.S. at 179). This operation or management test is not met simply because there is a business relationship between the defendant and the Enterprise. *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721 (1998). Likewise, the test is not met simply because a defendant performed services for the corporation. *Id.* at 727. Indeed, it is clear that "performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability. . . ." *Id.* at 728; *see also Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) (internal quotation marks and citation omitted) (no RICO enterprise exists unless "the acts complained of . . . were the work of an organization, however loose-knit"). What would satisfy the operation or management test is for a member of an association-in-fact enterprise knowingly to implement decisions of upper management. *Coran*, 156 F.3d 728 n.3.

In fact, the undisputed evidence establishes that Borys, Dunne, and Lau were unaware of

the BLR Fraud while it was being perpetrated.  Both Barone and Lee–indisputably the leaders, with

Rehmat, of the BLR Fraud–testified that Borys, Dunne, and Lau were not involved in, were not

informed of, and did not share the proceeds of the BLR Fraud.  (Pls.' Resp. to Corps.' 56.1 ¶¶ 51-

52.)  Barone testified that none of the individual Defendants knew of the fraud he perpetrated:

> Q:     Did Francis Lau play any role in these transactions you've been describing
>        with Cement-Lock, the Cement-Lock fraud transactions?
>
> A:     To the best of my knowledge, no.
>
> Q:     Did you ever ask him to participate?
>
> A:     No.
>
> * * *
>
> Q:     Did Stan Borys play any role in the Cement-Lock fraud?
>
> A:     To the best of my knowledge, No.  But I will caveat it.
>
>        We talked about this last time.  And the caveat is there were so many offline
>        conversations that were going on continuously that I can only speak from my
>        exact knowledge that I never spoke to Stan, nor was I aware of anything.
>
>        If anything transpired between Amir and Stan and Tony and Stan, I wasn't
>        a party to that.
>
> Q:     And you never heard from Amir or Tony any comments about Stan Borys's
>        involvement?
>
> A:     Not at all.
>
> * * *
>
> Q:     What about Jim Dunne?  I'll ask you about Jim Dunne.  Did he play any role
>        in the Cement-Lock fraud?
>
> A:     The answer to that is no.
>
> * * *
>
> Q:     Did you or Tony Lee ever ask Jim Dunne to participate in or get involved in
>        the Cement-Lock transactions and fraudulent transactions we've been
>        talking about?
>
> A:     No.

(Barone Dep. 59-61, Corps.' Ex. 1.)  Similarly, Lee testified that he never told Borys, Dunne, or Lau

that he was subcontracting work to his daughter and son-in-law (Lee Dep. 27-28, 40, 43,51-52,

Corps.' Ex. 2); that he and Rehmat actually did the work subcontracted to his daughter and son-in-

law (*id.* at 74-76); or that he, Barone, and Rehmat were sharing the monies paid to the company owned by his daughter and son-in-law. (*Id.* at 84, 484.) Lee and Barone both testified that Borys, Dunne, and Lau did not participate in the fee-sharing arrangement. (*Id.* at 85, 141-44; Barone Dep. 34-35, 227-28, Corps.' Ex. 1.)

Nor are the masterminds of the BLR Fraud (aside from Rehmat, who has asserted his Fifth Amendment rights and thus refused to testify) alone in denying Borys's, Dunne's, and Lau's participation in the scheme. Not one of the individuals who co-conspired with Barone, Lee, and Rehmat has implicated Borys, Dunne, or Lau. (Pls.' Resp. to Defs.' 56.1 ¶ 53.) These co-conspirators include Kathreen Jones (Lee's daughter), Charles Wayne Jones (Lee's son-in-law), Jinnetk Hemani (Rehmat's sister-in-law), Minazali Rehmat (Rehmat's brother), Karl O. Lee (Lee's son), and Lloyd Lee (Lee's brother). (*Id.*) None was aware of any role that the individual Defendants played in the BLR Fraud. (Kathreen Jones Dep. 238-9, 247-51 Corps.' Ex. 4 (she was aware of the fraud but had no reason to believe Borys, Dunne, or Lau was involved); Charles Wayne Jones Dep. 92-93, Corps.' Ex. 5 (he never transferred funds or monies to Borys, Lau or Dunne, nor was he instructed to do so); Minazali Rehmat Dep. 325-28, Corps.' Ex. 6 (he could recall no involvement of Borys, Dunne, or Lau); Jinnet Hemani Dep. 124, Corps.' Ex. 7 (she did not know Borys, Dunne, or Lau); Karl Lee Aff. ¶¶ 27-29, Corps.' ex. 8 (he has never heard nor has personal knowledge that Borys, Dunne, or Lau was involved in the fraud or any wrongful activity, nor has he ever corresponded with or paid any of the three); Lloyd Lee Aff. ¶¶ 2, 35-36, Corps.' Ex. 9 (Lee never mentioned that Borys, Dunne, or Lau was involved in the scheme, nor has he met, spoken to, or paid any of the three).) Plaintiffs dispute none of this. (Pls. Resp. to Corps.' 56.1 ¶ 53.)

