## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CEMENT-LOCK, LLC, an Illinois limited liability company, and RICHARD MELL, an individual, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 05 C 0018 |
| GAS TECHNOLOGY INSTITUTE, an Illinois corporation, et al. | ) ) ) | Honorable Rebecca Pallmeyer |
| Defendants. | ) | |

## DEFENDANT BORYS' MOTION FOR JUDGMENT AS A MATTER OF LAW AS TO COUNTS I, IV,V, AND VI PURSUANT TO FED. R. CIV. P. 50

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................. iv

STANDARD FOR JUDGMENT AS A MATTER OF LAW .......... 1

I. PLAINTIFFS HAVE NOT PRESENTED EVIDENCE THAT BORYS PARTICIPATED IN THE SPECIFIC ACTS WHICH ARE ALLEGED TO BE FRAUDULENT ........................................ 2

II. PLAINTIFFS HAVE NOT PRESENTED EVIDENCE SUFFICIENT TO AVOID JUDGMENT AS A MATTER OF LAW REGARDING BORYS' ALLEGED BREACH OF HIS FIDUCIARY DUTIES ...... 3

   1) Self dealing ........................................ 4

   2) Misappropriation of Intellectual Property ............ 6

   3) Internal Controls .................................. 8

   4) Willful suppression of technology. .................. 9

   5) Unitel license .................................... 10

III. PLAINTIFFS HAVE NOT PRESENTED EVIDENCE OF ACTIONABLE FRAUDULENT CONCEALMENT BY BORYS. .... 12

   1) The source and amounts of money obtained by IGT/GTI and ECH for the benefit of the technology .......... 13

   2) The amount of money defendants kept for themselves .... 14

   3) Concealment of the misappropriation of millions of dollars intended for the development of the Cement Lock Technology and Defendant's lack of internal controls ........ 15

   4) Financial information and status of CLG .............. 15

   5) The fact that inter-company time and expenses of the Defendants were charged to CLG .................... 16

6)     The fact that as of April of 2003 at the latest Defendants had
no further interest in commercializing the technology……….17

7)     The royalty agreement entered into by Borys, Dunne and others
to benefit personally from any royalties collected from
from Cement Lock Technology……………...……….17

8)     The terms of the ECH worldwide royalty free exclusive licenses
and the purposes for obtaining them……………… 18

IV.    PLAINTIFFS HAVE NOT PRESENTED EVIDENCE OF
ACTIONABLE FRAUDULENT OR NEGLIGENT
MISREPRESENTATION BY BORYS.…………………...19

1)     The source and amounts of money obtained by IGT/GTI and
ECH for the benefit of the technology………………. 20

2)     How money granted to IGT/GTI and ECH on behalf of
CLG was spent ……………………………… 20

3)     The true financial condition of CLG and ECH, including multiple
misrepresentations that ECH was out of money …….……….20

4)     The true condition and status of the Bayonne New Jersey facility,
including the selection of inferior or improper equipment…..…….20

5)     The full nature and scope of the scheme that resulted in the
misappropriation of millions of dollars intended for the
development of the Technology, including the failure of
Defendant's internal controls, if any …...…….…...……….21

6)     The claim that IGT, GTI, ESI and ECH were spending
large amounts of their own money to support CLG ...………….21

7)     The claim that CLG's Board Minutes were accurate and complete.…21

8)     The claim that CLG's financial information was complete and
accurate.……..…..………………….…………...22

9)     The claim that the kiln purchased from Anderson 2000
would work ……..………….…………….…...22

10)    The basis of the amounts claimed as due to IGT or ESI by CLG
and the purpose for expanding the licenses…..…...…………….23

11)   The fact that the Defendants were attempting to build a 30KTPY
      capacity plant knowing that they had purchased a 15KPTW
      capacity kiln í í í í í í í í í í í …í ..í í …í í í í í í í .23

CONCLUSIONí í .í í í í í í í í í í í í í í í í í í …í …í í í ..24

**TABLE OF AUTHORITIES**

Cases                        Page(s)

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................1

*Connick v. Suzuki Motor Co.*,
174 Ill.2d 482 (1996) ...............................................19

*Express Valet, Inc. v. City of Chicago*,
373 Ill.App.3d 838 (1st Dist. 2007) ............................2

*In re Illinois Valley Acceptance Corp.*,
531 F. Supp. 737 (C.D. Ill 1982) ...............................2

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*,
218 Ill.2d 326 (2006) ..............................................19

*Guttman v. Jen-Hsun Huang*,
823 A.2d 492 (Del. 2003) .........................................9

*In re Caremark Intn'l*,
698 A.2d 959, 970 (Del. 1996) ..................................9

*Juarez v. Ameritech Mobile Communications, Inc.*,
957 F.2d 317 (7th Cir. 1992) ....................................1

*Matsushita Electric Industrial Co. Ltd. v. Zentih Radio Corp.*,
475 U.S. 574 (1986) ................................................1

*McMullin v. Beran*,
765 A.2d 910 (Del. 2000) .........................................4

*Murphy v. Walters*,
87 Ill.App.3d 415 (1980) ..........................................2

*Murray v. Chicago Transit Authority*,
252 F.3d 880  (7th Cir. 2001) ....................................1

*People ex rel. Hartigan v. E & E Hauling, Inc.*,
153 Ill.2d 473(1992) ...............................................2

*Reeves v. Sanderson Plumbing Prod., Inc.*,
530 U.S. 133 (2000) ................................................1

*Satellite Receivers, Ltd. v. Household Bank* (Nevada), N.A.,
    49 F.Supp.2d 1083 (E.D. Wis. 1999)……………..……………...1

*Shlensky v. South Parkway Bldg. Corp.*,
    19 Ill.2d 268 (1st Dist. 1960).…………………..……………...2

*Teamsters Local 282 Pension Trust Fund v. Angelos,*
    839 F2d 366 (7th Cir. 1988) ..……………..……………….19

*Trustees of the AFTRA Health Fund v. Biondi,*
    303 F.3d 765 (7th Cir. 2002)..……………..……………….13


Statutes and Rules

Delaware Code, 6 Del.C § 18-305……………..……………...15, 16, 23

DEL. CODE. ANN.  Tit. 6 §18-1101……………..………………4

Delaware Corporation Law, Title 8, ch. 1, s 144……………..…………...2

Fed.R.Civ.Proc. 50(a)………………..……………..…………...1

Now comes Defendant Stanley S. Borys (õBorysö), by and through his undersigned attorney, and pursuant to Fed. R. Civ. P. 50, respectfully moves this Court to grant judgment as a matter of law regarding Counts, I, IV, V, and VI of the Amended Complaint. Plaintiff Cement-Lock, LLC (õCLLLCö) and Richard Mell, on behalf of Cement-Lock Group, LLC (õCLGö), have not submitted sufficient evidence upon which a reasonable jury could find Defendant Borys individually liable for the alleged breaches of fiduciary duty, fraudulent concealment, fraudulent misrepresentation and negligent misrepresentation claimed by the Plaintiffs.  With respect to the RICO and RICO conspiracy claims (Counts II and III), Borys has submitted a separate Rule 50 motion as to these Counts and hereby adopts the arguments of the GTI Defendants, and Defendants Dunne and Lau set forth in their Rule 50 motions.

## STANDARD FOR JUDGMENT AS A MATTER OF LAW

Under Rule 50, a district court should enter a judgment as a matter of law when õa party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.ö Fed.R.Civ.Proc. 50; *Murray v. Chicago Transit Authority*, 252 F.3d 880, 886-87 (7th Cir. 2001) (affirming the district courtøs granting of Fed.R.Civ.Proc. 50(a) motion at the close of Plaintifføs case for Plaintifføs failure to establish a legally sufficient basis for a reasonable jury to enter a verdict on her behalf) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000)).  Moreover, the standard for granting a judgment as a matter of law mirrors the standard for granting summary judgment, such that "the inquiry under each is the same." *Reeves*, 530 U.S. at 150  (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).  A motion for directed verdict should be granted "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Satellite Receivers, Ltd. v. Household Bank* (Nevada), N.A., 49 F.Supp.2d 1083, 1087 (E.D. Wis. 1999) (citing *Juarez v. Ameritech Mobile Communications, Inc.* 957 F.2d 317, 322 (7th Cir. 1992) (quoting *Matsushita Electric Industrial Co. Ltd. v. Zentih Radio Corp.,* 475 U.S. 574, 586 (1986).  There must be more than a mere scintilla of evidence in support of the non-moving party's case, õthere must be evidence on which the jury could reasonably find for the Plaintiff.ö *Anderson*, 477 U.S. at 250.