The uncontradicted testimony therefore establishes that the individual Defendants played no role whatsoever in the BLR Fraud or any Enterprise related to that fraud. Thus, there is no argument that Borys, Dunne, and Lau were joined in purpose with the perpetrators of the BLR

fraud. To the contrary, the Defendants in fact "learned of the BLR fraud . . . in October 2002," (Defs.' Resp. to Pls.' 56.1 ¶ 79), at the same time that the GTI management learned of it. In late 2002, GTI–the company of which Borys was COO and Dunne was CFO–began an investigation into the BLR Fraud and reported it to the FBI. (Pls.' Resp. to Lau's 56.1 ¶¶ 45-46.) There is simply no evidence that the individual Defendants claimed to be a part of the Enterprise were aware of the BLR Fraud or involved in it.

Faced with this reality, Plaintiffs suggest that the individual Defendants could have prevented or uncovered the BLR Fraud and that they indirectly benefitted from it. (Pls.' Opp'n 22 n.12.) Plaintiffs offer no legal support for their theory that this draws the individual Defendants into the BLR Fraud. The court is unwilling to conclude that individuals who *could* have learned that a fraud was being perpetrated, but never *did,* can be liable as part of a RICO enterprise. *See Bachman v. Bear, Stearns & Co.*, 178 F.3d 930, 932 (7th Cir. 1999) ("But [defendant] cannot be thought to have been conducting, or to have agreed to conduct, the affairs of any of these [enterprises] through a pattern of racketeering activity. That would require [defendant] to have exercised (or agreed to exercise, in order to be liable as a RICO conspirator) at least some measure of control over the [enterprise].") Even if they might have been able to prevent fraud and/or may have indirectly and unknowingly benefitted from it, Defendants did not manage or operate the alleged RICO enterprise and are not liable under RICO for this wrongdoing.

With regard to the Corporate Defendants, Plaintiffs' allegations of vicarious liability for the BLR Fraud also fail. "[V]icarious liability is inconsistent with this court's approach to direct RICO liability." *D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 966 (7th Cir. 1988). The "statute is designed to impose liability upon a corporation which is a perpetrator of illegal activity but not upon an unwitting conduit of its employees' RICO violations." *Id.* at 967. While there is some dispute as to what lengths Barone, Rehmat, and Lee went to conceal the BLR Fraud from the Corporate Defendants, there is no evidence that any perpetrator of the BLR Fraud actually disclosed the

scheme or the fee-sharing arrangement to them. (*See* Pls.' Resp. to Corps.' 56.1 ¶ 50.) Indeed, it is clear that neither Barone nor Lee disclosed their conflicts of interest to management. (Barone Dep. 231-32, Corps.' Ex. 1; Lee Dep. 30, Corps.' Ex. 2.) Nor is there any evidence that, even if the company managers were aware of the conflicts of interest, they were informed of the fraud itself–that is, of Barone, Lee, and Rehmat's practice of dividing the money intended to be paid to the subcontractors among themselves, rather than paying to have the work performed.

At most, then, the Corporate Defendants were "unwitting conduits," and to the extent that their research funding was misappropriated, they were victims of the scheme. For example, the BLR Fraud caused the Corporate Defendants to pay Barone twice for completing the same task. (Pls.' Resp. to Corps.' 56.1 ¶ 70.) In addition, the Corporate Defendants contend that work was not performed on their subcontracts, due to the BLR Fraud. (*Id.* ¶ 71.) It is undisputed that, according to Barone's testimony, the Corporate Defendants sometimes did not receive final reports for the work that was to be performed on their subcontracts, and, in those cases, the work was obviously worthless. (*Id.* ¶ 72.) Barone further testified that it was more likely than not that any final reports the Corporate Defendants did receive were plagiarized from other reports. (*Id.*) Finally, in connection with the Cement-Lock projects, GTI made an insurance claim and ultimately received a recovery from its insurer of $3 million dollars. (*Id.* ¶ 73.) Thus, the Corporate Defendants are not vicariously liable for the BLR Fraud. *D & S Auto Parts*, 838 F.2d at 967, quoting *Haroco v. Am. Nat'l Bank & Trust Co. of Chicago*, 747 F.2d 384, 401 (7th Cir. 1984) ("the corporation-enterprise should not be liable when the corporation is itself the victim or target, or merely the passive instrument for the wrongdoing of others").

### 2. Non-BLR Fraud

Perhaps as a result, Plaintiffs have suggested that their RICO claim "exist[s] independently of the BLR fraud." (Pls.' Opp'n 22.) In other words, Plaintiffs argue that the claimed Enterprise committed RICO violations apart from the BLR fraud. Neither party has explained what would

differentiate the BLR Fraud from the fraud perpetrated by the Defendants in this case or precisely what roles Barone, Lee, and Rehmat played in that fraud. In this summary judgment briefing, Defendants bear the initial burden of proving that there is no genuine issue of material fact and, thus, that they are entitled to judgment as a matter of law. *Hicks*, 500 F.3d at 651.