**ARGUMENT**

I.     **PLAINTIFFS HAVE NOT PRESENTED EVIDENCE THAT BORYS PARTICIPATED IN THE SPECIFIC ACTS WHICH ARE ALLEGED TO BE FRAUDULENT.**

In order to avoid a judgment as a matter of law pursuant to Rule 50 on Counts I, IV, V, and VI Plaintiffs must have presented evidence that Borys individually participated in the wrongs complained of.  A corporate officer is individually liable only for fraudulent acts of his own or those of the corporation in which he participates, only if he knew or acted with knowledge of the fraud or while recklessly avoiding knowledge of the fraud.  *Express Valet, Inc. v. City of Chicago,* 373 Ill.App.3d 838, 851-52, (1 Dist.,2007); *People ex rel. Hartigan v. E & E Hauling, Inc.,* 153 Ill.2d 473, 502, (1992); *Murphy v. Walters*, 87 Ill.App.3d 415, 418-19, 43 (1980).  The fact that Borys served as director or officer of certain of the defendant corporations during the relevant time period does not automatically and alone establish that he committed fraud or that he knew of any alleged fraud.  *In re Illinois Valley Acceptance Corp.*, 531 F.Supp. 737,  740 (C.D. Ill 1982)(õIt is clear that interlocking directorates are not fraudulent per se, and therefore transactions between corporations sharing common directors are merely voidable, upon a showing of fraud or unfairness) (citing Delaware Corporation Law, Title 8, ch. 1, s 144 and *Shlensky v. South Parkway Bldg. Corp.*, 19 Ill.2d 268, (1st Dist. 1960)).  In the instant case, Plaintiffs have not demonstrated that Borys individually participated in any wrongs complained of nor any wrongs of the corporation.

Borysø liability can only be based upon his own conduct or statements.  With respect to the actions and statements of Tony Lee, Amir Rehmat, and Peter Barone, it is well-settled in this circuit that when an agent acts õ*entirely* on his own behalf . . . he is acting outside the scope of the agency and the principal is not bound.ö *William Electronics Games, Inc. v. Garrity*, 366 F.3d 568, 575 (7th Cir. 2004) (citing *Hartmann v. Prudential Ins. Co. of America*, 9 F.3d 1207, 1210 (7th Cir. 1993) (emphasis in original). Also, with respect to any other individual, the Plaintiffs have not established that Borys was a member of any alleged conspiracy such that the statements or conduct of any such other individual could be considered in establishing Borysø liability. Plaintiffs have repeatedly and expressly disavowed the use of any statements of co-conspirators against the Defendants.  In fact, since they have not established a conspiracy, the statements of any alleged co-conspirators under Fed. R. Evid. 802(d)(2)(E) cannot be admissible against

Borys.  Consequently, Plaintiffs' evidence is limited to Borys' *own* statements and actions and must be sufficient to withstand judgment as a matter of law.

Plaintiffs claim that Borys 1) breached his fiduciary duties 2) engaged in fraudulent concealment 3) made fraudulent misrepresentations and 4) made negligent misrepresentations. The factual bases for these allegations as to Borys are not clearly and specifically set forth in Plaintiffs' Amended Complaint.  While Plaintiffs' jury instructions also fail to clearly identify the specifics required by law for Borys' alleged breaches of fiduciary duty, Plaintiff's Response to the Motions for Summary Judgment and this Court's Second Amended Memorandum Opinion and Order, 11/30/07, granting and denying in part Defendants' Motions for Summary Judgment addressed some of the fiduciary duty claims made by Plaintiffs.   Plaintiffs have also submitted Jury Instructions 75 and 78 setting forth the claims for fraudulent concealment, fraudulent misrepresentation and negligent misrepresentation, but do not specifically identify Borys' alleged acts, when they occurred and in what manner they occurred. Plaintiffs' proof at trial has not done so either.  Defendant Borys herein therefore addresses to the extent possible allegations as set forth in the instructions, Plaintiffs Response to the Motions for Summary Judgment, and the Memorandum Opinion and Order.[1]

## II.  PLAINTIFFS HAVE NOT PRESENTED EVIDENCE SUFFICIENT TO AVOID JUDGMENT AS A MATTER OF LAW REGARDING BORYS' ALLEGED BREACH OF HIS FIDUCIARY DUTIES.

In Count I, Plaintiffs claim that Borys breached his fiduciary duties to them as shareholders of CLG during his tenure as one of the ESI designated representatives on the

---

[1]    In Plaintiffs' response to Defendants' Motions for Summary Judgment, Plaintiffs' identified 9 bullet points regarding Borys which they contended constituted breaches of fiduciary duty, acts of fraud and violations of RICO. (Pltf. MSJ Resp., at p. 19).  The 9 bullet points are addressed herein as follows:
1) authorizing ESI and GTI to misrepresent their interests in Cement Lock Technology to receive funding - addressed in Argument II(2);
2) failing to inform CLG of funding – addressed in Arguments III(1) and IV(1) – Representation/Concealment of funding;
3) misdirecting funding for GTI operating costs – addressed in Arguments II(1), III(5) and IV(2);
4) failure to adopt internal controls – addressed in Argument II(3), III(3) and IV(5);
5) charging employee time to CLG and relationship to ECH licenses – addressed in Arguments II(1); III(5), III(8) and IV(10);
6) misrepresenting CLG finances – addressed in Arguments III(4), IV(3) and IV(6);
7) denial of Unitel license expansion – addressed in Argument II(5)
8) misrepresenting FBI investigation of Randhavas to Mell -  Plaintiffs did not present any evidence on this matter during trial.
9) failing to commercialize Cement Lock Technology – addressed in Arguments II(4), III(6), IV(4), IV(9) and IV(11).

Operating Board of CLG, a Delaware LLC. Initially, it should be noted that, as this action is a derivative action on behalf of CLG, there can be no claims based on any actions prior to CLG's incorporation on December 1, 1997. Even after December 1, 1997, Plaintiffs' claims fail for a number of reasons. Borys was not a shareholder of CLG. Rather, he was the President of shareholder ESI. As such, Borys, along with the individual members of Plaintiff CLLLC was on the board of managers. As a member of the board of managers, he did not owe a fiduciary tudy to the CL LLC or Mell, but rather to CLG as an entitiy. Moreover, the Plaintiffs controlled 6 of the 7 members of the board of managers: 5 members of Plaintiff CLLLLC (including the two hidden members) were on the board— Serge Randhava, Ravi Randhava, Richard Kao, Tony Lee, and Amir Rehmat and Mell representing himself. Under Delaware law, the actions of a director are protected under the business judgment rule unless the Plaintiff can prove that the director breached his fiduciary duty of loyalty, good faith or due care. *McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000). As permitted by Delaware law, the CLG Operating Agreement limits any liability for actions of the managers within the scope of their authority, unless the claim is based on "fraud, gross negligence or bad faith." (CLG Operating Agreement, §5.3) DEL. CODE. ANN. Tit. 6 §18-1101. Here, Plaintiffs have not presented sufficient evidence of any fraud, gross negligence or bad faith on the part of Borys to withstand judgment as a matter of law. Moreover, Plaintiffs have not presented evidence establishing as a matter of law that any of these claims could constitute a breach of Borys' fiduciary duties to the CLG.