### a. The Enterprise and its Conduct[7]

Plaintiffs claim that the Enterprise's wrongful conduct included obtaining funding intended for development and commercialization of the Cement-Lock Technology, and misdirecting that funding; obtaining funding in connection with the Technology on behalf of GTI with knowledge that GTI had no rights in the Technology; and preparing false documents and paperwork to conceal the misappropriation of funding. (Pls.' Opp'n 21-22.) Plaintiffs contend that Borys and Dunne directed and controlled the Enterprise, as the two oversaw, authorized, approved, and processed funding and other financial information for GTI, ESI, ECH, and CLG. (*Id.* 14.) They contend that Lau, along with Barone and Lee, managed administrative, licensing, and fund-raising functions and directed Goyal, Mensinger, and Rehmat. (Am. Compl. ¶¶ 119, 120.)

The basis of Plaintiffs' RICO claim, then, is that Defendants secured and then concealed from CLG funding for Cement-Lock Technology. There is evidence that Borys and Dunne played an active role in managing and operating the scheme by which funding was received for projects related to the Cement-Lock Technology, and then diverted from its proper purpose. Both Borys and Dunne oversaw efforts to secure funding related to the Technology for GTI, an entity that arguably had no rights to the Technology. For example, Borys authorized several proposals for funding that GTI made to GRI, the Michigan Department of Environmental Quality, and Brookhaven National Laboratory, all in 1999. (Defs.' Resp. to Pls.' 56.1 ¶ 35.) Dunne signed Contracts for

---

[7] None of the Defendants acknowledge the possibility that a RICO enterprise might have existed apart from the BLR Fraud, and therefore none of them makes any argument regarding his involvement in any non-BLR enterprise. Nevertheless, the court sets forth Plaintiffs' allegations for clarity.

Research on behalf of GTI, by which GRI agreed to pay GTI to perform work related to the Cement-Lock Technology. (Contract for Research dated 9/8/03, Pls.' Ex. 29; Contract for Research dated 7/01, Pls.' Ex. 30.) In addition, contract and loan approval sheets show that after 2000, Borys' and Dunne's approval was needed on at least some contracts, and specifically contracts with ECH. (Defs.' Resp. to Pls.' 56.1 ¶ 37.) Dunne was CFO and Vice President of GTI, and ran the administrative section of GTI, including its contracts department. (*Id.* ¶ 36.)

Having obtained this funding through GTI, there is also evidence that Borys and Dunne kept the details from CLG and the Plaintiffs. In addition, both Borys and Dunne were on the distribution list to receive copies of ESI's, ECH's, and CLG's financial statements. (Defs.' Resp. to Pls.' 56.1 ¶ 41.) They were therefore aware (or should have been) of the financial operation and status of all three companies. Yet aside from receiving CLG annual reports in fiscal year 2001 and 2002, Plaintiffs "rarely" received CLG financial statements until 2004. (*Id.* ¶ 24.) Thus, Borys and Dunne were both well-situated to assess and manipulate CLG's finances.

Plaintiffs also contend that CLG was not informed of the funding received from sponsors and GRI. Serge has attested that CLG's "Operating Board was never informed by GTI, ESI or ECH of the millions of dollars of funding received from GRI and other sponsors" and that the Operating Board was only told of commitments but never that the money had been received. (Randhava Aff. ¶ 21, Pls.' Ex. 1.) Nor, according to Serge, was the CLG Operating Board ever told that GTI, ESI, and ECH had spent the funding received. (*Id.* ¶ 23.) Because funding commitments often failed to materialize, failing to inform the CLG Operating Board that the funding had been received, rather than merely promised, was significant. (*Id.* ¶ 21.) Mell agrees that he never discussed with any of the Defendants "the millions of dollars that GTI and ESI received relating to the Cement-Lock Technology. Instead, I was repeatedly told that there was little or no money for the development of the Cement-Lock Technology." (Mell Aff. ¶ 4, Pls.' Ex. 6.)

Defendants do not directly dispute that CLG was not notified of the true sum of money GTI

and ESI received relating to the Cement-Lock Technology. Instead, they point to isolated instances in which CLG was informed of funding commitments. Defendants note that, in August 1999, Lee informed Mell and Serge that ECH had four active projects, and Lee specifically mentioned an $8 million commitment ECH had from the State of New Jersey for providing a demonstration plant capable of processing 30,000 tons per year. (Fax from Lee to Mell et al. of 8/9/99, Defs.' Resp. Ex. 47.) In March 2000, CLG Operating Board Minutes report a discussion of the fact that GRI funding for the State of New Jersey project totaled $4.9 million. (Minutes of Meeting at G410140, Pls.' Ex. 54.) Mell did not attend that meeting. (*Id.*) Lee also testified that he answered questions regarding funding to the best of his ability. (Lee Dep 195-96, Defs.' Resp. Ex. 16.) This evidence, however, does not establish that all of the funding received was disclosed to CLG: none of the documents noted refer to money actually received by IGT or ECH, and none involves a comprehensive accounting of the sums received and spent.

In total, the parties agree that ECH received approximately $17 million in funding pursuant to research contracts with specific objectives related to the Cement-Lock Technology. (Defs.' Resp. to Pls.' 56.1 ¶ 33.) Furthermore, a May 1, 2003 e-mail from Dunne to Lau, Borys, and others explains that about $2.9 million of the $20.3 million in Cement-Lock contract funding received by ECH and IGT remained unspent. (*Id.* ¶ 47.) Neither Mell nor Randhava is copied on the e-mail. (E-mail from Dunne to Lau et al. of 5/1/03, Pls.' Ex. 39.) This comports with Plaintiffs' theory that Borys and Dunne had access to financial information about CLG and ECH, which they withheld as a part of their scheme.