1)      **Self dealing.**  Plaintiffs claimed that Borys engaged in self-dealing based on the charging of time to CLG by employees of the defendant corporations and that this charging of time allegedly resulted in forcing CLG to accept unfavorable contracts with ECH to pay for this employee time. Plaintiffs claim the motive for this was allegedly done to ensure that ECH, ESI and GTI would receive a continuous stream of contract revenue. While Plaintiffs have introduced some evidence that time was charged to CLG for work done by IGT/ESI employees Michael Mensinger and Tony Lee, Plaintiffs have not provided any evidence that Borys personally charged his time nor benefited in any way, nor to suggest that such time charging was in any way self-dealing by Borys. For example, it is true that Mike Mensinger, while an ESI employee and co-inventor on the Cement Lock Technology patents assigned to CLG, charged the time he spent prior to issuance of the patents in September 1998 and January 1999 responding to the US Patent Office's rejection of CLG's two patents to CLG. Tr. 2578:15-

2585:6 (Mensinger).  But Plaintiffs were aware of this fact and thus cannot now assert that they did not know about Mensinger's time and activities as Richard Kao, a member of Plaintiff CLLLC, assisted Mensinger in this activity. Tr. 2582:24-2583:16 (Mensinger).  Further, Plaintiffs can hardly contend that Borys was self dealing as to this, as this activity and these charges directly benefited CLG, were directed toward insuring that CLG had protectible property interests-e.g., that the patents the subject of the assigned applications issued, and were in no way adverse to CLG. Tr. 2584:1-8 (Mensinger) Additionally, as to the charges of Mensinger to CLG for marketing the Cement Lock Technology, Plaintiffs were fully aware of Mensinger's marketing activities GTIX 289, 290 (10/5/2000 Letters of Mensinger to Patricia Young and Mell) and Plaintiff Mell testified that he fully expected that Mensinger would charge his time to CLG that was devoted to making presentations to Mell's contacts at the Water Reclamation District in an effort to obtain support, investors and funding for the Cement Lock Technology. Tr. 1594:11-14, 1607:21-1608:2, 1609:20-22(Mell); 2589:24-2590:18 (Mensinger); 4142:7-24 (S. Randhava)  Likewise, Tony Lee, a member of Plaintiff CLLLC, charged expenses he incurred in lunches with the Plaintiffs regarding Cement Lock, its marketing and its potential funding sources and activities and CLG authorized Lee to engage in such activities. See, e.g. BX 49 (7/22/98 Minutes), BX 53(a) (4/16/99 Minutes), BX 60/135I  (3/8/2000 Minutes). None of this was self-dealing by Borys, all of it was done with Plaintiffs' direct knowledge and participation and all of it was directly related to the best interests of CLG. As to any complaints Plaintiffs may have that IGT charged administrative support expenses to CLG, Plaintiffs themselves requested that IGT supply all the administrative support for the Cement Lock projects. BX 19. PX 20, GTIX88; Tr. 3281:3-3282:13 (S. Randhava) (8/2/96 Serge Randhava letter to Borys); 1980:25-1981:18 (Dunne); 1069:15-23 (Borys).

Plaintiffs claim in this litigation that any of the licenses CLG granted to ECH on 12/1/97, 3/24/99 (signed 8/25/99) and 2/2/01 (and thereafter amended on 6/24/02 (BX 72) 4/7/03(BX81) were not in CLG's best interests are disengenous at best.  First, the ECH licenses were made with the Plaintiffs' full knowledge and participation and without objection.  See e.g.  Tr. 422:20-423:17, 427:9-429:21, 433:25-434:6, 436:12-437:21;  439:2-21; 649:13-651:7 (R. Randhava); 1508:16-1515:19 (Mell); 1038:7-1039:3 (Borys); 3321:7-23 (Dec 1, 1997 License), 3703:7-3704:22 (S. Randhava) (admitting attendance at March 24, 1999 meeting where CLG partners

consent to expanded license for 500,000 tons to ECH). [2]  Second, Borys has not been shown to have personally benefited in any way from the two licenses he signedô the 12/97 license which does not appear to be in dispute, nor the 1999 license which likewise does not appear to be in dispute. Third, the ECH licenses generated much needed cash to reimburse activities directed to making the cement lock patents viable and marketable. The need for additional funding for patent protection and legal costs was made clear to all the members of CLG in meetings as reflected in these minutes but when cash calls were made and CLLLC and Mell declined to fund their share of these costs.  BX. 52, 53 (March 24, 1999 CLG Meeting Minutes); Tr. 1508:16-1515:19 (Mell); 1186:15 -1187:16 (Borys); 430:16-433:18 (R. Randhava).  In fact, an aggregate of $500,000 was paid by ECH to CLG to cover patent costs and other expenses of CLG.  PX 805; Tr. 1050:7-1051:3 (Borys).  There is no evidence that Borys engaged in self-dealing at the expense of CLG; all of Plaintiffsø complaints of self-dealing were acts and events of which they had knowledge and that were designed to benefit CLG, and none involved direct benefits to Borys.  Indeed, the only evidence of self-dealing which occurred at the expense of CLG were the acts of Plaintiffs in granting self dealing licenses to themselves in conflict with CLGøs licenses to ECH and from which CLG derived no monetary benefit.

   **2)    Misappropriation of Intellectual Property.**  Plaintiffsø next complain that Defendants allowed GTI to wrongly misrepresent itself as owner of Cement Lock Technology to secure funding for the Technology without a license and by keeping that funding secret from CLG.  Most importantly as to Borys, while this is not a patent infringement action, patent rights cannot be enforced and do not arise until patents issuedô  here September 1998 as to the process invention and January 1999 as to the product invention. PX 898, PX899, BX 32, 33. Plaintiffs have not demonstrated any misrepresentation of ownership rights to the patented inventions by Borys after these dates.  Consequently, there is no factual or legal basis for any claim of õmisappropriationö of CLGøs rights when it had none until September 1998 and January 1999.  Likewise, CLG did not even exist at the time of any alleged misrepresentations in 1997.  So that alleged misrepresentations regarding ownership of invention rights cannot be the basis of a claim against Borys

---

[2]      While Serge Randhava claims not to have received the correspondence forwarding the 2001 license to him, documentary evidence with Mr. Randhavaøs own handwritten markings demonstrates his attendance at meetings where ECHøs 1.1 millon ton license was discussed. PX 717.  Prior to that Mr. Randhava expressed knowledge during the September 10, 1999 of the cumulative nature of ECHøs license.  GTIX. 203.

Plaintiffs complain of statements related to IGT as contained in the Brookhaven proposals, but ignore the fact that Plaintiffs new IGT had intellectual property rights to the Cement Lock Technology, and therefore could not õmisappropriateö those rights. First, the Plaintiffs Serge Randhava, Ravi Randhava and Richard Kao, as Unitel, participated in Phase II of the Brookhaven Funding with IGT and knew full well of IGTøs involvement in Phase I and later in the future phases. See BX 18, BX 19, PX 20, PX 286; Tr. 575:3-581:9 (R. Randhava). Second, IGT did have rights in the Cement Lock Technology through its employee and co-inventors Amir Rehmat, Tony Lee and Mike Mensinger by virtue of assignments that these employees gave IGT at the time of their employment. Tr. 2537:24-2538:20 (Mensinger); 1246:1-14 (Borys); 535:5-23 (R. Randhava). IGT was the rightful owner of the intellectual property at the time of the proposal to BNL for Phase I and II. See BX 13, 14 and PX 7A; Tr. 1396:2-1397:1 (Borys); 4139:23 -4142:4 (S. Randhava). The evidence demonstrated Plaintiffs knew about IGTøs involvement in this research and development of the Cement Lock Technology as early as 1996. GTIX 128, BX. 18. Plaintiffs also concede that IGTøs ownership through its employees and inventors Lee, Rehmat and Mensinger when Plaintiffs listed these IGT co-inventors on patent applications and had their [Plaintiffsø] own attorneys include them on the Cement Lock patents prepared in part by Richard Kao, a member of Plaintiff CLLLC. Tr. 178:15-23 (R. Randhava); BX 32, 33; PX, 898, 899. Ravi Randhava testified that he was aware that Lee, Rehmat and Mensinger had employment agreements with IGT, which assigned their invention rights to IGT and therefore these rights could not lawfully be assigned by Lee, Rehmat and Mensinger to CLLLC. Tr. 535:5-536:2 (R. Randhava); 1245:22-1246:14 (Borys); 2143:12-2144:4 (Dunne). Indeed, Ravi testified that that Lee and Rehmat did not list themselves on the CLLLC operating agreement as owners but rather listed entities/persons that they owned and/or controlled. Tr. 240:11-243:24, 508:22-25, 509:11-13 (R. Randhava); 3984:24-2985:1 (S. Randhava).

Second, IGT/GTIøs rights in the technology included both the rights in the inventions which are the subject of two U.S. Patents up through and including their issuance in September 1998 as to one patent and January 1999 in another. PX 898, 899; Tr. 177:10-178:19 (R. Randhava); 2896:3-11 (Mensinger). IGT/GTI also retained intellectual property rights in the research and development that occurred prior to and outside of the inventions represented by the two patents including but not limited to the research and development performed pursuant to all

Brookhaven Contracts, Phases I, II. BX 14, 15, 18; PX 7A; Tr. 973:14 -974:10 (Borys). These rights are not extinguished simply because inventions become patented.

Finally, Plaintiffs also concede that they had long agreed that IGT was the entity that would perform õall downstream R and D work on the process and its applications.ö BX 19; PX 489; Tr. 410:13-25 (R. Randhava); 1331:21-1333:4 (Borys). Consequently, Plaintiffs have not presented evidence of a misappropriation of CLGøs intellectual property rights by Borys, nor evidence that Borys engaged in self-dealing as to these rights. Moreover, Plaintiffs have not shown that CLG was at all injured by the alleged misappropriation.