There is also evidence that Borys and Dunne benefitted, albeit indirectly, from the scheme, in the form of salary, bonuses, and benefits. Plaintiffs point out that, between 1997 and 2005, Dunne's compensation from GTI increased significantly. His income grew from $120,782.44 to $286,076.71, and his retirement contributions grew from $12,100.15 to $30,450. (Defs.' Resp. to Pls.' 56.1 ¶ 81.) During that same time period, Borys' income grew from $171,607.44 to

$542,106.52, and his retirement contributions grew from $17,658.47 to $30, 450.03.  (*Id.* ¶ 80.)
This evidence is sufficient to create a genuine issue of fact as to whether Borys and Dunne were
involved in a RICO conspiracy, and, consequently, they are not entitled to summary judgment on
Count II.

### c.     Lau

Lau, on the other hand, had, at most, limited involvement in the Cement-Lock projects from
1996 through 2002.  (Pls.' Resp. to Lau's 56.1 ¶ 14.)  Indeed, Lau was involved with the Cement-
Lock project in 1995-96 but then did not manage, supervise, or work on CLG or on the Technology
project until 2003.  (*Id.*)  From 1996 through 2002, Lau was not involved with the submission of
proposals to obtain funding for the Technology project and played no role in the negotiation or
issuance of any licenses to the Technology by CLG.  (*Id.* ¶¶ 15-16.)

Plaintiffs attribute three categories of wrongful conduct to Lau: (1) failing to disclose millions
of dollars of funding received to develop and commercialize the Cement-Lock Technology; (2)
denying Unitel's request for license rights in Taiwan; and (3) wasting CLG's corporate opportunities
in favor of serving the interests of ESI, GTI, and/or ECH.  (Pls.' Opp'n 21.)  With regard to the first
category of conduct, there can be no dispute that Lau, who was not involved with the Technology
until 2003, only learned of funding received to develop and commercialize the Technology at that
time.  Lau attended the January 2003 CLG board meeting, the notes of which reflect a discussion
of "the situation involving the possible misappropriation of funding from Endesco Clean Harbors,
the licensee of the Cement Lock technology, by a number of former GTI employees involved in the
project."  (Minutes of the Annual Meeting of Members of Cement-Lock Group, LLC of 1/30/03, Lau
Ex. 18.)  On March 17, 2003, Lau became the CLG President.  (Pls.' Resp. to Lau's 56.1 ¶¶ 5, 26.)
At the April 2003 CLG board meeting, the Managers were on the construction of the New Jersey
facility and the plant equipment installation.  (*Id.* ¶ 31; Minutes of the Annual Meeting of Members
of Cement-Lock Group, LLC of 4/18/03, Lau Ex. 23.)  At that meeting, the Managers (though

Plaintiffs dispute that it was all the Managers) complimented Lau on the progress made since he began managing the demonstration plant and stated that he had "effectively refocus[ed] and revitalize[d] the entire project." (*Id.*) Aside from the information he shared at the April 2003 meeting, there is no evidence that Lau was aware of funding received to develop the Cement-Lock Technology. Thus, Lau cannot said to have fraudulently concealed funding sources or sums from Plaintiffs.

The second two categories of allegedly wrongful conduct rely on identical factual support and both relate to the Unitel license. While Lau's conduct may have constituted a breach of fiduciary duty (*see* Section IV.A.2.d), it cannot be considered fraudulent. There is no allegation that Lau concealed his position at ECH from Plaintiffs. In fact, Lau wrote a letter to Serge regarding the potential conflict on ECH letterhead, on the same day he notified Serge that the expansion request was denied. (Letter to Serge from Lau of 9/26/03, Pls.' Ex 79.) Without more, his notifying the CLG Operating Board of the potential conflict and denying the Unitel request for an expansion based on that conflict cannot be considered fraudulent.

Separately, Plaintiffs also make an allegation that a May 2003 proposal for funding to complete the Cement-Lock project, prepared by Lau, was a "ruse" by which GTI would reimburse GRI for the BLR Fraud using GRI's own assets. (Pls.' Opp'n 31; Pls.' 56.1 ¶ 110.) Lau's role in preparing the proposal in question is undisputed (Defs.' Resp. to Pls.' 56.1 ¶ 110), but Plaintiffs have identified no factual support for the assertion that the proposal was a ruse. They point to an April 2003 e-mail in which Dunne informs Lau that the "ECH project is completely out of money," (E-mail from Dunne to Lau et al. of 4/24/03, Pls.' Ex. 87), and a May 2003 Proposal Lau signed as President of ECH and submitted to GRI. (Proposal, Pls.' Ex. 88.) Lau did not send, receive, or merit any mention in the next three exhibits Plaintiffs point to, one of which relates to GTI's request for additional funding from GRI (e-mail from Vitalo to Dunne of 6/11/03, Pls.' Ex. 89), and two of which relate to GTI's attempts to reimburse the FERC program for the BLR Fraud. (E-mail from

Momot to Dunne et al. of 4/9/04, Pls.' Ex. 90; Documentation Of FERC Payback From ECH Incident Meeting Notes of 4/15/04, Pls.' Ex. 91.) Plaintiffs never explain how this indicates a "ruse," much less one in which Lau was involved. Because the factual information to which Plaintiffs point does not support a finding that Lau committed a fraud, Plaintiffs have not raised a genuine issue of fact with regard to this allegation.