3)     **Internal Controls.** Plaintiffs argue that IGTøs lack of internal controls resulted in its failure to detect and prevent fraud including what has been referred to as the BLR fraud and this in turn resulted in a breach of duty to CLG. Plaintiffsøsole evidence on this point is that there was a BLR fraud which resulted in the embezzlement of certain funds directed toward the NY NJ Harbor Plant activities by their partners, Rehmat and Lee, and Peter Barone, a GRI employee from GRI monies that were intended for the research and development at the New York New Jersey Plant and that, *a fortiori,* CLG was injured. The testimony is to the contrary. Michael Mensinger, the project manager at the New York New Jersey Harbor plant testified that the BLR embezzlement had no impact on the activities there, largely because the monies were embezzled from contracts that were designed to explore the viability of alternative feed stock uses at the plant and not the demonstration of the Cement Lock Technology. Tr. 2888:23-2889:10 (Mensinger). Moreover, the evidence is that the embezzled funds were repaid to the cement lock project once the fraud was discovered. Tr. 2838:11-21 (Mensinger); 462:17 -463:15 (R. Randhava); PX 197. Indeed, Plaintiffs own evidence demonstrated that there was no complaint thereafter until, according to Kao at a 2003 CLG Board meeting, which was just prior to the plant becoming operational in July 2003. Tr. 3048:22 -3049:8 (Kao). In the instant case, Plaintiffs have not established any legal or factual basis to impose duties by officers and directors of IGT to CLG, as none of the funding embezzled was funding directly linked to CLG. Absent a basis for such a duty, there is no basis to impose fiduciary liability on Borys for acts and events of employees of IGT including fraud by such employees. On this basis alone, this claim for breach by Borys as an officer and director of IGT should fail.

Even assuming *arguendo* such a duty of Borys existed to CLG by virtue of his positions as COO and Chief Executive Officer of IGT/GTI, the case law makes clear that the fact that a

fraud occurs is not alone sufficient to hold officers and directors liable for a breach of fiduciary duty. Under *In re Caremark Intn'l*, 698 A.2d 959, 970 (Del. Ch. 1996), it is necessary that Plaintiffs demonstrate a lack of good faith attempt to ensure that an adequate corporate information and reporting system exists. As this Court recognized, for Plaintiffs to meet the *Caremark* standard is no easy task as the decision "premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs." *Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 506 (Del.Ch. 2003). Plaintiffs have not shown this. Further, the undisputed facts demonstrate that no injury occurred to the development of the technology. Mensinger testified in fact that the embezzlement did not delay development of the Cement Lock Technology. Tr. 2887:19-23 (Mensinger). According to Mensinger, the delay in demonstrating the technology was due to problems associated with finding a site, delays experienced in negotiating a lease for the site, and delays involved in assembling and engineering the kiln at the site to try to make the technology work under the environmental conditions of the NY/NJ Harbor. Tr. 2257:22-2258, 2479:1-2480:13 (Mensinger). Mensinger further testified that the funds embezzled by Barone, Lee and Rehmat were not funds directed at building the New Jersey plant but, rather, funds that were to be used to investigative alternative feedstocks and river sediment. Tr. 2888:18-2889:10 (Mensinger). And, as Mensinger testified, the funds embezzled by BLR for the demonstration project were replaced by IGT/GRI, and spent on the project. Tr. 2838:11-2839:16 (Mensinger).

In addition, Plaintiffs own evidence demonstrated that the BLR fraud was so sophisticated that even Mr. Mensinger, an IGT employee who worked daily with Lee and Rehmat and interfaced with Barone at GRI, could not detect the fraud happening right under his nose and, therefore, he testified that he did not think that management could have been expected to discover it either. Tr. 2365:25-2367:2 (Mensinger). Lastly, the evidence demonstrated the existence of internal controls that under *Caremark* made reliance by Borys and others on the expectation that IGT's employees would adhere to their fiduciary duties reasonable. Tr. 1242:10-16 (Borys) (internal investigation discovered BLR fraud). See *Caremark* at 969.

**4)** **Willful suppression of technology.** Plaintiffs claim that Defendants purposely suppressed the development of the CL technology. As "proof" of Defendants' suppression, Plaintiffs argue that Defendants purchased a "used" and non-slagging kiln which ensured that the plant could never properly operate. First, there is no evience that Borys was involved in the

selection of the kiln. Second, Plaintiffs contentions that the kiln was used and non-slagging are wrong. The Anderson 2000 kiln was not "used." Rather, it had merely been originally designated for another customer, not delivered and put in storage. Tr. 2396:23-2397:7 (Mensinger). Also, the evidence shows that the kiln in fact operated in slagging mode. PX 197; Tr. 2487:4-7 (Mensinger); 466:8-468:14 (R. Randhava) (conceding that the Anderson 2000 kiln worked at temperatures in the slagging mode); 774:15-19 (Borys). Third, Plaintiffs themselves were involved in its selection and Richard Kao acknowledged as much. However, Kao admitted that he did not voice his concerns about the kiln that he had in 1998 when he learned about it and was involved in its selection until sometime in 2003 when he mentioned it to defendant Frances Lau for the first time. Tr. 2989:9-2992:6 (Kao).

Further, while there were problems at the New Jersey plant, Mr. Douglas testified that he never saw anything done by Borys or the defendants to prevent the New Jersey project from being successful. Tr. 1877:16-1879:1 (Douglas). Indeed, not only is there is no evidence that Borys attempted to suppress the development of the technology; but the evidence is to the contrary. All witnesses with knowledge of the project agreed that upper management, including Borys, was at all times exerting pressure to get the project done, not suppress the technology. Tr. 1846:20-1847:21 (Douglas); 2516:6-2517:4 (Mensinger).

As support for their "suppression" argument, Plaintiffs argue that defendants had a motive for this suppression because ECH signed promissory notes that would have to be repaid only upon plant start-up, *a fortiori*, Defendants must not have had an interest in achieving plant start up. With respect to the delay of repayment to GRI until plant start-up, Plaintiffs' argument is a straw man. The upshot of Plaintiffs argument appears to be that ECH should have agreed to pay back the promissory notes to GRI prior to start up-essentially requiring repayment of funding for R & D during the R & D phases. However, Plaintiffs have not suggested how that could be done until after commercial implementation of the technology. Further, the testimony at trial reflected that repayment of GRI obligations post start up was a practice common in the industry. Tr. 1214:16-1216:5 (Borys). Consequently, the evidence does not support a conclusion that Defendant Borys took any action to willfully suppress the technology.

**5)** **Unitel License.** Plaintiffs' claim regarding the Unitel License essentially is that defendants, including Borys, subordinated CLG's interest to those of ECH by refusing to expand Unitel's license. As background, it should be noted that the Unitel license was originally granted

without the knowledge of Borys or Dunne. Plaintiffs (including Unitel owners Ravi Randhava, Serge Randhava, Richard Kao, Richard Mell and Tony Lee) voted to have CLG grant Unitel a license in conflict with ECH's exclusive license at meetings in 2001 and 2002 at which Stan Borys was not present. Plaintiffs concede they did not disclose these licenses to Borys. BX 75; Tr. 439:25-440:11 (R. Randhava); 1514:19-1516:2, 1632:24-1634:5 (Mell). No independent representative of ESI, the 51% owner of CLG (e.g. Borys or Dunne), participated in this vote. BX. 75 (April 19, 2002 Minutes). Also, it appears that the meeting was held off the premises of IGT as no one signed in. Tr. 668:17- 669:8 (R. Randhava). The existence of Unitel's conflicting license came to the attention of CLG's independent officers and ESI's representatives in 2003 only after both Amir Rehmat and Tony Lee (ESI's other representatives at CLG) had been terminated and that action was immediately taken to address the conflicting nature of Unitel's license at CLG Board meetings that Plaintiffs attended. BX 76 (1/30/03 Board Meeting); see also BX 85, 135EE (4/18/03 Board Meeting); Tr. 3171:18-3177:15 (Lau); 676:4-680:16 (R. Randhava).

Thereafter, Plaintiffs request in or about September 2003, on behalf of Unitel, to expand its conflicting license was rejected not only by the three (3) ESI representatives on the CLG Board, but by Richard Mell as well, who cast the tie breaking vote 4 to 3 because such an expansion was not in the best interests of CLG. PX 752; Tr. 3206:19-3207:17 (Lau). Thus the action to deny Unitel an expanded license was due in large part to Plaintiff Richard Mell's actions in casting the 4th vote -- not the actions of defendants.