Moreover, there is no evidence regarding Lau's intent or enrichment based on the alleged fraud. In light of this, the court concludes there are no disputes concerning Lau's contention that he did not engage in fraudulent conduct toward CLG and did not manage or operate the Enterprise. Lau is entitled to summary judgment on Count II.

### d. Predicate Acts

As predicate acts, Plaintiffs have identified wire fraud, mail fraud, and money laundering. *See* 18 U.S.C. § 1961(1) ("'racketeering activity' means . . . (B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) . . . section 1956 (relating to the laundering of monetary instruments)"). Defendants claim they lacked any fraudulent intent with respect to any such predicate acts. (Corps.' Mem. 6-9; Dunne's Mem. 8; Lau's Mem. 8-9; Borys' Mem. 5-8.) Absent intent to defraud, Defendants argue, they can not be liable for racketeering.

Defendants claim that they had no intent to defraud, which is required to perpetrate the acts of racketeering claimed in this case. Plaintiffs insist the evidence is sufficient to defeat summary judgment on this issue. They focus on the money laundering claim, and point to *United States v. Esterman*, 324 F.3d 565 (7th Cir. 2003), where the Seventh Circuit explained the intent element for that offense. The *Esterman* court observed, "First, we have tried to maintain some separation between the initial transaction from which illegal proceeds were derived and further transactions designed to conceal the source of those proceeds. Second, we have stressed that the mere transfer and spending of funds is not enough to sweep conduct within the money laundering

statute; instead, subsequent transactions must be specifically designed to hide the provenance of the funds involved." 324 F.3d at 570 (internal citations and quotation marks omitted). Plaintiffs allege that Defendants' conduct meets this test: Defendants obtained funding and then issued subcontracts among the various corporations and companies, to distribute the money. (Pls.' Opp'n 33.) Indeed, there is evidence, as described above, that the Defendants not only received and spent funding but actively engaged in conduct intended to conceal the true extent of the funding received. (*See* Section IV.A.1.) This includes running up debts from CLG to ESI and IGT, thus forcing expansion of ECH's license rights, and structuring funding agreements such that there would be no obligation to repay the amount received until "Plant Startup," in other words until the Technology was successfully implemented. (*Id.*)

At this stage, the court is unwilling to decide the issues regarding Borys' and Dunne's states of mind when creating these arrangements. Although fraud claims may be resolved by summary judgment, "as a general principle, questions of motive and intent are particularly inappropriate for summary adjudication" and "resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible." *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir. 1986) (internal quotation marks and citations omitted); *see also Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 991 F.2d 1249, 1258 (7th Cir. 1993) ("Due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually not appropriate for summary judgment."). The fact-finder is permitted to infer an intent to defraud from all of the circumstances. *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000) (jury permitted to infer intent to defraud in mail fraud and wire fraud cases without direct evidence).

In this case, the Plaintiffs have described a scheme to suppress the Cement-Lock Technology and misappropriate funds. Knowing that they had an understanding of the various entities' finances that surpassed that of Mell or CL, Borys and Dunne coordinated a plan to run

CLG into debt to ECH, which it could repay by granting ECH expanding licenses. Using its rights, ECH would then secure funding for the Cement-Lock Technology, which would not be used to develop the Technology at all. At the same time, GTI was receiving and mis-spending funding also related to the Cement-Lock Technology. It purchased substandard equipment and otherwise sabotaged efforts to make the Cement-Lock Technology profitable. This, in turn, deprived CLG of opportunities to develop–and, later, to license–the Technology and undermined the value of CLG's asset. Plaintiffs have also described the overlap between the various entities and their officers, directors, employees, and functions, which further suggests motive and opportunity to defraud. In addition, there is some testimony that Investment Committee meetings in 2000 and 2001, Dunne stated that GTI did not intend to commercialize the Cement-Lock Technology. (Shefcik Dep. 136, Pls.' Ex. 40.) Thus, the court cannot decide as a matter of law that Defendants did not intend to deceive CLG.

### e. Damages

Defendants also argue that Plaintiffs did not suffer a clear and definite injury. The court addressed this argument in its earlier ruling, summarizing Plaintiffs' claimed injuries as follows:

> (1) misappropriation of millions of dollars in grant money, which prevented the development of the Technology and results in the future loss of profits from the licensing of the Technology; (2) harm to Cement-Lock Group's business reputation; (3) lost business opportunities to market the Technology to other individuals, corporations, or governmental entities, including Taiwan, Hong Kong, and China; and (4) devaluation of Cement-Lock Group's intellectual property by wasted years in the lifespan of certain patents and confusion and infringement on the Technology's service mark and trademark.

*Cement-Lock I*, 2005 WL 2420374, at *13 (internal citations omitted).