Plaintiffs' argument also fails because they have not proven that the decision not to expand Unitel's conflicting license resulted in any demonstrable damage to CLG. Plaintiffs make an incorrect distinction between Unitel's license and the ECH licenses as "royalty bearing" versus "non-royalty bearing." In fact, ECH's 8/99 and 2/2/01 licenses were paid up front or prepaid. BX 58, 65; Tr. 1038:7-17 (Borys). Moreover, contrary to Plaintiffs' assertions, the testimony is undisputed that: the December 1997 license was executed in conjunction with the agreement by GRI to fund at least $4.5 million to ECH for building the NY and NJ Harbor plant; the August 1999 license was granted for an up-front payment in the amount of $150, 000.00 (BX 58, para. 4.1; PX 248) and did carry a royalty provision albeit with an unspecified amount; and the February 2001 license, while not royalty bearing in the future (2.1), was granted in exchange for additional up-front consideration of $150,000 (PX 485; BX. 65, para. 4.1), also required ECH

to provide to CLG a copy of all operational data generated by use of the Process in the defined field and assigned to CLG all rights, title and interest in any inventions, improvements, modifications and designs ECH might make related to the Process at no cost to CLG, and contained performance requirements. BX 65 at 4.2.

The Amendments to this License retained these provisions in addition to providing additional up front consideration: increasing ECH's consideration to $400,000 (BX. 72, para. 4) in 2002; and increasing ECH's consideration to $500,000 in April 2003 (BX 81)(para. 4). In contrast, Unitel's initial conflicting license was granted by its owners and others free of charge and with no consideration to CLG albeit with the promise in the future to pay a royalty following an unspecified plant start up and contained no performance requirements. BX 75. Its proposed expanded license likewise carried no up front fee or consideration and a royalty based on future tonnage which would not be paid to CLG until commercialization. Tr. 675:5-16 (R. Randhava). Further, Plaintiffs have not produced evidence that even under its initial self dealing license issued in December 2001, Unitel had potential to develop the Cement Lock Technology. Given the fact that the Unitel license contained no up front payments, and that Plaintiffs have never identified a real opportunity based upon more than speculation to develop the Cement Lock Technology under its initial license, Plaintiffs have not established that CLG lost any revenue based on the failure to expand the Unitel license. That is because the expanded Unitel license would not have provided any revenue to CLG *until the technology was commercialized*, a condition which has not been achieved to date.[3] Consequently, there is simply no injury to CLG based on the non-expansion of the Unitel license.

## III.  PLAINTIFFS HAVE NOT PRESENTED EVIDENCE OF ACTIONABLE FRAUDULENT CONCEALMENT BY BORYS.

Plaintiffs alleged in Count IV that Borys participated in fraudulent concealment of material facts. In order to demonstrate fraudulent concealment, Plaintiffs must show (1) concealment of a material fact, (2) that the concealment was intended to induce a false belief, under circumstances creating a duty to speak, (3) that the innocent party could not have discovered the truth through a reasonable inquiry or inspection or was prevented from making a

---

[3]    Any claim based on some theory of lost future, post-commercialization revenue is speculative. See January 9, 2008 Order re Testimony of Ronald Volmar, at pp 12-13 (rejecting New Business Rule application because Plaintiffs do not seek lost profits).

reasonable inquiry or inspection and relied upon the silence as a representation that the fact did not exist, (4) that the concealed information was such that the injured party would have acted differently had he been aware of it. and (5) that reliance by the person from whom the fact was concealed led to his injury. *Trustees of the AFTRA Health Fund v. Biondi,* 303 F.3d 765, 777 (7th Cir. 2002). Plaintiffs have identified certain alleged fraudulent omissions as the basis for their claim in their proposed jury instruction Number 75. However, none of these alleged concealments are directed specifically at Borys. Further, Plaintiffs have failed to prove they are entitled to recovery based on any of the acts described, because they have failed to demonstrate all of the elements regarding each alleged omission, particularly as to Borys.

**1)** **The source and amounts of money obtained by IGT/GTI and ECH for the benefit of the technology.** Plaintiffs claim of concealment regarding the sources and the amount of funding fails for a number of reasons. First and foremost, Plaintiffs and CLG have no interest in IGT/GTI, ESI, ECH, GRI, BNL, NJDOT or MDEQ and, consequently, they have not demonstrated any circumstances which impose a duty on the part of any defendant including Borys to provide Plaintiffs with specific details about the R&D funding for the demonstration plant in the NY/NJ Harbor area. Plaintiffs, in fact, intended IGT to perform the downstream R&D for the technology. Tr. 410:13-25 (R. Randhava); 1331:21-1333:4 (Borys). Plaintiffs have not demonstrated any legal basis for holding that Borys had a duty to inform them of specific funding received by the defendant corporations. Indeed, Plaintiff Mell admits that Cement Lock Operating Agreement does not require disclosure of the financial information of the sponsors. Tr. 1611:1 -1613:13 (Mell).

Moreover, Plaintiffs were aware of the sources of money obtained by IGT/GTI and ECH for the benefit of the technology. Both Ravi and Serge Randhava knew BNL was a primary sponsor based on Unitel's participation in BNL's Phase II of the development. PX 286; Tr. 600:23-601:25 (R. Randhava). Serge and Ravi admitted they knew GRI was a primary sponsored initial funding of $4.5 Million for the project. Tr. 414:19-415:9 (R. Randhava); 3373:12-22 (S. Randhava). Ravi also admitted he knew BNL and the State of New Jersey were providing funding for the demonstration plant. Tr. 415:10-17 (R. Randhava). Serge acknowledged he knew about the BNL funding. Tr. 3502:9-3503:19 (S. Randhava). GRI's agreement to increase its $4.5 million funding to $4.9 was disclosed to Plaintiffs, including Serge, Kao, Rehmat, and Lee at the 3/8/2000 CLG meeting. BX 60, 135I. Funding from BNL, NJDOT, MDEQ were

discussed at the April 17, 2000 meeting that Serge, Ravi, Mell, Lee and Rehmat attended. BX 62, 135K; GTIX 246, p. 2; Tr. 415:18-416:14 (R. Randhava). Tr. 1541:13-1544:16 (Mell). Mell also admitted that he learned GRI was a sponsor of the project at a meeting when Borys described GRI as the primary sponsor. Tr. 1660:3-16 (Mell). Mensinger testified that he kept all Plaintiffs and members of CLLLC informed about the funding and sponsors on PX 885 as well as the status of the project. Tr. 2606:25-2607:13 (Mensinger). Moreover, Borys testified several times that the Plaintiffs were made aware of the funding related to the Technology both formally and informally. Tr. 1088:15-1089:20 (Borys).    Moreover, it was Plaintiffsø CLLLC partner Rehmat, as an IGT employee, who oversaw the project, prepared and submitted proposals for funding and, following his termination, continued to obtain information for the Plaintiffs for purposes of bringing this lawsuit. GTIX 526; Tr. 353:15-354:1 (R. Randhava); 2364:4-14 (Mensinger). The evidence demonstrated that Plaintiffs had regular access to Lee and Rehmat and to Mensinger; and Plaintiffs were well informed at CLG meetings. Additionally, Unitel participated in the plant start-up and had a contract through which two of its engineers were paid to be on site. GTIX 483; Tr. 2902:1-15 (Mensinger); 3539:13-16 (S. Randhava).

Finally, the evidence shows Plaintiffs did not request any further information concerning project funding prior to initiating this lawsuit, and yet, they knew prior to 12/1/97 that funding would be obtained for demonstrating the technology.  To the extent that Plaintiffs felt the disclosures were inadequate, nothing prevented them from seeking additional information.  The fact that they did not seek further information does not give rise to a claim for fraudulent concealment.  Plaintiffsø claim of concealment also fails because plaintiffs have not identified any actions they took or failed to take had they been aware of the funding or any resulting injury.