The Corporate Defendants argue that Plaintiffs' claimed injury is "speculative" and that there is no way to calculate these damages. (Corps.' Mem. 14-16.) As the court has previously noted, "[s]uch damages are neither speculative nor remote." *Id.* For example, injury to business reputation is compensable under RICO, if it results in "concrete economic, contractual, or business

losses." *Id.* Likewise, devaluation of intellectual property value and rights can constitute a concrete injury. *Id.* Lost profits are unquestionably difficult to calculate. *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986). Despite this, "there is no per se rule that claims of lost profits are invariably uncalculable." *Id.* Here, Plaintiffs point to a specific lost business opportunity, in the Unitel-Taiwan license. This is sufficiently concrete to confer RICO standing.

### C.    Count III (RICO conspiracy)

In Count III, Plaintiffs charge that the Defendants conspired to violate section 1962(c) of RICO, an offense punishable by section 1962(d). Section 1962(d) makes it unlawful to agree to violate RICO's substantive provisions. *Goren*, 156 F.3d at 731. Because Defendants' only argument that the RICO conspiracy claims are improper relate to the BLR Fraud, summary judgment on the RICO conspiracy claim is not appropriate.

Lau, who was not a part of the RICO enterprise, would nevertheless be liable under section 1962(d) if he "agreed to the objective of a violation of RICO." *Id.* at 732 (quoting *United States v. Neapolitan*, 791 F.2d 489, 498 (7th Cir. 1986)). But "the broad construction of the RICO conspiracy provision should not be used by the courts "to criminalize mere association with an enterprise." *Id.* at 731-32 (quoting *Neapolitan*, 791 F.2d at 498). Here, there is no evidence that Lau was more than merely associated with the Enterprise. As a result, he is entitled to summary judgment on Count III.

### D.    Count IV (fraudulent concealment)

"In order for a plaintiff to demonstrate fraudulent concealment under Illinois law, it must prove: (1) the concealment of a material fact; (2) that the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) that the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) that the concealed information was such that the injured party would have

acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury." *Trs. of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002). Furthermore, the circumstances creating a duty to speak include "the existence of a special or fiduciary relationship . . . ." *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 573, 692 N.E.2d 812, 817 (1st Dist. 1998). As discussed in Section IV.A., each of the Defendants owed fiduciary duties to CLG at various times.

### 1. Borys and Dunne

During the time that they had fiduciary duties, there is ample evidence that the Borys and Dunne committed fraudulent concealment. For example, there remains a dispute of fact as to whether Defendants properly disclosed the funding ECH and GTI received by individuals affiliated with CLG, including Serge, Mell, and Kao. (Defs.' Resp. to Pls.' 56.1 ¶ 56.) Because the Technology and associated intellectual property was CLG's primary asset, it certainly would have been material to CLG that entities–one of which arguably had no rights to the process–were receiving millions of dollars in funding. Particularly as the BLR Fraud was being perpetrated, Plaintiffs could not accurately assess the finances of either entity. Moreover, given the myriad roles that Borys and Dunne played with regarding to the Cement-Lock Technology, and with the entities involved in this litigation, Defendants had every reason to rely on their representations regarding the financial status of the entities.

In other words, there is evidence that Borys and Dunne withheld material information from CLG as a part of their scheme. The remaining question, then, is whether this was done with fraudulent intent. As discussed above, summary judgment on questions of fraudulent intent is rarely appropriate. Furthermore, Borys' and Dunne's intent to deceive can be inferred from the facts and circumstances surrounding their actions. *Washington Courte Condominium Ass'n-Four v. Washington-Golf Corp.*, 267 Ill. App. 3d 790, 815, 643 N.E.2d 199, 216 (1st Dist. 1994); *Warren v. Le May*, 142 Ill. App. 3d 550, 573, 491 N.E.2d 464, 478 (5th Dist. 1986) ("Intent may be shown by

46

circumstantial evidence."). In this case, Plaintiffs have presented adequate evidence that Borys and Dunne were engaged in a scheme to funnel money away from CLG, which is circumstantial evidence of intent.

### 2. Lau

As for Lau, as explained above, the only allegedly wrongful conduct he engaged in was refusing to expand the royalty-bearing Unitel license. (*See* Section IV.B.2.c.) Even if Lau made the decision based on allegiance to ECH, however, he never concealed his involvement with ECH from CLG, and there is as a result no basis for a fraudulent concealment claim against him. (*Id.*)

### 3. Corporate Defendants

Although the Corporate Defendants do not contest this point, the court notes that each may be held vicariously liable for Borys' and Dunne's fraud. *Shapo*, 246 F. Supp. 2d at 969 (a corporation acts through its agents, directors, and officers and thus is liable for their intentional torts when they are acting within the scope of their authority); RESTATEMENT (THIRD) OF AGENCY § 7.07 ("An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.").

### E. Count V (fraudulent misrepresentation)

"The elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996). In addition, reliance upon the truth of the statement must be justifiable. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370 (7th Cir. 1988) (finding no justifiable reliance as a matter of law where party's investigation was inadequate). Plaintiffs have set forth several allegedly wrongful actions perpetrated by the individual Defendants, described above. Essentially, Plaintiffs argue that Defendants designed a scheme by which

funding was obtained to develop the Cement-Lock Technology and directed to entities other than CLG, the owner of the rights to that Technology. That funding was not used to develop the Technology, which Plaintiffs claim has been devalued though this neglect. Furthermore, they assert that GTI obtained these funds by wrongfully holding itself out to have rights in the Cement-Lock Technology.