**2) The amount of money defendants kept for themselves.**  There is no evidence in the record that Borys received any money from funding related to Cement Lock.  In fact, all of Borysø compensation which consisted of salary, bonus and severance was paid by IGT. Tr. 828:6-830:22; 1262:8-16 (Borys).  Borysø compensation was determined by the board of directors based upon recommendations of independent directors with access to external compensation studies. Tr. 1230:12-1232:4 (Borys).  Plaintiffs have not established that any circumstances created a duty for Borys to reveal his salary and compensation to Plaintiffs, who have no interest in IGT.  While Delaware law and the CLG operating agreement gave CLG members a right to certain information as to LG, there is no basis for extending that right to

information regarding corporations (like ESI or IGT) in which Plaintiffs have no interest. 6 Del C. 18-305 (members access limited to certain records of LLC). Plaintiffs have provided no authority for the proposition that Borys was required to disclose his IGT compensation to CLG's other members. Plaintiffs cannot demonstrate that they took any action or failed to take any action as members of CLG based on the absence of information regarding Borys' compensation, compensation that was publicly available to Plaintiffs through IRS Form 990, Title 26 U.S.C. 6104(d). Finally, it is also difficult to see how this claim can be a derivative claim by CLG.

     **3)     Concealment of the misappropriation of millions of dollars intended for the development of the Cement Lock Technology and Defendant's lack of internal controls**. Plaintiffs have not demonstrated that Borys concealed the BLR fraud. In fact, the evidence shows Borys reported the fraud to the CLG board at the first CLG Board meeting in 2003 after he first learned of the BLR fraud. BX 77, 135X (1/30/03 Meeting Minutes). All Plaintiffs concede this. Tr. 676:4-22 (R. Randhava); 1482:23-1484:15 (Mell); 4074:5-11 (S.Randhava). Plaintiffs attempt to complain they did not know the full amount of the BLR fraud. As the funding from which Lee, Rehmat and Barone took monies was not CLG's monies, Plaintiffs can point to neither a legal basis or duty that required Borys to report the full extent of the fraud to Plaintiffs nor can they establish any evidence of any injury to CLG. Moreover, Borys cannot report what is not known. Plaintiffs have not demonstrated Borys knew the full extent of the fraud prior to when he reported it. It is undisputed Borys reported a fraud of approximately $4.3 million when he updated the Board in April 2003 after further investigation was done. Tr. 1242:22-1244:5 (Borys). Ravi admitted that he learned of BLR fraud in 2003, and that $4.3 million had been misappropriated. Tr. 316:18-318:1 (R. Randhava). Mell testified that he recalled that Borys reported the BLR fraud in January 2003. Tr. 1634:11-14 (Mell). Plaintiffs have not presented any concealment regarding the fraud, any reliance, or any damages resultant from this alleged injury. Likewise, Plaintiffs have not demonstrated deficient internal controls.

     **4)     Financial information and status of CLG.**  Plaintiffs have not demonstrated that the financial information and status of CLG was concealed. Ravi admitted that his brother Serge signed a unanimous written consent in 2002 indicating that CLLLC received the CLG financials for 2001. GTIX 411; Tr. 724:21-725:8 (R. Randhava). Serge and Mell admit to signing these documents. Tr. 3494:6-3496:5(S. Randhava); Tr. 1556:22-1559:11(Mell). Borys also testified that the annual financial report for 2001 was distributed to, reviewed, and approved

by unanimous consent by Serge and Mell.  BX. 73, 135T; 144V; Tr. 1320:14-1322:22 (Borys).

A similar consent was executed in 2003 regarding the 2002 financials.  BX. 78, 135Y, 144Y;

GTIX 473; Tr. 726:5-18 (R. Randhava).  Borys also testified that financial statements were

provided to CLG members, specifically the Randhavas, Kao, Mell.  Tr. 1260:8-11 (Borys).

Moreover, Plaintiffs had the opportunity to request financial information in writing under  CLG's

Operating Agreement and Delaware law, yet they produce no evidence that they sought and were

denied this information. Plaintiffs cannot establish that Borys had a duty to disclose financial

information that was concealed from them and cannot establish they made any requests of Borys

that were denied.

Information concerning the funding related to Cement Lock Technology development or

other financial information of CLG, was accessible to Plaintiffs if they had requested it. The

CLG Operating Agreement para. 10.2 (c ) permits inspection of CLG's books and records at

reasonable times. BX 24. Further, Delaware law allows Plaintiffs to request "1) true and full

information regarding the status of the business and financial condition of the limited liability

company; 2) true and full information regarding the amount of cash and a description and

statement of the agreed value of any other property or services contributed by each member and

which each member has agreed to contribute in the future, and the date on which each became a

member; and 3) other information regarding the affairs of the limited liability company as is just

and reasonable."  6 Del. C. § 18-305(a).  The Act states further that such demand be in writing

and state the purpose of the demand.  6 Del. C. § 18-305(e).  Plaintiffs cannot complain of failing

to receive information they did not request,  as allowed by CLG's Operating Agreement and

Delaware statute.

**5)**      **The fact that inter-company time and expenses of the Defendants were

charged to CLG.**  Plaintiff's contention centers around the technical and administration

expenses charged to CLG and that they alleged was concealed from Plaintiffs.  Plaintiffs,

however, knew about the purpose and nature of these charges.  First, Mell testified that he

requested that Mensinger give demonstrations about the Cement Lock Technology to the Water

Reclamation District Board and understood that Mensinger would be paid. Tr. 1607:21-1608:13

(Mell); GTIX 290.  Second, Plaintiffs knew that Mensinger was working with Kao to respond to

the U.S. Patent Office after it rejected the patent applications. Tr. 2579:12-18 (Mensinger).

Third, Ravi testified there was no surprise to Plaintiffs that about the costs for maintaining

patents. Tr. 548:8-549:4 (R. Randhava). And, finally, the CLG Board authorized Lee to perform marketing and other activities related to the Cement Lock Technology for which Lee charged his time to CLG. BX 49, 52, 53(a), and 60. Dunne testified when CLG was formed there were discussions that IGT and ESI employees were going to be charging time to CLG and that Mell said he assumed that would be the case. Tr.1980:25-1981:18 (Dunne). Plaintiffs signed a Written Consent in January 1998 authorizing IGT employees to handle all financial and banking transactions (BX 45/133M) and acknowledged that they had received CLG financial statements; and Plaintiffs did not seek further information regarding the CLG financials prior to 2003, as permitted by statute. When Plaintiffs made such a request, Thomas O'Laughlin provided an accounting. PX 805. Lastly, no inter-company transfers were made by Borys and none were used to pay or compensate Borys. Consequently, Plaintiffs' claims such information was concealed from them and they were unaware that inter-company time and expenses were charged to CLG are unfounded; there is no evidence against Borys regarding this claim; and no evidence of injury to CLG.

**6)** **The fact that as of April of 2003 at the latest Defendants had no further interest in commercializing the technology.** With respect to Borys, Plaintiffs have offered no evidence he was uninterested in commercializing the Cement Lock Technology. In fact, Borys testified even at the time of his departure in 2005, he strongly supported commercializing the technology. Tr. 1278:25-1279:7 (Borys). Mensinger testified further work on developing the technology for commercial use continued through 2007. Tr. 2502:18-2503:3 (Mensinger). In fact, the testimony concerning Borys showed that he was putting pressure on Mensinger to get the NY/NJ Harbor project completed, not delay it. GTIX 383; Tr. 2520:13-2521:11 (Mensinger); 1846:20-1847:21 (Douglas). Plaintiffs claims are internally inconsistent, as they contend that Borys would have benefited financially from commercialization through a royalty agreement. Borys would only have benefited from the royalty allocation, however, if the Cement Lock Technology was successfully commercialized, profits paid to ESI as an owner in CLG, and the Board of IGT/GTI voted to approve Lee's recommendations contained in PX 129;. Tr. 1274:24 -1276:9 (Borys).

**7)** **The royalty agreement entered into by Borys, Dunne and others to benefit personally from any royalties collected from Cement Lock Technology.** Plaintiffs seek to make a big deal about a proposed "royalty agreement" by Lee that included himself, Rehmat,

Goyal, Mensinger, Borys and Dunne as potential recipients of funds should the Cement Lock Technology be commercialized.  PX 129.  Plaintiffs argue that this õagreementö was concealed from them.  First, the õagreementö was not that; but rather a recommendation for allocation of ESIøs share of any dividends issued by CLG that would be forwarded to the ESI Board of Directors for consideration. Tr.  1101:2-25 (Borys).  Second, the õagreementö did not relate to CLG. Rather, it was a proposal for distribution of any profits paid to ESI pursuant to the CLG Agreement.  Plaintiffs do not explain how ESI was required to disclose a proposal for distribution of profits to CLLLC, yet CLLLLC was not similarly obligated. Lastly, Plaintiffs have not shown how such a proposal caused any injury to CLG.  Therefore, Plaintiffs cannot use the internal ESI proposal as an allegation of fraudulent concealment by Borys.  Moreover, the existence of such a proposal argues against Borys õsuppressingö the technology.