### 1. Corporate Defendants

The Corporate Defendants seek summary judgment on Plaintiffs' fraudulent misrepresentation claim on the grounds that the Corporate Defendants did not have fraudulent intent. (Corps.' Mem. 21.) For this reason, as explained in Section II.D., the court concludes that there is a genuine issue of material fact as to the Corporate Defendants' state of mind and therefore denies the Corporate Defendants' motion for summary judgment.

### 2. Borys and Dunne

Borys and Dunne argue that each was unaware of the BLR Fraud and therefore cannot be held liable for fraudulent misrepresentation. (Dunne's Mem. 4; Borys' Mem. 16-17.) But as with Plaintiffs' RICO claims, the fraud claims against Borys and Dunne are based on conduct apart from the BLR Fraud, and cannot be resolved on summary judgment. There is a genuine issue of material fact as to whether Borys and Dunne made fraudulent misrepresentations to CLG. By way of just one example, Plaintiffs contend that ECH obtained expansive license rights from CLG based on an understanding that CLG was in financial need. In essence, CLG granted ECH expansive license rights to secure a loan from the company. If true, this would constitute a fraudulent misrepresentation. As explained above, Borys and Dunne clearly had access to financial information about CLG and ECH, but Plaintiffs received less regular financial updates on the companies' status. Thus, Borys and Dunne were both well-situated to assess CLG's finances, and determine a loan from ECH would be necessary. In addition, in light of the gap in information between Borys and Dunne on the one hand and Plaintiffs on the other, it was reasonable for CLG

to rely on Borys' and Dunne's expertise. Plaintiffs claim that Borys and Dunne misrepresented to CLG that it owed money to ECH, for services various employees performed for the company. CLG then used this as leverage to secure the license rights for ECH. This, in turn, prevented CLG from granting additional licenses, including the Unitel license. As a result, CLG was deprived of license royalties and thus damaged.

### 3. Lau

As discussed above (*see* Section IV.B.2.c), Lau did not commit a fraud and therefore is entitled to summary judgment on Count V.

### F. Count VI (negligent misrepresentation)

"Negligent misrepresentation has essentially the same elements as fraudulent misrepresentation, except that the defendant's mental state is different . . . [and except that] the defendant [must owe] a duty to the plaintiff to communicate accurate information." *Neptuno*, 295 Ill. App. 3d at 574, 692 N.E.2d at 818. Thus, a plaintiff has a claim for negligent misrepresentation if there was: "(1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information." *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 334-335, 843 N.E.2d 327, 332 (2006). Moreover, if a plaintiff is seeking purely economic damages, liability is only imposed if the defendant "is in the business of supplying information for the guidance of others in their business transactions."[8] *Id.* at 335, 843 N.E.2d at 332.

### 1. Borys and Dunne

---

[8] As none of the Defendants has raised the issue of whether they were in the business of supplying information (Corps.' Mem. 19-20; Borys' Mem. 16-17; Dunne's Mem. 12), the court will not consider it as a possible defense.

The individual Defendants argue that the negligent misrepresentation claims fail because they were not fiduciaries of CLG and because they did not misrepresent material facts, intentionally or negligently. (Dunne's Mem. 12; Borys' Mem. 16-17; Lau's Mem. 12-13.) The court has already concluded that each individual Defendant did owe a fiduciary duty to CLG, and that there is evidence from which it is reasonable to conclude that the Borys and Dunne made misrepresentations. For the same reasons, summary judgment is denied on the negligent misrepresentation claims against Borys and Dunne and vicariously against the Corporate Defendants.

### 2. Lau

The case against Lau stands on much different footing. Plaintiffs fail to identify any affirmative representation made by Lau that could be considered negligent. With regard to the Unitel license, for example, the only representation Lau made is that it would likely conflict with the ECH license; Plaintiffs never dispute that this is true. With regard to the funding received by GTI or ECH for projects related to the Cement-Lock Technology, there is nothing aside from bare speculation to suggest that Lau withheld or mispresentated information. At worst, then, he breached his fiduciary duties to CLG, but there is no indication that he made any careless or negligent representation to the company. Thus, Lau is entitled to summary judgment on Plaintiffs' negligent misrepresentation claims.

### 3. Corporate Defendants

The Corporate Defendants argue only that they are entitled to summary judgment on Plaintiffs' negligent misrepresentation claim because they owed no fiduciary duties to CLG. (Corps.' Mem. 19-20.) In light of the court's holding that the corporate veil is not impenetrable as a matter of law (*see* Section IV.A.2.a.), the Corporate Defendants are not entitled to summary judgment at this stage.