**8)     The terms of the ECH worldwide royalty free exclusive licenses and the purposes for obtaining them.**  Plaintiffs continue to mischaracterize the ECH licenses as õroyalty free.ö In fact, the 1997 license from CLG to ECH was prepared in connection with GRIøs agreement to fund $4.5 million of the New York New Jersey Harbor project as Plaintiffs well knew, and the 1999 and 2001  licenses were issued in exchange for up-front payments. BX 58, para. 4; BX65, 135N, para. 4; Tr. 1038:7-1039:3 (Borys). Plaintiffsøcontention that the royalty free or worldwide nature of the licenses were concealed is not supported by the facts. Plaintiffs acknowledged that the December 1, 1997 license was signed in their presence and that they received copies of the license by correspondence dated December 3, 1997. GTIX 127; BX. 41; 133A, 44; Tr. 422:20-423:17 (R. Randhava); 1481:11-21 (Mell); 3321:7-23 (S. Randhava). The first license was õexclusiveö in the territory of the NY/NJ Harbor. The Randhavas, Kao, and Mell attended the CLG meeting on March 24, 1999, when the CLG members agreed to expand the ECH license to 500,000 tons per year.  BX 52, 53, BX 135C, 135; Tr. 424:8-429:20  (R. Randhava).  Thereafter, the license was discussed in CLG Board Meetings (BX 51/135F; BX 59/135H) and distributed to CLG Board of Managers.  Tr. 1187:17-1189:20 (Borys).  Plaintiffs also were informed of the expansions after the 1999 license.  In February 2001, a third License was issued to ECH for additional financial consideration paid by ECH to CLG, after CL LLC and Mell refused to respond to a cash call. BX 65, 135N.  The Randhavas and Mell received copies of this License Agreement and are listed as recipients of February 2, 2001 memo that stated õit is agreed that another license similar to the one executed between CLG and Endesco

Clean Harbors, LLC (ECH) on August 25, 1999 would be executed.ö BX 64A; GTIX 319 A. Tr. 436:12-437:21 (R. Randhava). Mell was unable to state that he did not receive the memo and license. Tr. 1545:2-6 (Mell). The terms of the 2002 license clearly indicate that it is an exclusive, worldwide license, which following the payment up front of consideration would not bear a royalty in the future. BX 65; GTIX 319A. Tr. 439:2-21 (R. Randhava). The evidence does not support Plaintiffsø contention that these licenses were concealed from them, nor that any injury occurred.

## IV.  PLAINTIFFS HAVE NOT PRESENTED EVIDENCE OF ACTIONABLE FRAUDULENT OR NEGLIGENT MISREPRESENTATION BY BORYS.

In Counts V and VI, Plaintiffs claim that Borys individually made actionable fraudulent and/or negligent misrepresentations to them. The factual allegations which form the basis for negligent misrepresentation are the same as the fraudulent misrepresentation and are set forth in Plaintifføs jury instructions. To demonstrate fraud, Plaintiffs must show: 1) a false statement of material fact; 2) Defendantøs knowledge that the statement was false; 3) Defendantøs intent that the statement induces Plaintiff to act; 4) Plaintifføs justifiable reliance upon the truth of the statement; and 5) Plaintifføs damage resulting from reliance upon the statement. *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 496 (1996); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F2d 366, 370 (7th Cir. 1988). The elements of negligent misrepresentation are: 1) false statement of material fact; 2) carelessness or negligence in ascertaining the truth of the statement by the party making it; 3) an intention to induce the other party to act; 4) action by the other party in reliance on the truth of the statement; 5) damage to the other party resulting from such reliance; and 6) a duty on the party making the statement to communicate accurate information. *First Midwest Bank, N.A. v. Stewart Title Guar, Co.*, 218 Ill.2d 326, 334-335 (2006).

Plaintiffsø claims for misrepresentation against Defendant Borys fail for various reasons. First and foremost, Plaintiffsø claims must be denied as a matter of law since they have failed to identify any materially false statements made by Borys to CLG or its members, CL LLC or Mell. Additionally, Plaintiffs have failed to demonstrate that either CLG or its members took any action in justifiable reliance on any statements made by Borys. Plaintiffs did not make any additional investments in commercializing the technology nor did they forgo any opportunity based on any statements made by Borys. Plaintiffs also have not demonstrated that CLG or its

members were injured as a result of their reliance on any statement of Borys.  Finally, Plaintiffs have submitted absolutely no evidence regarding Defendant Borys's knowledge and intent.  Consequently, all of the claims for fraudulent and negligent misrepresentation must be dismissed.

**1)** **The source and amounts of money obtained by IGT/GTI and ECH for the benefit of the technology.**   Plaintiffs have not identified a single false representation by Borys regarding the funding to IGT/GTI or ECH for  purposes of the technology.    In fact, as set forth in Section III(1), *supra*, Plaintiffs were well aware of the sources and amounts of the funding and intended that all R&D be done through IGT and ECH.  Plaintiffs also have not demonstrated that they took any action or were injured by the funding.

**2)** **How money granted to IGT/GTI and ECH on behalf of CLG was spent.** Plaintiffs have not established that money was granted to these corporate entities "on behalf of CLG."  Moreover, Plaintiffs  have  not identified any misrepresentations which were made by Borys regarding how money granted to IGT/GTI and ECH by any of the project sponsors was spent.

**3)** **The true financial condition of CLG and ECH, including multiple misrepresentations that ECH was out of money.**  The only testimony which Plaintiffs submitted regarding any representation regarding ECH's financial condition was based on a statement during the March 24, 1999 CLG Board Meeting which Mell recalled as having been made by Borys that ECH was $3 Million short. Tr. 1469:15-18.   Based on the testimony of Ravi, Serge and Borys, there is a dispute as to whether this statement was even made. Tr. 703:19-23 (R. Randhava); 1016:5-16 (Borys); 3363:18-3364:6 (S. Randhava).  Regardless, Plaintiffs have not shown: 1) that this statement was false; 2) that Plaintiffs took any action relying on this statement or 3) that plaintiffs were injured based on their reliance.

As for CLG, Plaintiffs have not identified any specific statements regarding CLG's financial condition made by Mr. Borys which are alleged to be false.  Instead, Plaintiffs rely primarily on discussions within documents regarding the financial condition of CLG related to its need for patent protection funding which, in any event, do not contain false statements or demonstrate reliance or injury by the Plaintiffs.  E.g, GTIX 319A.

**4)** **The true condition and status of the Bayonne New Jersey facility, including the selection of inferior or improper equipment.**  Plaintiffs have not identified a single

statement made by Borys regarding the condition and status of the New Jersey facility. Moreover Plaintiff's general contentions regarding the allegedly "improper" or "inferior" equipment for the New Jersey facility are simply not factual assertions which support a claim of fraudulent misrepresentation. While Plaintiffs have claimed that the kiln used was undersized and non-slagging, each of these contentions has not been shown or had been directly refuted by the testimony. See e.g. Tr. 2396:23-2397:7 (Mensinger).

5) **The full nature and scope of the scheme that resulted in the misappropriation of millions of dollars intended for the development of the Technology, including the failure of Defendant's internal controls, if any.** As set forth in Section III (3), supra at pp. 9-10, Plaintiffs have not demonstrated that Borys concealed the BLR fraud. Moreover, Plaintiffs have not demonstrated Defendant's lack of internal controls and to the extent there was a lack of internal controls, Plaintiffs have not shown that Borys was responsible for the alleged lack of internal controls.

6) **The claim that IGT, GTI, ESI and ECH were spending large amounts of their own money to support CLG.** Plaintiffs have not shown that Borys claimed that IGT, GTI, ESI and ECH were spending large amounts of their own money to support CLG. Moreover, Plaintiffs have not shown this statement was false. In fact, the testimony and evidence introduced during Plaintiffs' case demonstrates that many of these entities (IGT/GTI) were spending large amounts of their own money to cover CLG expenses. Tr. 2006:11-2008:4 (Dunne). For instance, Plaintiffs were fully aware of ECH's funding to CLG. BX 52; Tr. 627:16-628:12 (R. Randhava); Tr. 1618:2-11 (Mell); BX 53, Tr. 1619:13-25 (Mell).