### G. Count VII (unjust enrichment)

The Defendants argue that Plaintiffs lack standing to bring an unjust enrichment claim. Under Illinois law, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment and that defendant's retention of the benefit violates the fundamental principles of justice , equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989). The *HPI* court further explained that where, as here, a party seeks to recover a benefit conferred by a third party, unjust enrichment is proper under three limited circumstances: "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id*. at 161-62, 545 W.E.2d at 679 (citations omitted); *see also Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 854 (7th Cir. 2007) (same). Plaintiffs here apparently focus on the second circumstance, that the Defendants procured benefits from wrongful conduct. No argument has been made that a benefit due CLG was mistakenly given to Defendants or that CLG had a better claim to the benefit than do Defendants.

### 1. Corporate Defendants

Here Plaintiffs make no argument that the unjust enrichment claim against the Corporate Defendants can be proven at trial. The Corporate Defendants are therefore entitled to summary judgment on Count VII.

### 2. Individual Defendants

Plaintiffs contend that the individual Defendants were enriched in the form of increased salaries and bonuses. (Pls.' Opp'n 36-37.) They effectively argue that the individual Defendants received these increased salaries and bonuses as a cut of the profits generated by the Cement-Lock Technology Fraud. (*Id.* 37.)

The individual Defendants respond, first, that the Plaintiffs' unjust enrichment claim is improper because a written contract governs their relationship. (Borys' Mem. 17-18; Dunne's Mem. 17; Lau's Mem. 13.) As discussed in some depth above, however, Plaintiffs' claims against the individual Defendants are grounded in fraud. Thus, the argument that a contract precludes the unjust enrichment claim "is neither here nor there because plaintiffs' unjust enrichment claims are obviously not grounded in quasi-contract. Rather . . . they are grounded in tort–fraud, to be specific." *In re Sears, Roebuck & Co.*, Nos. 05 C 4742, 05 C 2623, 2006 WL 3754823, at *3 (N.D. Ill. Dec. 18, 2006). For the reasons explained above, the court finds that Plaintiffs have provided sufficient evidence that the individual Defendants committed a fraud to survive summary judgment. As a result, no contract precludes an unjust enrichment claim.

The unjust enrichment claim fails in any case. Even under the "wrongful conduct" circumstance, Plaintiffs must show some entitlement to the increased salaries and bonuses allegedly enjoyed by the individual Defendants, which they have not done. *See Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00 C 3290, 2003 WL 22232801, *7 (N.D. Ill. Sept. 26, 2003). There is no authority for applying "*HPI*'s wrongful conduct exception where a plaintiff is attempting to recover money to which it is not entitled." *Id.* While the *Asch* court found that the defendant had "engaged in wrongful conduct that resulted in inflated fees," it nevertheless held that only a party with entitlement to those fees would be entitled to recover them under an unjust enrichment theory. *Id.* "The court cannot conclude that the Illinois Supreme Court intended to create a claim for unjust enrichment where a plaintiff claims damages that rightfully belong to a third party." *Id.* Thus, the *Asch* court granted summary judgment for the defendants on the unjust enrichment claim. Likewise, in *Paolino v. Hussain Egan Bendersky & Franczyk, L.L.C.*, No. 06 C 611, 2006 WL 1980200, *2-3 (N.D. Ill. July 11, 2006), this court dismissed without prejudice an unjust enrichment claim where the plaintiff alleged that the defendant was unjustly enriched by the amount of consideration he received from participation in a scheme to defraud. *Id.* at *2. The court found that

defendant ought to have been sued for conspiracy to commit conversion rather than unjust enrichment. *Id.* at *2. Because Plaintiffs here have failed to establish any entitlement to the increased salaries and bonuses allegedly paid to the individual Defendants, their unjust enrichment claim against these parties is dismissed.

### H. Count VIII (accounting)

"An accounting is 'an adjustment of the accounts of the parties and a rendering of judgment for the balance ascertained to be due.'" *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 WL 2005808, at *4 (N.D. Ill. Sept. 3, 2004) (quoting 1 AM. JUR. 2d *Accounts and Accounting* § 52 (2004)). Accounting is an equitable remedy, properly imposed where any legal remedy would be inadequate, and there is: "(1) breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature." *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003) (citation omitted). Where there is a lack of solid evidence regarding the amount owed, which is due to the defendant's poor record-keeping, an accounting should be ordered. *Id.* Defendants sole contention is that the accounting claim is superfluous in light of the massive discovery undertaken in this case. (Corps.' Mem. 20; Lau's Mem. 14-15.) But discovery is not a substitute for an accounting, as discovery may not uncover solid evidence regarding the various financial information in dispute here. In this case, given the allegations of breach of fiduciary duty and fraud, Defendants are not entitled to summary judgment on Plaintiffs' accounting claim.

### CONCLUSION

For the reasons explained above, the Corporate Defendants' Motion for Summary Judgment (179) is granted as to Count VII but denied as to Counts I-VI and Count VIII. Borys' Motion for Summary Judgment (183) is granted as to Count VII but denied as to Counts I-VI and Count VIII. Dunne's Motion for Summary Judgment (177) is granted as to Count VII but denied as to Counts I-VI and Count VIII. Lau's Motion for Summary Judgment (173) is granted as to Counts

II-VII but denied as to Counts I and VIII.  Plaintiff's motion to strike Borys' reply brief and Rule 56.1

response (232) is stricken as moot.

ENTER:

November 8, 2007

REBECCA R. PALLMEYER
United States District Judge