7) **The claim that CLG's Board Minutes were accurate and complete**. The undisputed evidence is that Tony Lee, and not Borys, prepared all of the minutes and memoranda regarding the board's actions. Moreover, Plaintiff Serge Randhava attended virtually all of the CLG meetings from September 1997 through October 2003 and participated in virtually all discussions related thereto;[4] Ravi attended and participated in twelve (12) of the fifteen (15)

---

[4] Tr. 4015:21 – 4017:14 (9/26/97 CLG meeting); 4017:12 – 17 (7/22/98 meeting); 4020: 1-7 (3/24/99 meeting); 402:8-14 (4/1699 meeting); 4029:12-23 (9/10/99 meeting); 4032:12- 21 (3/8/00 meeting); 4035:19 – 4036:7 (4/17/00 meeting); 4042:16 – 4043:13 (5/14/01 meeting); 4045:17-21 (9/7/01 meeting); 4047:21 – 4048:1 (11/16/01 meeting); 40152:3-8 (4/19/02 meeting); 4056:17-24 (1/30/03 meeting); 4058:8-15 (4/18/03 meeting); 4058:19 – 4059:1 (S. Randhava) (10/22/03 meeting).

meetings and discussions and received the minutes for most if not all of them;[5] Tr. 616:6-618:3
(R. Randhava); Kao attended ten (10) of the fifteen (15) meetings[6]; and Mell attended and/or
participated in fourteen (14) of fifteen (15) meetings and received minutes[7]. Plaintiffs all had
access to the meeting minutes. Tr. 616:6-618:3 (R. Randhava). When questioned during the
Plaintiffs' case, both Ravi and Mell were unable to point to any misrepresentations in the
minutes and more importantly, were unable to point to any misrepresentations made by Borys.
BX 23, Tr. 622:15-623:19 (R. Randhava); BX 45, Tr. 625:2-14 (R. Randhava); BX 49, Tr.
625:15-6 28:20 (R. Randhava); BX 55, Tr. 628:22-630:5 (R. Randhava); BX 56, Tr. 630:13-
631:1 (R. Randhava); BX, Tr. 638:11-23 (R. Randhava); BX 62, Tr. 641:7-14 (R. Randhava);
BX 68, Tr. 653:12-654:19 (R. Randhava); BX 69, Tr. 656:17-23 (R. Randhava), BX 75, Tr.
669:17-670:2 (R. Randhava). In addition, Plaintiffs never complained that the CLG Board
minutes were ever inaccurate or incomplete. See e.g. BX 56, Tr. 630:13-631:22 (R. Randhava);
BX 70, Tr. 662:11-663:20 (R. Randhava); PX 615 and GTIX 419, Tr. 1513:14-1515:19 (Mell).
The Plaintiffs also signed off on certain of the minutes. See e.g. IGT Exhibit 183 and BX 52, Tr.
1525:4-1527:11 (Mell); GTIX 466 or PX 691, Tr. 1551:19-1556:16 (Mell). Additionally,
Plaintiffs have failed to present any evidence of any action they took in justifiable reliance on the
meeting minutes, nor injury to CLG.

    **8)**    **The claim that CLG's financial information was complete and accurate.**
Plaintiffs failed to introduce any evidence that demonstrated that CLG's financial information
was incomplete or inaccurate. Moreover, the evidence was clear that Borys was not involved
with nor authorized to prepare the financial information for CLG. BX 45, 135A. In addition,
Plaintiffs signed off on unanimous written consents approving the annual financial reports of
CLG for the 2001 and 2002 years. See e.g. BX. 73, 78; GTIX 411, 473; Tr. 1557:1-12,
1557:25-1559:1 (Mell). Further, the Plaintiffs did not exercise their right to audit the financial
statements of CLG or to ask for additional financial reports as provided for in the CLG Operating

---

[5] BX 49 (7/22/98 meeting); BX 52 (3/24/99 meeting); BX 53A (4/16/99 meeting); BX 62 (4/27/00 meeting); BX 68
(5/21/01 meeting); BX 69 (9/7/01); BX 70 (11/16/01 meeting); BX 75 (4/19/02 meeting); BX 84 (10/22/03
meeting); BX 85 (4/18/03 meeting).
[6] BX 49 (6/22/98 meeting); BX 52 (3/24/99 meeting); BX 53A (4/16/99 meeting); BX 59 (9/10/99 meeting); BX 68
(5/21/01 meeting); BX 69 (9/7/01); BX 70 (11/16/01 meeting); BX 75 (4/19/02 meeting); BX 84 (10/22/03
meeting); BX 85 (4/18/03 meeting).
[7] (BX 23 (9/26/97 meeting); (BX 49 (6/22/98 meeting); BX 52 (3/24/99 meeting); BX 53A (4/16/99 meeting); BX
62 (4/27/00 meeting); (BX 63 (9/27/00 meeting); BX 68 (5/21/01 meeting); BX 69 (9/7/01); BX 70 (11/16/01
meeting); BX 75 (4/19/02 meeting); (BX 76 (1/30/03 meeting); BX 84 (10/22/03 meeting); BX 85 (4/18/03
meeting)).

Agreement and under the Delaware Code, 6 Del.C § 18-305 until the later part of 2003. Tr. 1559:2-11, 1607:5-13 (Mell).

**9)      The claim that the kiln purchased from Anderson 2000 would work.**
Plaintiffs failed to introduce any evidence that Borys made the claim that the kiln purchased from Anderson would work.  Indeed, the undisputed evidence is that Plaintiffs, through Kao and Ravi Randhava, were involved in the selection process and Borys was not. PX 197; Tr. 462:17-463:15 (R. Randhava).     Plaintiffs further admit that it was Anderson, and not the Defendants, that made representations regarding the kiln. Tr. 467:25-468:14, 718:18-25 (R. Randhava).

**10)      The basis of the amounts claimed as due to IGT or ESI by CLG and the purpose for expanding the licenses.** Plaintiffs have not identified any statements by Borys which falsely state the amounts due to IGT by CLG, the basis for the amounts or the reason for the corresponding expansion of the ECH license.   Plaintiffs admit that they were told that IGT had paid CLGøs patent protection expenses and that was the reason for the ECH license expansion.  BX 52, 53; Tr. 429:8-432:17 (R. Randhava). Additionally, with respect to IGT employeesøtime for patent protection and other marketing activities, the Plaintiffs knew that Mensinger was working with Kao to respond to the U.S. Patent Office rejection of the CLG license applications and would charge for these activities and had wanted IGT to supply all the administrative support for the Cement Lock projects.  Tr. 2579:12-18 (Mensinger).  In fact Ravi Randhava , Serge and Mell knew that IGT would be charging labor for such work. BX 45, 133M (Consent signed by all CLG board members and owners),  49, 52, 53(a), 56; Tr. 1980:25-1981:18 (Dunne).  Borys also testified that the CLG board discussed and charged Tony Lee with marketing activities. BX 49, 52, 53(a), 55, 56, 60, 61;  Tr. 1191:21-1192:21 (Borys).

**11)      The fact that the Defendants were attempting to build a 30KTPY capacity plant knowing that they had purchased a 15KPTW capacity kiln.**  It is unclear how this alleged claim is a misrepresentation. Mensinger, ESI/ECHøs project manager, testified that in 1998, Brookhaven commissioned a test plant at Bayonne that was to process 10,000 yards/tons of sediment fed into the plant per year. He testified further that it was understood that this plant would be converted with oxygen enriched air to process 30,000 yards/tons of sediment with an ultimate goal of processing 100,000 yards/tons per year by pre-drying the sediment and other steps. Tr. 2481:8-25; 2482:1-5; 2484:18-25; 2503:13-2504:17 (Mensinger). The uncontradicted evidence demonstrates that Plaintiffs were well aware of this information. PX 996, pp. 4, 31; Tr.

2400:5-19 (Mensinger); BX 56, 135F (30KTPY plant); BX 57, 135G (30 tons demo plant); BX 59 (9/10/99 Meeting which Kao, Serge, Amir, Lee õNJ format is to start a small (less than 30ktpy) demonstration plant first.ö See also,  Tr. 1198:25-1201:12 (Borys). In any event, Plaintiffs have failed to submit any evidence that shows that Borys made a misrepresentation regarding a 30KTPY capacity plant, nor that CLG was injured.

## CONCLUSION

For the foregoing reasons, Defendant Stanley Borys requests this Court enter Judgment as Matter of Law in favor of Defendant Borys and against Plaintiffs and grant whatever further relief the Court deems just.

RESPECTFULLY SUBMITTED,

DEFENDANT STANLEY BORYS

BY:	_____/s/ Susan Bogart_____
	Law Offices of Susan Bogart
	30 North LaSalle St., Ste. 2900
	Chicago, IL  60602
	(312) 263-0900 ext. 7014
	SBogart514@aol.com