| | | |
|---|---|---|
| CEMENT-LOCK, an Illinois limited liability company, and RICHARD MELL, an individual, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 05 C 0018 |
| GAS TECHNOLOGY INSTITUTE, an Illinois corporation, INSTITUTE OF GAS TECHNOLOGY, an Illinois corporation, ENDESCO SERVICES, INC., an Illinois corporation, ENDESCO CLEAN HARBORS, LLC, an Illinois limited liability company, STANLEY S. BORYS, an individual, JAMES E. DUNNE, an individual, FRANCIS S. LAU, an individual, and CEMENT-LOCK GROUP, LLC, a Delaware limited liability company and nominal defendant, | ) ) ) ) ) ) ) ) ) ) ) ) | Judge Rebecca Pallmeyer |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

On January 3, 2005, Plaintiffs Cement-Lock, LLC ("CL") and Richard Mell filed a derivative lawsuit on behalf of Cement-Lock Group LLC ("CLG"). CLG was the owner of certain intellectual property and rights to the "Cement-Lock" technology (the "Technology"), a method for converting contaminated waste into a decontaminated, beneficial cement additive. The Technology did not prove as profitable as its inventors hoped, however, and litigation among the developers and investors ensued. In addition to the nominal Defendant, CLG, Plaintiffs have named several entities and individuals as Defendants: Gas Technology Institute and Institute of Gas Technology ("IGT") (together "GTI"); Endesco Services, Inc. ("ESI"); Endesco Clean Harbors, LLC ("ECH"); Stanley S. Borys, James E. Dunne, and Francis S. Lau. Three individuals who are not named as Defendants in this case played a significant role in the Technology's troubled history: Peter Barone, Anthony Lee, and Amirali Rehmat were involved in a kickback scheme for which all three men were

ultimately indicted, and Lee and Rehmat have pleaded guilty (Barone has died). *See United States v. Barone,* No. 07 CR 0574 (N.D. Ill.) Although that scheme–sometimes referred to as the "BLR Fraud"–is not the focus of this lawsuit, the parties here have attempted to lay blame on one another for the harm resulting from the BLR Fraud.

Plaintiffs' allegations here describe another fraudulent scheme, one by which the named corporate and individual Defendants deprived CLG of millions of dollars and devalued CLG's intellectual property in the Technology. In their eleven-count complaint, Plaintiffs alleged that the Defendants breached fiduciary duties (Count I); violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts II and III); committed fraudulent concealment (Count IV); committed fraudulent misrepresentation (Count V); committed negligent misrepresentation (Count VI); were unjustly enriched (Count VII); must provide an accounting (Count VIII); infringed certain trademarks (Count IX); committed unfair competition (Count X); and engaged in deceptive trade practices (Count XI). (Docket Entry No. 1.) The court dismissed the RICO counts in Plaintiffs' original complaint without prejudice on September 30, 2005. *Cement-Lock v. Gas Tech. Inst.,* No. 05 C 0018, 2005 WL 2420374, *23 (N.D. Ill. Sept. 30, 2005) ("*Cement-Lock I*"). Their amended complaint, filed on November 30, 2005 (Docket Entry No. 56), presented RICO claims that survived Defendants' Rule 12(b)(6) motions. *Cement-Lock LLC v. Gas Tech. Inst.,* No. 05 C 00018, 2006 WL 3147700, *11 (N.D. Ill. Nov. 1, 2006) ("*Cement-Lock II*"). Defendants then moved for summary judgment on Counts I through VI and VIII; the individual Defendants also moved for summary judgment on Count VII. The court granted Dunne, Lau, and Borys summary judgment on the unjust enrichment claims (Count VII), granted Lau summary judgment on several other claims against him, and otherwise denied the motions for summary judgment. *Cement-Lock LLC v. Gas Tech. Inst.,* 523 F. Supp. 2d 827 (N.D. Ill. 2007), as amended by *Cement-Lock LLC v. Gas Tech. Inst.,* No. 05 C 00018, 2007 WL 4246888 (N.D. Ill. Nov. 30, 2007) ("*Cement-Lock III*"). The court will presume familiarity with the factual and legal discussions in *Cement Lock I*, *Cement Lock II*, and *Cement*

*Lock III* in this opinion.

Trial of Plaintiff's surviving claims commenced on January 14, 2008. (Docket Entry No. 399.) Before jury deliberations, the court dismissed Counts VI (negligent misrepresentation), VIII (accounting), and X (unfair competition). The remaining claims were submitted to the jury, which found for Plaintiffs on Counts I through V and VII and for Defendants on Counts IX (trademark infringement) and XI (deceptive trade practices). (Docket Entries No. 494 & 496.) The jury awarded damages of $10,000 on Count I, and $3,000,000 in damages on Counts II through V and VII. (*Id.*) The total award is unclear: the parties dispute whether the $3,000,000 awarded on counts II through V and VII was intended to remedy a single injury, or to be added together to total $15,000,000. (Docket Entries No. 499, 515, 516, 530, & 534.) At the close of Plaintiff's case-in-chief, Defendants moved for judgment as a matter of law; at the close of their own case-in-chief, Defendants renewed this motion. Following the jury verdict, Defendants moved for judgment in their favor on Counts I through V and VII.

Plaintiffs' damages theory is that Defendants' actions stripped the Technology of all value. To measure the devaluation, Plaintiffs asked an expert to compare the value of the Technology in approximately 1997 with its current value to CLG. As explained below, the court now concludes that Plaintiffs' current-day valuation of the Technology was in fact based on a calculation of projected lost income and was therefore barred by the new business rule. As a result, Plaintiffs offered no basis for calculating the devaluation of the Technology, and therefore no basis for calculating their damages. Proof of measurable harm is an essential element of each of the six claims on which Plaintiffs prevailed at trial, and, thus, the jury's verdict cannot stand. Although there had been substantial motion practice aimed at Plaintiffs' damages theory, however, no specific contemporaneous objection was raised to Plaintiffs' current-day valuation of the Technology. Plaintiffs therefore did not have the opportunity to cure the deficiency in their evidence at trial, and the court is unwilling to enter judgment for Defendants as a matter of law. Instead, the

court will strike the jury's verdict on all counts. Defendants are entitled to judgment as a matter of law on counts for which Plaintiffs failed to prove other essential elements: Counts II and III (the RICO claims) as well as Count VII (unjust enrichment) against all Defendants. In addition, IGT, GTI, and ECH are entitled to judgment on Count I, and Dunne is entitled to judgment in his favor on Count V (fraudulent misrepresentation). The parties are entitled to a new trial on all remaining claims. Lastly, the court denies as moot those pending post-trial motions that are aimed at determining what damages award best reflects the jury's verdict.

**DISCUSSION**

**I.      Standard of Review**

Once the jury returns a verdict, the non-prevailing party may renew its Rule 50(a) motion for judgment as a matter of law and ask the court to enter judgment in its favor notwithstanding the verdict. FED. R. CIV. P. 50(b). If "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [prevailing] party," it may allow judgment on the verdict, order a new trial, or direct the entry of judgment as a matter of law for the non-prevailing party. FED. R. CIV. P. 50(a) & (b). When deciding a Rule 50(b) motion, the court views the facts in the light most favorable to the non-moving party, here Plaintiffs, and disregards all evidence favorable to the moving parties, here Defendants, unless the jury was required to believe that evidence. *Morales v. Jones*, 494 F.3d 590, 599-600 (7th Cir. 2007); *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007). The court examines the record as a whole, including the evidence presented and reasonable inferences drawn from that evidence, to determine whether there is sufficient evidence to support the jury's verdict. *Id.* The court may neither re-weigh the evidence nor make credibility determinations. *Id.*

If the trial court concludes that the moving party would be entitled to judgment as a matter of law, the court nevertheless has discretion to order a new trial rather than entering judgment for the non-prevailing party. FED. R. CIV. P. 50(b)(2); *Network Publ'ns, Inc. v. Ellis Graphics Corp.*, 959

F.2d 212, 213 (11th Cir. 1992) ("once a trial court concludes that a verdict should be set aside for insufficiency of evidence it then has the option of granting a new trial or granting judgment to the movant (the loser at trial)"); 9B Wright & Miller, *Federal Practice & Procedure* § 2538 (3d ed. 2008). "Rule 50(b) contains no language which absolutely requires a trial court to enter judgment notwithstanding the verdict even though that court is persuaded that it erred in failing to direct a verdict for the losing party." *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 215 (1947). Instead, the fact that the rule offers trial judges alternative paths "means what it seems to mean, namely, that there are circumstances which might lead the trial court to believe that a new trial rather than a final termination of the trial stage of the controversy would better serve the ends of justice." *Id.* The court's exercise of discretion to grant a new trial can, in fact, be an opportunity to correct errors in conduct of the trial "without the delay, expense or other hardships of an appeal." *Id.* at 216 (citations omitted). If the court "concludes that a verdict should be set aside for insufficiency of evidence it then has the option of granting a new trial or granting judgment to the movant (the loser at trial)."

## II. Plaintiffs' Alleged Injury

One issue Defendants raise in their post-trial briefs is relevant to each of Plaintiffs' claims: whether Plaintiffs proved any injury at trial. Proving actual injury is a standing requirement for Plaintiffs' RICO and RICO conspiracy claims. 18 U.S.C. § 1964(c); *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006); *Vazquez v. Cent. States Joint Bd.*, 547 F. Supp. 2d 833, 856 (N.D. Ill. 2008). Plaintiffs argue that this is a generous test, citing the Supreme Court's recent decision in *Bridge v. Phoenix Bond & Indem. Co.*, ___U.S.___, 128 S. Ct. 2131 (2008) (Pl.'s.' Opp'n [555] at 92-92), but the focus in that case was on causation, not standing. Plaintiffs in *Bridge*, who bid at tax sale auctions, claimed they were harmed when other bidders concocted a scheme to submit multiple bids in violation of the county's auction rules. The Seventh Circuit concluded these allegations were sufficient to confer standing on plaintiffs who claimed they had lost the "valuable

chance" to acquire tax liens on favorable terms; if plaintiffs' allegations were true, there was no question the multiple bid scheme decreased their chances of winning the tax auction. *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 929-30 (7th Cir. 2007). Affirming that result, the Supreme Court brushed aside defendants' arguments that plaintiffs could not prevail because they themselves did not rely on defendants' alleged misrepresentations to county authorities. 128 S.Ct. at 2145. The *Bridge* case stands for the proposition that a direct victim may recover under RICO whether or not it was the direct recipient of false statements. *Bridge* does not depart from the principle that "injuries proffered by plaintiffs in order to confer RICO standing must be 'concrete and actual,' as opposed to speculative and amorphous." *Evans*, 434 F.3d at 932 (citations omitted).

Plaintiffs do not contest that having suffered actual injury is an essential element of their remaining claims. In fact, the court instructed the jury that, in order to find for CLG on Plaintiffs' substantive claims, they must find actual injury, or damages, to CLG. (Docket Entry No. 496 at 31 (breach of fiduciary duty); 64 (fraudulent concealment); and 70 (fraudulent misrepresentation).) Plaintiffs' unjust enrichment claim also requires a showing that Defendants were enriched at CLG's expense. *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 852 & 855 (7th Cir. 2007) ("where the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well"). Because it was a required element of each of their claims, Plaintiffs bear the burden of proving that they introduced "substantial affirmative evidence" of their injury at trial.

Prior to trial, Plaintiff identified four categories of injuries they had purportedly suffered as a result of Defendants' wrongdoing:

> (1) misappropriation of millions of dollars in grant money, which prevented the development of the Technology and results in the future loss of profits from the licensing of the Technology; (2) harm to Cement-Lock Group's business reputation; (3) lost business opportunities to market the Technology to other individuals, corporations, or governmental entities, including Taiwan, Hong Kong, and China;

and (4) devaluation of Cement-Lock Group's intellectual property by wasted years in the lifespan of certain patents and confusion and infringement on the Technology's service mark and trademark.

*Cement-Lock I*, 2005 WL 2420374, at *13; *Cement-Lock III*, 523 F. Supp. 2d at 85-59. The court here considers whether Plaintiffs proved injuries in any of these categories that were actual and concrete, rather than merely speculative and amorphous.

### A.    Devaluation of the Technology

In this set of briefs, Plaintiffs rely exclusively on the fourth category of alleged injury: devaluation of the Technology. (Pl.'s. Opp'n [as corrected, 555] at 42-44.) At trial, Plaintiffs' damages expert Ronald G. Vollmar testified that CLG suffered at least $26.4 million in losses as a result of Defendants' actions. (Trial Tr. 4190:2-5.) To reach this conclusion, Vollmar compared the value of the Technology in the mid-1990s with its current value to CLG. Defendants take issue with his method of valuing the intellectual property both in the mid-1990s and today, and as explained here, their objections have considerable traction.

### 1.    Vollmar's Mid-1990s Valuation

Three methods for valuing intellectual property are accepted by experts: the income approach, the cost approach, and the market approach. Vollmar's expert report used all three. In a pre-trial ruling, the court excluded Vollmar's proffered income-approach valuation pursuant to Federal Rule of Evidence 702. (Docket Entry No. 392 at 11-12; 2/26/08 Trial Tr. 4243:2-21.) Under that approach, Vollmar calculated the royalties CLG might receive from licensing the Technology, and then discounted that sum to allow for the fact that the Technology was still in early stages of development at the relevant time. The court found that Vollmar failed to explain why he chose a discount rate of 15%, rather than the 40% discount rate treatises suggest for businesses, such as CLG, that have a proven prototype but have not yet achieved commercial scales of production. (Docket Entry No. 392 at 12.) In addition, the court concluded that, to the extent that Vollmar relied on lost royalties as a measure of damages, his testimony was inadmissible pursuant to the new

7

business rule.  (*Id.* at 13.)  Based on the court's pre-trial rulings, Vollmar was limited at trial to employing the cost- and market-approaches of valuing intellectual property, unless he could satisfy the court that his income-approach valuation was admissible.  (*Id.* at 16.)

At trial, the cost approach was the centerpiece of Vollmar's damages theory.  That approach considers the reproduction cost (the cost to produce an exact replica of the intangible asset) as well as the replacement cost (the cost to recreate the equivalent level of utility that the owner of the intangible asset possesses) of the intellectual property.  (Docket Entry No. 392 at 3.)  Vollmar thus calculated the money spent to create the Technology, which is presumably the same as the cost of replacing the Technology.  Vollmar noted that in a 1997 proposal to GRI, GTI proposed to spend $26.4 million over thirty-nine months to build a demonstration plant for the Technology.  (Trial Tr. 4258:16-4259:14.)  GRI's agreement to the proposal, Vollmar asserted, illustrates that the Technology was worth at least $26.4 million, because "nobody is going to commit to spending $26 million when the technology isn't worth a lot more than $26 million."  (*Id.*)  Vollmar also asserted that the decision by GTI and GRI to invest over $26 million in the Cement-Lock Technology was a marketplace decision.  (*Id.* 4285:12-22.)  At the time of the proposal, then, Vollmar concluded that the value of the Technology was at least $26.4 million.[1]

To corroborate his cost-approach valuation, Vollmar employed the market approach.  That approach values an intangible asset by ascertaining and comparing what others have paid for comparable assets in a free and competitive market place.  (Docket Entry No. 392 at 14 (citation omitted).)  In his market-approach valuation, Vollmar considered GRI's agreement to purchase $4.5 million of debentures from ECH, in exchange for the option to convert those debentures into a 20% ownership stake in the company.  (Trial Tr. 4259:17-4260:15.)  The debenture was essentially a

---

[1]     Stipulations introduced at trial confirmed that Defendants actually received $23,678,002.68 in funding for the Cement-Lock project.  (Pl.'s' Opp'n [555] at 70; Trial Tr. 4433:9-4436:1.)

loan, but it enabled GRI to opt for repayment or for an ownership stake in ECH. At the time, ECH's only asset was a license to use the Technology. (*Id.*) Extrapolating from GRI's 20% investment, Vollmar concluded that the Technology had a value in the marketplace of $22.5 million. (*Id.*) This made Vollmar "very secure" that his cost-approach valuation of the Technology at $26.4 million was accurate. (*Id.*)

### 2.    Pump's Response to Vollmar's Mid-1990s Valuation

To counter Vollmar's analysis, Defendants introduced the testimony of rebuttal expert Bernard Pump. Pump concluded that Vollmar's calculation was based on "a very superficial and incomplete valuation." (Trial Tr. 4488:14-4489:1.) First, Pump criticized Vollmar's use of the cost approach; that approach, Pump observed, is more appropriate for valuing tangible assets, where projecting replacement or replication costs is a more straightforward inquiry. (*Id.* 4499:16-4500:3.) According to Pump, it is particularly extraordinary that Vollmar used the approach to value an untested intangible asset. The cost approach is rarely used to value new technology, and is an ineffective way of doing so because it cannot account for the risks associated with new technology. (*Id.* 4500:7-21.) In other words, Pump questions whether any cost-approach valuation of the Technology could be reliable.

Pump found additional fault with Vollmar's use of the cost approach as applied in this case. Pump explained that the proposal to GRI (as well as Brookhaven National Labs, the United States EPA, and the New Jersey Department of Transportation) is not an appropriate transaction with which to conduct a cost-approach valuation:

> The fundamental—one of the fundamental assumptions of the cost approach is that investors are not going to pay more than the asset is worth. So they are going to take a look at what the future profits are from an asset and say, well, I am not going to spend more than that to build it.
>
> But there is no necessary requirement for the Department of Transportation or the EPA or GRI, for that matter. Their primary mission is not to earn profits. Their primary mission is to fund research. They don't have shareholders who expect dividends.

(*Id.* 4507:11-23.) In other words, these entities were driven by interests independent of cost, and their willingness to invest in the Technology is not a reliable indicator of its value. (*Id.* 4507:24-4508:2.) This testimony undermines Vollmar's assumption that "nobody is going to commit to spending $26 million when the technology isn't worth a lot more than $26 million." (Trial Tr. 4258:16-4259:14.)

Pump identified several additional flaws in Vollmar's analysis, as well. For example, Vollmar's Report did not account for the historical financial performance of either the Technology or CLG, the future financial projected performance of the Technology or CLG, the industry in which the Technology would be used, the economic conditions at the time of valuation, market alternatives to the Technology, potential competitors of the Technology, risk factors, or investment considerations. (*Id.* 4494:13-4495:9.) Nor did Vollmar prepare any exhibits suggesting that his calculations or analysis incorporates these factors, each of which, in Pump's view, should be part of a valuation report. (*Id.* 4489:20-4491:25; 4495:10-16.) In light of the need to take these factors into account, a valuation report for a simple business or a simple intangible asset would be at least twenty to thirty pages long, with five to ten exhibits, Pump stated. (*Id.* 4492:1-12.) Valuation of a new technology (such as the Cement-Lock Technology) is typically even more complex because of the lack of performance history. (*Id.*) Vollmar's valuation report was just two pages long, and the valuation analysis consisted of two paragraphs, comprising less than one full page. (*Id.* 4293:14-4494:3.) The report contained no exhibits that would illuminate the calculations. (*Id.* 4495: 10-13.) As a result, Pump testified, Vollmar's analysis deviated sharply from what treatises require for valuation of an intangible asset: (1) detail and explanation consistent with the complexity of the asset; (2) supporting documentation to illuminate the logic and calculations; and (3) a discussion of the market in which the technology operates. (*Id.* 4496:4-4497:3.) The business appraisal community also follows these guidelines. (*Id.* 4497:4-8.) Pump testified that Vollmar adhered to none of them. (*Id.* 4497:9-12.)

In addition to the problems with Vollmar's cost-approach valuation, Pump also identified failings in Vollmar's market-approach valuation. According to Pump, the debenture transaction Vollmar considered was not an appropriate starting point for two reasons. First, as explained above, GRI's motivation was not profit: GRI is a not-for-profit research organization with a mission of funding research to improve the natural gas industry for the public good. (Trial Tr. 4509:2-21.) Nor was the transaction a purchase of either ECH or the Technology in the strict sense; rather, it was an unsecured loan. (*Id.* 4509:22-4510:14.) The debenture transaction is therefore not a reliable indicator of the value of ECH. (*Id.*)

In other words, the experts offered sharply different viewpoints on the proper method for evaluating the Technology's value in the mid-1990s. The court finds Pump's critiques compelling and troubling, yet the jury's verdict makes clear that they sided with Vollmar in this dispute. It is not for the court to decide whether Vollmar was credible, or whether his testimony was correct. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). Indeed, the court expressly instructed the jury that it was entitled to give expert witness testimony "whatever weight you think it deserves, considering the reasons given for the opinion, the witnesses's qualifications, and all of the other evidence in the case." (Docket Entry No. 496 at 16.) For the reasons explained in the court's pre-trial decision, the court anticipated that Vollmar's analysis would be sufficiently reliable to be admitted at trial. Defendants opted not to set forth their own damages calculation, and the jury apparently found Defendants' attempts to discredit Vollmar's analysis insufficient. In light of this, the court declines to impose its own evaluation of the damages theory. *See also Gorlikowski v. Tolbert*, 52 F.3d 1439, 1447 (7th Cir. 1995) ("When a defendant goes for broke, staking its all on convincing the jury to award zero damages—fearing otherwise a compromise verdict--it risks being hit with a verdict much larger than if it had offered the jury an alternative estimate of damages to the plaintiff's. It should not expect the appellate court to relieve it from the consequences of its gamble.").

### 3.     Vollmar's Current-Day Valuation

The next step in Vollmar's calculation of the harm to the Technology's value was an assessment of the Technology's current value to CLG, a value he would then subtract from the $26.4 million he claims it was worth in the mid-1990's. It is in this step of his analysis that Vollmar's opinion runs afoul of Seventh Circuit standards for calculating damages.

According to Vollmar, the Technology now has "little or no value to CLG" because the patent life is nearly expired. (Trial Tr. 4250:4-19.) While the Technology may retain value for others, the value to CLG therefore has all but expired. (Trial Tr. 4251:5-16.) In explaining this distinction, however, Vollmar exposes a fundamental flaw in his analysis. As he testifies: "It's only the value to CLG, because, remember, CLG's only method of making money from this technology was to receive royalties. So if it no longer can receive royalties, the value to it, CLG, is de minimis." (*Id.*) In other words, Vollmar's calculation of the current value of the Technology relies exclusively on his analysis of CLG's ability to earn royalties from the Technology. Vollmar explained why he used value to CLG, as opposed to a market-based measure, to calculate the Technology's current value:

> And here maybe it's worthwhile explaining when we are talking about value to CLG, that's different than the value of the technology itself.
>
> CLG was a small company. It could never have gotten the funds to actually commercialize the technology itself. So when it was formed it was really designed to license the technology and collect royalties or rentals basically from other people using that technology. So when I talk about value of the technology to CLG, that really means what impact did it have on the ability of CLG to collect royalties down the road.[2]

(Trial Tr. 4177:7-4178:17.)

The court clearly and repeatedly barred Plaintiffs from using lost profits as a measure of damages before trial commenced, in its ruling excluding Vollmar's income-approach valuation at trial. (Docket Entry No. 392 at 13.) At trial, the court reaffirmed this ruling, again barring Vollmar

---

[2]     Notably, this testimony effectively acknowledges the court's conclusion, discussed below, that CLG had no direct entitlement to the grant money at issue in this litigation.

from testifying regarding his income-approach valuation of the Technology. (Trial Tr. 4243:2-21.) Plaintiffs claim that they did not elicit such evidence from Vollmar at trial. (Pl.'s.' Opp'n [555] at 66 & 66 n.32.) Vollmar's current-day valuation of the Technology makes clear, however, that while lost profits may not be the basis for Plaintiffs' theory of damages, they are a part of Vollmar's method for calculating the current value of the Technology. Thus, after the court reaffirmed its ruling regarding the income-approach valuation, Vollmar also offered testimony that the current value of the Technology to CLG is zero, based on the fact that CLG will not have the option of licensing the Technology. (Trial Tr. 4258:16-59:14.) Despite this, the court failed to recognize that Vollmar's current-day valuation of the Technology did incorporate an inadmissible lost profits analysis, and, during Vollmar's testimony, Defendants themselves did not raise an objection specifically aimed at Vollmar's current-day valuation of the Technology.

### 4. Legal Remedy

Although neither party identifies the appropriate standard of review under these circumstances, the court applies Federal Rule of Evidence 103. Rule 103 provides that a court commits error if it admits evidence that affects a substantial right of a party if the party makes a timely objection or motion to strike and the grounds for exclusion is clear. FED. R. EVID. 103(a). The Rule 103(a) requirement that a timely objection be made allows "the trial judge to avoid or correct the error efficiently." 21 Wright & Graham, *Federal Practice & Procedure: Evidence* § 5037, at 708-09 (2d ed. 2005). Defendants here did raise a new-business-rule objection to Vollmar's testimony, but it was limited to his income-approach valuation, and the court did not understand Defendants as suggesting that the objection extended to his other methods of valuing the Technology. (*See* Mot. to Strike [258] at 11.) Plaintiffs clearly believed that Vollmar's testimony was devoid of any lost profits analysis. (Pl.'s.' Opp'n [555] at 66 & 66 n.32.)

Rule 103(a) will not bar the court from redressing plain error that affects substantial rights of the parties, even where no objection was raised at trial. FED. R. EVID. 103(d). *See Estate of*

13

*Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005) (plain error review of an evidentiary issue in a civil case is available only where exceptional circumstances exist, substantial rights are affected, and a miscarriage of justice will otherwise occur). The court concludes that plain error review of the admission of Vollmar's current-day valuation of the Technology is proper here. It was error to admit Vollmar's testimony that the current value of the Technology to CLG is zero, because Vollmar based this conclusion on CLG's ability to recover royalties with the Technology.

The parties agree that "as a general rule, expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery" under Illinois law. *TAS Distrib. Co. v. Cummins Engine Co.,* 491 F.3d 625, 633 (7th Cir. 2007). That rule recognizes that calculating the profits a new business might earn often requires speculation, and thus runs afoul of the principle that damages must be proven to a reasonable degree of certainty. *Id.* at 634-35. Usually, of course, the new business rule prohibits a plaintiff from introducing evidence of exorbitant profits it hoped to collect based on a new invention or venture. Here, on the other hand, Plaintiffs' measure of damages is not lost profits but, rather, lost value of the Technology. The logic of the new business rule was nevertheless triggered once Vollmar admitted that his current-day valuation of the Technology is an approximation of the profits CLG might earn from that Technology. Thus, while Vollmar does not actually calculate CLG's damages to be its lost profits, he does rely improperly on lost profits when valuing the Technology to CLG today. *See id.* ("Illinois courts consistently have rejected the use of speculative, inaccurate or false projections of income in the valuation of a business") (internal quotation marks and citation omitted). To the extent Vollmar's explanation of his current-day valuation of the Technology suggests that his mid-1990s cost-approach valuation of the Technology, too, is no more than a proxy for lost profits (and the court is not at all certain that it does), the new business rule would also bar his valuation of the

Technology in 1997.[3]  In any case, the court concludes that Vollmar's current-day valuation of the Technology should have been excluded at trial.

Second, this error was plain, in light of the court's prior recognition that the new business rule bars Plaintiffs from recovering speculative damages, including lost profits from the untested Technology.  (Docket Entry No. 392 at 13 (quoting *TAS,* 491 F.3d at 633).)  Finally, this plain error did affect Defendants' substantial rights.  In effect, Vollmar's testimony enabled Plaintiffs to present a damages theory that was so speculative as to be irrefutable.  Even more significantly, because a showing of non-speculative injury is an element of each of Plaintiffs' substantive claims, consideration of Vollmar's current-day valuation of the Technology may render the jury's liability findings infirm.

The court is nevertheless unwilling to enter judgment for Defendants as a matter of law.  As noted, Defendants did not specifically object to Vollmar's current-day valuation of the Technology, and therefore did not put Plaintiffs on notice that the new business rule exclusion extended to that testimony.  Had Plaintiffs recognized that Vollmar's cost-approach valuation–the crux of his opinion–was also in jeopardy, Plaintiffs might have been able to correct or supplement his testimony, perhaps by correcting Vollmar's calculation, or by presenting alternative evidence of the Technology's value.[4]  It is impossible to know for certain how exclusion of this testimony might have

---

[3]    Defendants point out that one Circuit has held that the fair market value of a company, by definition, includes expected earnings and expenses.  *Eateries, Inc. v. J. R. Simplot Co.*, 346 F.3d 1225, 1236 (10th Cir. 2003).  The *Eateries* court reached this conclusion in the context of deciding whether permitting a plaintiff to award diminution in value of a company and expected future profits constitutes double recovery.  *Eateries*, then, does not consider methods of valuing intellectual property, and the court cannot conclude that its analysis outweighs expert treatises; both sides agree that these sources have developed an income approach, cost approach, and market approach to valuing intellectual property.

[4]    Plaintiffs do point out that the Technology has since been assigned to an entity in which CLG owns only a minority interest.  (Pl.'s.' Opp'n [555] at 43 n.20.)  This evidence was excluded at trial.  As it appears that this evidence is relevant only to establish that CLG can no longer earn royalties on the Technology, it will be of little assistance to Plaintiffs.

affected the trial's outcome. Accordingly, the court concludes that a new trial is necessary to cure this error. *See Waters v. Young*, 100 F.3d 1437, 1442 (9th Cir. 1996) (reversing grant of JML for defendant and ordering new trial where trial court failed to apprise *pro se* plaintiff of failure in proof and holding that this responsibility is "mandatory in all cases"); *Network Publ'ns*, 959 F.2d at 215 (reversing grant of Rule 50 judgment for defendant and ordering new trial where plaintiff's failure to provide evidence of the amount of damages was "possibly remediable").

### B. Other Damages Theories

As noted, Plaintiffs' post-trial briefs rely exclusively on the loss in value of CLG's intellectual property. The court nevertheless pauses to note that alternative damage theories are flawed, as well. With respect to the first category of damages, lost profits resulting from misappropriation of grant money, the court made clear during summary judgment proceedings that Plaintiffs had no evidence that they were ever the intended recipients of the grant money allegedly misappropriated. *Cement-Lock III*, 523 F. Supp. 2d at 863. Thus, they cannot claim direct entitlement to the grants themselves. Insofar as the first category of damages seeks lost royalties because Plaintiffs were intended beneficiaries of that grant money, pre-trial briefing also precludes Plaintiffs from recovering such sums: lost profits evidence is inadmissible because the methodology used to calculate them is not reliable and, in any case, the evidence is unduly speculative and barred by the new business rule. (Docket Entry No. 392 at 11-13.)

Turning to the second and third categories of damages, Defendants contend that Plaintiffs introduced no evidence of harm to business reputation at trial. (JML Brief [482] at 6; Supp. to JML Brief [527] at 2 n.1.) Defendants also argue that any evidence of lost business opportunities in Taiwan was too speculative to constitute a cognizable injury. (JML Brief [482] at 5-6; Supp. to JML Brief [527] at 2 n.1.) Plaintiffs offer no response to either argument in their Opposition, which constitutes waiver. *See Blakely v. Brach & Brock Confections, Inc.*, 181 F. Supp. 2d 943, 951 (N.D. Ill. 2002). Thus, Plaintiffs implicitly acknowledge that they did not introduce substantial affirmative

evidence to prove these two categories of injury. Furthermore, the court is inclined to agree with Defendants that any evidence Plaintiffs did introduce of business opportunities that might have existed in Taiwan was too speculative to support a claim for damages under governing law. Accordingly, Plaintiffs may not revive these damages theories at trial.

### C. Causation

Defendants also urge that Plaintiffs failed to establish a causal relationship between Defendants' alleged wrongdoing and Plaintiffs' claimed injury. *See, e.g., Evans*, 434 F.3d at 924 (that RICO injury was caused "by reason of" violation of RICO is a RICO standing requirement). In support of this argument, Defendants rely on *Movitz v. First Nat'l Bank*, 148 F.3d 760 (7th Cir. 1998). Plaintiff in *Movitz* was a real estate investor who purchased a building in reliance on the defendant bank's valuation of a building's structural soundness. The real estate market took a plunge and plaintiff's purchase turned out to be a disaster. *Id.* at 762. Plaintiff lost nearly all of his investment and sued the bank, recovering a substantial jury award. Reversing the judgment, the Seventh Circuit acknowledged that "but for" the bank's advice, plaintiff would not have made the investment. Still, the plaintiff had not offered evidence of an accurate valuation of the property on the date of his purchase, and therefore did not identify which of his losses were the result of the banks' actions. *Id.* at 765. Because the investor failed to link his losses with the bank's wrongdoing, the jury's damages award was overturned.

*Movitz* is instructive, but distinguishable here. Although the court has taken issue with Plaintiffs' damages calculation for other reasons, the court acknowledges that Plaintiffs have introduced evidence that *all* their losses were attributable to the Defendants' actions. As described above, Plaintiffs' evidence begins with the value of the Technology in 1997, before Defendants' wrongful conduct occurred. Vollmar testified that it was Defendants' actions that caused the value of the Technology to be reduced by at least $26.4 million. (Trial Tr. 4316:6-9.) More specifically, Vollmar testified that Defendants' fraud caused $5.3 million in development funds to be diverted

from their intended purpose of commercializing the Technology. (*Id.* 4297:2-17.) Vollmar identified Defendants' misdeeds as including not only the purchase of inadequate equipment, but also imposition of restrictions on development of the Technology by issuing restrictive licenses to ECH. (*Id.* 4118:1-4, 9-16, 4320:13-21:1.) Thus, this case is unlike *Movitz*, in which the plaintiff ignored causation altogether. As the court previously held, Vollmar was under no obligation to exclude every other possible explanation for the devaluation; his failure to account for the factors to which Defendants point goes to the weight, rather than the admissibility of his testimony. (Docket Entry No. 392 at 7-8 (citing *Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 693 (8th Cir. 2001); *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 733 (N.D. Ill. 2007).)

### D. Jury's Award

The parties offer extensive analysis of the jury's verdict and argument concerning its relationship to the evidence introduced at trial. In light of the court's conclusion that the error in Vollmar's current-day valuation of the Technology renders his opinion inadmissible, the court need not reach these arguments.

### III. Breach of Fiduciary Duty Claims (Count I)

Having concluded that the Plaintiffs failed to prove their damages at trial, the court now turns to the other substantive elements of their claims. To the extent Plaintiffs were able to prove the other elements of their claims, a new trial will be necessary for the reasons explained above. The court determined that Delaware law applies to Plaintiff's breach of fiduciary duty claims, and instructed the jury that a breach of fiduciary duty is proven where: (1) a defendant owed CLG fiduciary duties; (2) that defendant breached a fiduciary duty to CLG; and (3) the defendant's breach of fiduciary duty was the proximate cause of injury to CLG. (Docket Entry No. 496 at 31.) The court also instructed the jury that the CLG Operating Agreement contains the following provision regarding fiduciary duties:

A Manager shall perform his duties as a member of the Operating Board in good faith, in a manner he reasonably believes to be in the best interest of the Company and the Members, and with similar care as an ordinarily prudent person in a like position would use under such circumstances. A person who so performs his duties shall not have any liability by reason of being or having been a Manager of the Company. The Operating Board shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member for any action taken or failure to act on behalf of the Company within the scope of authority conferred on the Operating Board under this Agreement or the Act, except where the claim at issue is based on the fraud, gross negligence or bad faith of the Operating Board.

(*Id.* at 32.) Finally, the court instructed the jurors that Borys, Dunne, and Lau are entitled to the protection of the business judgment rule, which is a presumption that the fiduciary acted with sound business judgment. (*Id.* at 37; *see also McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000) (to rebut business judgment rule, plaintiff must show that defendant breached duty of loyalty, good faith, or due care).)

### A. Borys and Dunne

The court is conscious that the claims addressed below will be re-tried, to the extent a claim is not barred as a matter of law. The court therefore directs its discussion of the surviving claims as narrowly as possible, focusing primarily on the scheme Plaintiffs describe with respect to the licenses for use of the Technology that CLG granted ECH. Plaintiffs argue that both Borys and Dunne breached their fiduciary duties to CLG by facilitating the grant of expanded license rights to ECH in 1999 and 2001 and, simultaneously, by procuring grant money for ECH, despite its lack of commitment or effort to develop the Technology. Significantly, the question is not whether the grants ought to have been funneled to CLG rather than ECH; Plaintiffs do not make this argument, nor would it be proper for them to do so. The proper inquiry is not whether CLG was entitled to the research grants but, rather, whether Plaintiffs were injured by a scheme in which CLG granted ECH expansive rights to the Technology, ECH used those rights to obtain funding for the Technology, and ECH squandered those funds and CLG's opportunity to commercialize the Technology.

### 1. Duties

To begin, it is clear that both Borys and Dunne owed CLG fiduciary duties. Borys acknowledges that, as of CLG's formation on December 1, 1997, he—as President of ESI (CLG's majority shareholder) and ESI's designated representative to CLG's Operating Board—owed CLG fiduciary duties. (Borys JNOV for Counts I, IV, V, and VI [as corrected, 523] at 3-4.) He points out that he did not owe these duties to CL or to Mell, a point Plaintiffs do not dispute. (Resp. to Borys JNOV for Counts I, IV, V, and VI [546] at 3 n.1.) During the timeframe relevant to the jury's consideration of the ECH license rights (1999-2001), Borys also held a number of relevant roles. He was Executive Vice President of GTI until November 1999, at which point he was also its Chief Operating Officer through the end of 2001. (PX 872A.) Beginning in August 2000, he was the Executive Vice President and Chief Operating Officer of GRI. (*Id.*) He also served as President of ESI until August 2000; from November 1999 through the end of 2001, he served on its Board of Directors. He was a Manager of ECH. (*Id.*) Finally, he served on CLG's Board of Managers. (*Id.*)

The parties also agree that Dunne owed CLG fiduciary duties at least as of the date on which he became the company's secretary, in February 2002. (Dunne Reply [577] at 12.) Plaintiffs argue, however, that Dunne's fiduciary duties were triggered long before that time. They suggest that Dunne owed fiduciary duties to CLG as of January 1988, when the CLG Operating Board appointed Dunne as its agent. (Dunne JNOV Resp. [545] at 3, citing Cement-Lock Group L.L.C. Action by Written Consent of Managers dated 1/26/98, BX 45.) Dunne himself admits that, to the extent his actions between 1998 and 2002 were within the scope of his agency, they are subject to fiduciary duties. (Dunne Reply [577] at 12-13.) Indeed, under Delaware law, an agent has a fiduciary duty of good faith, fair dealing, and loyalty–similar to those of a corporate director–only limited by the scope of the agency relationship. *O'Malley v. Boris*, 742 A.2d 845, 849 (Del. 1999).

In *O'Malley,* the court held that an agent's fiduciary duties extend to those decisions over which the agent has discretionary authority. *Id.* Dunne's authority as CLG's agent, as defined in January 1998, included the ability to "open bank accounts" for CLG, "generally administer all

banking matters" for CLG, and "execute any and all other contracts, license agreements, purchase orders or other documents that [Dunne] shall deem necessary or desirable to operate the business and affairs of" CLG in the ordinary course of business. (BX 45.) In other words, Dunne was vested with broad authority to conduct CLG's financial affairs. Pursuant to that authority, Dunne communicated with GTI's patent counsel regarding the 1999 ECH license and steps necessary to effectuate its terms. (E-mail from J. Dunne to F. Vitalo of 7/13/99; Trial Tr. 1994:17-1995:16.) By e-mail, he forwarded a draft of the license agreement, reflecting the GTI patent counsel's changes, to Fred Vitalo. The jury was entitled to conclude from this evidence that negotiations regarding licensing agreements for the Cement-Lock Technology were within the scope of Dunne's authority.

During the relevant timeframe, Dunne also served as Chief Financial Officer and Vice President of Administration, beginning in May 2000 for GTI and in August 2000 for GRI. Before that, he was GTI's Vice President for Administration and Secretary. (*Id.*) In addition, he served as Secretary of ESI until August 2001, and then again beginning in March 2001. (*Id.*) He held no formal role in ECH, but was an agent for CLG beginning in January 1998. (BX 45.) On its own, this multiplicity of overlapping roles does not constitute a breach of fiduciary duty. It does, however, make the relationship among the entities particularly significant.

### 2. Breach

Turning to the next element of Plaintiffs' claims, a review of the record reveals that there was a legally sufficient evidentiary basis for the jury's conclusion that Borys and Dunne breached their fiduciary duties during these negotiations. Specifically, Plaintiffs have pointed to evidence of a scheme to broaden ECH's license to use the Technology, making it exclusive, worldwide, and applicable to all forms of waste, in ever-larger quantities. As a result of its expansive right to use the Technology, ECH was able to obtain increasing amounts of research grant money from GRI and other funding sources, which it was expected to use to develop and commercialize the Technology. Instead, the money was squandered on inadequate equipment, salaries, and bonuses. ECH's

license was so broad and exclusive that CLG could not collect royalties from other licensees; but ECH did not develop or commercialize the Technology and CLG was altogether deprived of the opportunity to benefit from it. All this, according to Plaintiffs, happened behind their backs. Now, years later, the patent is about to expire, and CLG cannot exploit the Technology, which has become valueless to it. By failing to act in CLG's interests during the negotiations, they argue, Borys and Dunne breached fiduciary duties.

The court reviews the evidence that supports this broad theory in the light most favorable to the jury's verdict. First, in May 1997, Dunne sent a letter to Peter Barone of GRI, enclosing a proposal related to the Cement-Lock Technology. (5/22/97 Letter from J. Dunne to S. Barone, PX 60.) In the enclosed proposal, ESI requested $780,671 in funding from GRI, which it proposed to use for technical work on the Technology. (*Id.*) Dunne signed the proposal in Borys's name. (ENDESCO Proposal No. E307, PX 61A.)[5] The proposal makes certain representations, including that ESI "had completed licensing negotiations with Cement-Lock, L.L.C. for ownership of several commercial initiatives." (*Id.* at G396523.) Presumably in response, in August 1997, GRI sent a letter of intent to ESI, proposing a debenture agreement for financing a company that ESI would form for the purpose of constructing and operating a cement manufacturing facility. (Letter from W. Kockenmeister to S. Borys of 8/20/97, PX 106B.) GRI proposed to purchase $580,671 of the new company's convertible debentures immediately, and to make an additional purchase of $200,000

---

[5] Defendant Borys moved to strike certain evidence relied on by Plaintiffs in opposing Borys' Rule 50(a) motions. Of the testimony and exhibits objected to by Borys, the court relies only on PX 437A and PX 61A in its analysis. To the extent Borys objects to other evidence cited in Plaintiffs' memoranda, his motion is denied as moot. With respect to PX 437A, Borys argues that it was never admitted against him at trial and cites to testimony where the court excluded the exhibit for lack of foundation. The court has cited PX 437A only once, and not against Borys; in any event, although the court initially refused to admit the document because Borys denied knowledge of it (Trial Tr. 1119-1120, 1374), PX 437A was later admitted during the direct examination of Michael Mesinger with no objections by Borys or any other Defendant. (Trial Tr. 2402:20-2403:21.) Borys is also mistaken as to the admission of PX 61A. Borys's counsel preserved an objection to the admission of PX 61A against Borys, but it was ultimately admitted against all Defendants without restriction. (Trial Tr. 2057:4-13.)

on December 1, 1997. (*Id.*) The proposal anticipated that ESI would use the sum "to complete preliminary plant design and associated technology and commercialization analysis." (*Id.*) In exchange, GRI would receive an option to purchase up to $4.5 million of the new company's convertible debentures by December 31, 1999. (*Id.*) GRI requested that ESI and the new company represent that they "have all rights to the technology necessary for the implementation of the proposed business plan and that said rights are exclusive . . . ." (*Id.*) Dunne signed his name to the letter of intent, accepting its terms, again on behalf of Borys. (*Id.*)

The day after receiving the letter of intent from GRI, Dunne sent Borys an e-mail in which he noted, among other things, that repayment of the loan would begin at plant start-up, but that the letter of intent was silent on what repayment obligations ESI would have if the plant never started up. (E-mail from J. Dunne to S. Borys of 8/21/97, PX 85.) Dunne's e-mail message also stated that he would sign the letter of intent that day and take receipt of the money. (*Id.*) Four days later, Dunne informed Borys that ESI had received $580,000 from GRI. (E-mail from J. Dunne to S. Borys of 8/25/97, PX 86.) In this second e-mail, Dunne noted, again, that ESI did not have to pay back the money it spent until "the plant starts selling product or when it becomes apparent that the plant will not sell product." (*Id.*) Dunne also noted that Barone and Paul Chromek of GRI had provided verbal assurances that there would be no repayment obligation if no product were sold. (*Id.*)

On December 1, 1997, ECH and GRI consummated the agreement discussed in their letter of intent. In a Purchase Agreement of that date, GRI agreed to purchase a convertible promissory note for $780,671 from ECH; the Agreement states that $580,671 had been paid to the company on August 21, 1997, and that an additional $200,000 would be paid on December 1, 1997. (Purchase Agreement dated as of December 1, 1997, PX 106C, § 2.2.) ECH agreed to sell to GRI additional convertible promissory notes during 1997, 1998, and 1999, pursuant to the terms agreed to by the parties, up to an additional $3,719,329. (*Id.*) Borys signed the Agreement for ESI, on

behalf of ECH; William Kockenmeister, Vice President and General Counsel, signed the agreement for GRI. (*Id.* at 14.)  A December 1, 1997 promissory note accompanying the Purchase Agreement makes clear that ECH would repay the principal amount of $780,671, with interest, "commencing upon Plant Startup." (Promissory Note § 2(a), PX 105A.)  Borys signed the note for ESI, on behalf of ECH. (*Id.*)  A December 4, 1997 promissory note addressing an additional amount of $1.25 million, plus interest, also states that payment shall "commenc[e] upon Plant Startup." (Promissory Note § 2(a), PX 105B.)  Again, Borys signed the note for ESI, on behalf of ECH. (*Id.*)  By their terms, Plaintiffs contend, these documents create a disincentive to a plant startup—effectively a motivation to suppress development of the Technology. (*See also* Convertible Promissory Note dated 12/12/97, PX 120 (note signed by Borys in which ECH agrees to repay GRI $1,555,769 upon plant startup).)

As Defendants point out, it was GRI who structured the debenture agreement. (JNOV Br. [482] at 23.)  And there is no allegation that Dunne or Borys breached fiduciary duties to CLG by structuring this arrangement, as neither individual owed CLG any fiduciary duties at that time.  But the arrangement created an incentive not to commercialize the Technology, in that a functioning plant would trigger ESI's repayment obligations to GRI.  Plaintiffs therefore argued, and the jury could reasonably have concluded, that Borys and Dunne breached their fiduciary duty to CLG later by abandoning the commitment to commercialize the Technology—CLG's only asset—when they recognized that this would best serve ESI's and ECH's interests.

CLG's Operating agreement is dated December 1, 1997. (Operating Agreement of Cement-Lock Group, L.L.C., PX 107.)  Borys signed that Operating Agreement on behalf of ESI; Surjit ("Serge") Randhava (a member of CL) signed it on behalf of CL, and Mell signed it in his individual capacity. (*Id.*)  As of this date, Borys (but not Dunne) owed fiduciary duties to CLG.  Also on December 1, ECH and CLG entered into a license agreement for the Technology. (1997 License Agreement, BX 41.)  Pursuant to that Agreement, CLG granted ECH a royalty-free license to use

24

the Technology to treat up to 100,000 cubic yards of sediment per year, in one plant in New York or New Jersey. (*Id.*) Borys signed the license on behalf of CLG; Amirali Rehmat signed it on behalf of ECH. (*Id.*) Plaintiffs suggest that the financial benefits of this arrangement flowed not only to ECH and ESI through grant money, but also to GTI's predecessor, IGT. As evidence, they point to a subcontract for work to be performed between May 1997 and March 1998, for a total of $300,000. (Subcontract dated 10/1/97, PX 97A.) Dunne signed the subcontract on behalf of GTI; Borys signed it on behalf of ESI. (*Id.*) Borys made the proposal on behalf of GTI and then executed the contract on behalf of ESI. (Trial Tr. 1113:2-6.) Soon afterwards, in January 1998, Dunne's fiduciary duties to CLG were triggered by execution of an "Action by Written Consent" empowering him to conduct CLG's financial affairs.

The next event significant to the expansion of ECH's license rights occurred over a year later. Minutes from a March 24, 1999 CLG Partners Meeting attended by Surjit ("Serge") Randhava, Surabjit ("Ravi") Randhava, Richard Kao, Richard Mell, Stanley Boys, Amirali Rehmat, and Anthony Lee reflect a discussion of expansion of ECH's license rights. (GTI X 183.) Plaintiffs contend that Borys and Dunne, among others, manipulated the meeting to CLG's detriment. The attendees recognized that CLG had no income, other than funding from ECH; that CLG was $50,000 "in the red" for intellectual property protection expenses; and that CLG would need $60,000 more for this purpose. (*Id.*) The participants agreed that ECH would fund these expenses, up to $150,000, in exchange for a royalty-free license to process up to 500,000 tons of sediment per year. According to Mell, Borys also announced at this meeting that ECH was $3 million "short." (Trial Tr. 1469:9-18; *see also* GTI X 183.) This was untrue, Plaintiffs assert. They point to an e-mail message Dunne had sent to Borys and others shortly before the meeting, in which Dunne suggested that GTI could loan ECH $3 million to buy land, as GTI "has the cash." (PX 909.) Lee responded to the e-mail by stating that Dunne was his "guru" in business, and agreeing to the plan.

(*Id.*)[6] There is no indication that the parties followed through with this loan proposal, but the e-mail indicates that ECH had alternate sources of funding.[7] In addition, within a week of the meeting, a convertible promissory note Borys signed for ESI on behalf of ECH confirms that ECH borrowed $913,560 from GRI. (Convertible Promissory Note of April 1, 1999, PX 219.) After depositing the $913,560 check, in an April 1999 e-mail, Ken Wicherek informed Dunne and others that ECH had over $2.6 million to support the project and would be able to cover payments until August 1999. (PX 221.) In other words, Plaintiffs contend that, contrary to representations made at the March 24, 1999 meeting, ECH had no need for additional funding.

ECH and CLG then executed the license agreement that Dunne helped to negotiate. That license agreement, dated August 25, 1999, significantly expanded ECH's rights. (PX 248.) In it, CLG granted ECH an exclusive, royalty-bearing license to process up to 600,000 tons of waste per year and the right to sub-license the Technology. (*Id.*) In consideration, ECH agreed to pay CLG $150,000. (*Id.*) Borys signed the license on behalf of CLG, while Rehmat signed it on behalf of ECH. (*Id.*) As discussed at the meeting, records show that CLG owed ECH approximately $110,000 in patent protection costs. (BX 144N.) The amount of the debt was transferred out of CLG's account in September 1999. (Trial Tr. 4831:3-21.) Borys urges that there is no evidence that the patent protection costs were false (Borys Reply to JNOV on I, IV, and V [582] at 6), but Plaintiffs point to testimony that ESI employees and GTI employees charged time to CLG's account

---

[6]     As an alternative, Lee suggested asking the CLG members to contribute their share of the costs to date. (PX 909.) CLG's Operating Agreement, however, makes clear that members will not be required to make additional capital contributions to the company. (PX 107 § 3.2.) As Defendants emphasize, the initial capital contributions set forth in the Operating Agreement were minimal: ESI contributed just $510; CL, $390; and Mell's contribution was a mere $100. (*Id.* at Ex. A.)

[7]     Plaintiffs also suggest that a change in ECH's technical direction was occurring at the same time, as ECH had opted to build several plants, rather than just one. The court does not consider this argument, as it is unnecessary to deciding whether Borys and Dunne breached their fiduciary duties.

(Trial Tr. 2878:15-25), demonstrating, Plaintiffs suggest, that CLG's debt was not entirely attributable to patent protection costs chargeable to CLG. Defendants contend that all parties understood that CLG would function merely to hold title to the patent rights in the Technology. Nevertheless, Mell testified that no one from GTI or ESI ever told him that the companies were charging time spent for work done by in-house employees for patent protection, or for time attending meetings. (Trial Tr. 1641:10-21.)

In 1999, with the newly expanded license in place, ECH received additional funding commitments (*see* Contract with New Jersey Department of Transportation dated 6/5/00, PX 437A; Cement-Lock Technology - Funding History, PX 885), which Plaintiffs attribute to ECH's expanded license rights to the Technology. Despite this, as both Dunne and Borys were aware, ECH continued to struggle to pay its bills. (E-mail from T. Lee to J. Dunne, S. Borys, et al, PX 258.) Dunne urged Borys and others to "find a sugar dad[d]y quickly," as GRI's money was running out. (*Id.*) As of March 1999, however, Serge was not aware that ECH was facing a financial shortfall, because he did not know what money was coming in to ECH or how it was being spent. (Trial Tr. 3363:15-3364:17.) And, as Plaintiffs note now, it is unclear how ECH was spending its money, as no plant had been built, no finished equipment purchased, and the Technology had not been successfully implemented. (Pl.'s.' Opp'n [555] at 25.) According to witness Michael Mensinger, the money was used to pay overhead, salaries, among other things, and fixed fees. (Trial Tr. 2241:6-14.) An e-mail Dunne wrote in September 1999 to Borys and others confirmed that ECH paid about $100,000 per month for staff, consultants, travel, and equipment. (PX 258.) Thus, Plaintiffs urge, the grant money was not spent on developing the Technology but, rather, was misappropriated.

Plaintiffs have suggested that, in light of the terms of ECH's agreement with GRI, Borys and Dunne were always motivated to suppress development of the Technology. William Shefcik testified that, during an investment committee meeting in the spring of 2001 with Dunne and Borys, Barone talked about the delays and lack of progress, and Dunne expressly stated that he had no

intention of commercializing the Technology. (Trial Tr. 1741:1-1742:14.) Neither Borys nor anyone else at the meeting responded. (*Id.* at 1742:15-18.) Given the exclusivity of the ECH license, ECH's failure to move forward would, of course, severely limit CLG's attempts to commercialize the Technology. While Defendants point to testimony that Borys, Dunne, and Lau were committed to the Technology and had incentives to commercialize it, the jury was not required to believe this testimony, and the court is therefore obligated to disregard it. *Morales*, 494 F.3d at 599-600; *Hossack*, 492 F.3d at 859.

At around the same time that Shefcik learned that Dunne and Borys had no intention of commercializing the Technology, ECH negotiated an expanded license agreement with CLG. (License Agreement dated 2/2/01, PX 485.) In this new Agreement, CLG granted ECH the right to treat an additional 500,000 tons per year of "all wastes," bringing ECH's cumulative capacity to 1.1 million tons per year (*Id.*) The license was exclusive, royalty-free, and included the right to sub-license. (*Id.*) In exchange for the expanded license, ECH agreed to pay CLG just $150,000. (*Id.*) ECH transferred this money to CLG's account on May 24, 2001; the same day, the sum was withdrawn and transferred to GTI's account. (PX 257A, PX 257B.) Dunne signed both authorizations to transfer. (*Id.*)

There is, in addition, evidence that Borys and Dunne were again complicit in a plan to suggest to CLG that license expansions were necessary to pay falsely-accrued patent protection costs. In a February 2, 2001 memo, copies of which were sent to Borys and Dunne, Lee told Plaintiffs the license expansion was necessary to "cover" such costs. (BX 64, 64A.) By a March 2001 e-mail to Borys and others, Dunne suggests that CLG's license to Endesco be expanded, and that Endesco pay enough to cover future patent maintenance costs for the Technology. (E-mail from J. Dunne to S. Borys et al of 3/27/01, PX 497.) But again, Plaintiffs urge, both Dunne and Borys were aware that CLG's debt was not entirely attributable to patent protection charges. Dunne knew that Lee was charging CLG for labor and administrative expenses, even though CLG had no

money. (E-mail from J. Dunne to R. Stokes et al of 11/14/00, PX 464; Trial Tr. 2009:21-2011:5 (Dunne testimony that "everyone" knew CLG was incurring costs for things other than patent protection).) Borys's trial testimony clarifies that he, too, was aware that the charges were not only for patent protection but also for marketing and technical services. (Trial Tr. 1069:15-23.) Billing time to the CLG project–while knowing that CLG had no way to pay the debts it incurred aside from granting an expanded license–was, Plaintiffs contend, part of a scheme to increase ECH's license rights, and thereby the revenue ECH could obtain from GRI and other funding sources. In other words, according to Plaintiffs' reading of the events, Dunne participated in ECH's scheme to create fraudulent debts, which CLG could pay for by expanding ECH's license rights. ECH's expanded license rights enabled ECH to secure additional funding from GRI. In a March 2001 proposal, ECH represented that CLG had offered ECH an additional license of 500,000 tons per year, in exchange for a nominal fee, and that it was in ECH's best interest to take advantage of this offer. (Proposal to GRI dated 3/12/01, PX 302B.) Rehmat signed the Proposal on behalf of ECH. (*Id.*)

Defendants continued to expand ECH's license rights. On March 30, 2001, Lee, on behalf of CLG, sent ECH a letter confirming that CLG had obtained an interest-free loan from ECH for $100,000, for the year beginning on April 1, 2001. (PX 502.) This loan was necessary, according to Lee, because CLG owed GTI $216,000 "and counting." (*Id.*) This loan, together with the expanded license for which CLG would receive $150,000, would enable the payment of CLG's debts. (*Id.*) Lee sent the letter on GTI letterhead. (*Id.*) Lee also noted that, if CLG were unable to pay the amount of the loan, CLG would grant yet another license to ECH. (*Id.*) In fact, as of June 2002, the parties executed an amendment to the 2001 license, leaving in place ECH's exclusive right to process the first 1.1 million tons of waste, but expanding ECH's overall rights to process a total of 1.6 million tons per year of sediment. (License Agreement, Amendment No. 1, PX 638.)

Plaintiffs also presented evidence that the grant money ECH obtained was being misspent.

29

When William Shefcik began auditing and monitoring the expenses in 2001, he uncovered inconsistencies in the documentation of payment for a kiln purchased for the project. (Trial Tr. 1672:16-1673:7, 1731:13-32:3.) He asked Barone, who was the "head of the effort for Endescos" about the irregularity several times, but Barone refused to answer. (*Id.* at 1732:11-33:12.) Shefcik brought the question to the accounting department, but still obtained no answer. (*Id.* at 1733:10-22.) Shefcik then went to Wicherek, GTI's corporate controller and treasurer, who told him not to question any of his people. (*Id.* at 1734:21-34:5.) There were other problems relating to the kiln: the specifications called for processing of just 13,000 tons per year, far short of ECH's 100,000 ton per year license capacity. (Trial Tr. 2467:20-23.) And the kiln suffered from engineering problems, which became obvious during its trial run. (Trial Tr. 1819:13-25; *see also, e.g.,* 1867:1-6 (kiln was not working as planned); 1971:14-73:2 (kiln plugged up in 2003); 1882:10-15 (kiln functioning problematic).) In addition, Ravi Randhava testified that, despite the manufacturer's representations, the kiln was not in fact a "slagging" kiln, and therefore was unable to process wastes properly. (Trial Tr. 709:13-710:21; 718:17-19:2.) Defendants criticize this evidence, but again, the jury was entitled to infer that ECH's lack of interest in commercializing the Technology led it to purchase or to tolerate ineffective equipment.

The jury was entitled to infer, further, that the scheme Plaintiffs described to acquire expanded license rights for ECH at CLG's expense did exist. There was evidence that ECH pursued funding sources, while misrepresenting its need for additional funds to CLG and that the ever-expanding ECH license rights were procured by falsely representing the nature of CLG's debts. Finally, both Borys and Dunne are tied by a number of documents and testimony to the scheme. Thus, it was not unreasonable for the jurors to conclude that Borys and Dunne breached their fiduciary duties to CLG.

### 3. Injury

As discussed above, Vollmar offered evidence to suggest that the Technology was worth

$26.4 million in 1997, before the scheme described above was put into action. That ECH's ever-increasing licenses were royalty-free deprived CLG of the right to collect royalties. (Trial Tr. 4249:12-4250:9.) CLG could profit from the Technology only through royalties; thus, the licensing scheme prevented CLG from developing the Technology through companies other than ECH. (Trial Tr. 4386:4-24.) Both Borys and Dunne point out that Plaintiffs cannot tie this theory to any single license expansion. Given that Plaintiffs' damages theory will need to be retooled in any case, the court need not determine which, if any, of Borys's and Dunne's breaches caused Plaintiffs' losses.

### B. Lau

Lau was President of CLG and served on its Board of Managers beginning from March 2003 to July 2004. (PX 872A.) Thus, there is no dispute that Lau owed CLG fiduciary duties beginning in 2003. (Lau Mem. [472] at 4.) At the same time he served as President of CLG, Lau was also President of ECH. (PX 872A.) Plaintiffs contend that Lau breached fiduciary duties in a number of ways, but the court will focus, again, on the ECH licenses. By prioritizing the exclusivity of ECH's license over other considerations, Plaintiffs claim, Lau deprived CLG of the ability to license or commercialize the Technology. (*Id.*)

Lau's fiduciary duty of loyalty required that the best interest of CLG take precedence over any of Lau's interests, not shared by CLG stakeholders generally. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993); *see also* PX 107 (CLG Operating Agreement § 5.3 ("A Manager shall perform his duties as a member of the Operating Board . . . in a manner he reasonably believes to be in the best interest of the Company and the Members.")). Thus, his decisions on behalf of CLG were to be based on the merits of the transaction to CLG alone. *Cede*, 634 A.2d at 361. Delaware law provides that a fiduciary is not acting independently where the independence of a reasonable person in his or her position would be affected and the fiduciary's self-interest affected decision-making on behalf of the entity in question. *Id.* at 362. Taking the exclusivity of ECH's license as an example, a reasonable jury might have concluded that Lau's decisions failed

this two-part test. Lau acknowledged that, pursuant to the terms of the ECH license, CLG was unable to grant other licenses until ECH had exhausted the capacity on its exclusive license, and that he, Lau, would be responsible to resolve any conflict between ECH's license rights and those of any other licensee. (Trial Tr. 3140:13-21.) Lau acknowledged, further, that the exclusivity of the license was "very important" to ECH. (*Id.* at 3180:21-23.) Lau's roles on both sides of the license negotiations support an inference of a conflict of interest. And, as Lau signed the April 2003 agreement as CLG's President, that inference is reasonable, regardless of whether other Operating Board members concurred with his recommendation.

This leaves the question of whether Lau's breach of fiduciary duty injured CLG. Although the court cannot resolve this question absent a sustainable damages theory, it is worth noting that Lau acknowledged that CLG's major business was commercializing the Technology. (Trial Tr. 3140:6-9.) CLG would do so by collecting license fees, once the Technology was commercialized. (*Id.* at 3140:10-12; 3128:1-4, 8.) For the reasons explained above, the jury was entitled to conclude that Lau's conduct suppressed commercialization of the Technology, and, thus, CLG's revenues.

### D. ESI

There appears to be no dispute that, as a CLG member, ESI owed CLG fiduciary duties. *Cement-Lock III*, 523 F. Supp. 2d at 844. ESI may be vicariously liable for the breaches of its agents, to the extent that their actions were committed within their authority on behalf of ESI. The parties have not addressed the issue of vicarious liability in their post-trial briefs, however, and the court concludes it would be premature to enter judgment in favor of ESI as a matter of law on these claims.

### E. GTI and ECH

GTI and ECH were not CLG members. They therefore owe CLG fiduciary duties only if the court pierces the corporate veil. *Cement-Lock III*, 523 F. Supp. 2d at 844. Whether to pierce the corporate veil is an equitable determination for the court to make. *Int'l Fin. Servs. Corp. v. Chromas*

*Techs. Canada, Inc.*, 356 F.3d 731, 739 (7th Cir. 2004). Defendants argue that there is no basis for piercing the corporate veil to hold GTI, IGT, or ECH liable for breach of fiduciary duty. (JML Brief [482] at 19.) Although Plaintiffs discuss the relationship between the entities in the factual section of their brief, they offer no argument in support of piercing the corporate veil, and the court will not construct one for them.

Instead, Plaintiffs contend that the companies' mere involvement in CLG's business creates fiduciary duties. (Pl.'s.' Opp'n [555] at 48.) The cases on which they rely, however, do not support the notion that a corporate outsider takes on fiduciary duties merely by being involved in a business relationship with the corporation. *Cf. Shamrock Holdings v. Arenson*, 456 F. Supp. 2d 599, 610 (D. Del. 2006) (aiding and abetting liability may exist for a third party who knowingly participates in breach of fiduciary duty); *In re Summit Metals, Inc.*, No. 98-2870, Civ. A. 00-387(KAJ), 2004 WL 1812700, at *13-14 (D. Del. Aug. 6, 2004) (controlling shareholder and sole director found to have breached fiduciary duty); *Bakerman v. Sidney Frank Importing Co.*, No. Civ.A. 1844-N, 2006 WL 2987020, at *14-15 (Del. Ch. Oct. 10, 2006) (limited liability company managers and members owed fiduciary duty to its other members), *revised and superseded*, 2006 WL 2927242 (Del Ch. Oct. 16, 2006). The court finds no evidence to support imposition of fiduciary duties on GTI, IGT, or ECH.

Plaintiffs also suggest that GTI, IGT, and ECH are vicariously liable for the actions of their agents. (Pl.'s.' Opp'n [555] at 46.) Plaintiffs do not, however, point to any specific evidence that the individual defendants were acting within the scope of their authority as agents when they committed these breaches. Instead, they appear to assume that the individuals' roles in GTI, IGT, and ECH create an agency relationship in all contexts. This does not satisfy their burden of proof. Finally, to the extent Plaintiffs suggest that it was ESI who was the agent, the court has already foreclosed this argument, making clear that "[t]he mere fact that ESI is a subsidiary of IGT is not sufficient to meet the test for piercing." *Cement-Lock*, 523 F. Supp. 2d at 844. There is, thus, no

argument that GTI, IGT, or ECH owe CLG fiduciary duties. The court therefore grants judgment as a matter of law in favor of GTI, IGT, and ECH on Count I.

## IV. RICO Claims (Counts II and III against Corporate Defendants, Dunne, and Borys only)

Defendants seek judgment as a matter of law on Counts II and III of the Amended Complaint on a number of grounds. For the reasons explained here, the court agrees with Defendants that the evidence at trial was insufficient to establish a RICO enterprise.

RICO defines an enterprise to include "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). According to Plaintiffs, the RICO enterprise in this case included Defendants Dunne and Borys as well as Amirali Rehmat, Anthony Lee, Peter Barone, Anil Goyal, Michael Mensinger, and Fred Vitalo. (Pl.'s.' Opp'n [555] at 80.) But it is not enough to identify a group of individuals. In order for an association to be considered a RICO enterprise, the individuals must have conducted the affairs of the enterprise itself and not merely acted to benefit themselves. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). In other words, the enterprise must be a discernable entity. In addition, "[t]he hallmark of an enterprise is a structure." *Richmond v. Nationwide Cassel, L.P.,* 52 F.3d 640, 645 (7th Cir. 1995) (internal quotation marks and citation omitted). The enterprise may be informal and "there need not be much structure, but the enterprise must have some continuity and some differentiation of the roles within it." *Id.* Thus, only individuals within a chain of command—either directing the enterprise's affairs or taking direction regarding those affairs—can be considered part of an enterprise. *MCM Partners, Inc. v. Andrews-Bartlett & Assocs. Inc.*, 62 F.3d 967, 978 (7th Cir. 1995).

According to Plaintiffs, Borys and Dunne masterminded the enterprise. (Pl.'s.' Opp'n [555] at 76.) In that capacity, Plaintiffs contend, Borys and Dunne directed the activities of Mensinger,

Barone, Lee, Rehmat, and Goyal.  (*Id.*)  They do not explain how Vitalo fit into the enterprise.[8]  As evidentiary support for the structure they outline, Plaintiffs claim, first, that Borys, having learned that GRI was significantly underspent, directed Lee to obtain GRI funds using the Technology for the benefit of GTI.  (Pl.'s.' Opp'n [555] at 74.)  The evidence, however, does not show any direction Borys gave to Lee.  (Trial Tr. 911:2-4 (Borys testimony that he wrote PX 59); 916:5-8 (Borys testimony that PX 59 states that GRI was significantly underspent); 917:4-16 (Borys testimony that e-mail instructing his people to "move quickly" and to "make proposals where they can" is "probably" related to Cement-Lock Technology).)

Plaintiffs next argue that Borys and Dunne—knowing that GTI needed money and that the Technology seemed to have promise—caused Rehmat to prepare a proposal, which ESI submitted to GRI for building a Cement-Lock plant in New Jersey.  (Pl.'s.' Opp'n [555] at 74.) The evidence demonstrates that a proposal was submitted; it does not, however, make clear whether Borys and Dunne directed its submission or to whom any such directions might have been given.  (Trial Tr. 1726:24-1727:2 (Schefcik testimony regarding IGT's proposal); 2075:14-23 (Dunne testimony that he signed the proposal in Borys's name with Borys's permission); PX 60 (5/22/97 cover letter from Dunne to Barone enclosing proposal from ESI to GRI); PX 61A (5/22/97 Proposal from ESI to GRI, signed "Stanley Borys/JED").)  They next assert that, because Goyal immediately informed Rehmat that ESI would subcontract the work to GTI, the jury was entitled to infer that Borys or Dunne directed him to do so.  This inference, however, would be based wholly on speculation, as there is no evidence that either Borys or Dunne communicated any such direction to Goyal.  The interactions among the individuals is insufficient to establish a structure.

---

[8]     Notably, Plaintiffs' most recent description of the structure of the alleged RICO conspiracy differs from the structure Plaintiffs identified at the summary judgment stage.  In that briefing, Plaintiffs suggested that Borys and Dunne directed the enterprise; Barone, Lau, and Lee were the second layer of the enterprise; and Goyal, Mensinger, and Rehmat were the third layer. *Cement Lock III*, 523 F. Supp. 2d at 850.

Plaintiffs also point to Mensinger's testimony that Borys was his immediate supervisor at ESI. (Trial Tr. 2251:3-10.) Indeed, Borys, a manager of ECH, testified that he authorized ECH's President, Amirali Rehmat, to sign a license agreement on behalf of ECH. (Trial Tr. 1037:1-12.) This testimony does not establish a chain of command within the enterprise, because it clearly refers to and describes the chain of command within two entities–ESI and ECH–neither of which is the purported enterprise. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) (plaintiffs have not proven RICO enterprise where they "fail[] to offer the slightest sign of a 'command structure' separate and distinct from [an entity] (which is not the purported enterprise)"). In other words, it is not enough to show that there was a command structure within the lawful entities; unless the enterprise is the entity (and Plaintiffs do not argue that it is), Plaintiffs must prove that the enterprise exists as an independent entity.

Aside from these attempts to prove a chain of command, Plaintiffs rely entirely on the activity of Borys and Dunne as evidence that an enterprise existed. At best, however, this is no more than evidence that Borys and Dunne were engaged in wrongdoing–not proof of the existence of a RICO enterprise. *Brown v. County of Cook*, 549 F. Supp. 2d 1026, 1031 (N.D. Ill. 2008) (quoting *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) ("An enterprise is distinct, separate, and apart from a pattern of racketeering activity: although a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does."). In *Brown*, the court dismissed RICO allegations for failure to state a claim, where the plaintiff only alleged that the group of defendants committed two or more predicate acts, but failed to allege structure. *Id.* Likewise, here, Plaintiffs' evidence that Borys and Dunne worked together toward an allegedly unlawful end does not mean that they created an enterprise, with an identifiable structure. Because Defendants have identified no "command structure," they failed to prove the existence of a RICO enterprise at trial. *Stachon*, 229 F.3d at 676-77; *MCM Partners*, 62 F.3d at 978; *Cement-Lock III*, 423 F. Supp. at 849 (a RICO

36

enterprise "requires more than basic organization: To establish structure, the plaintiff must show that the association is joined in purpose and organized in a manner amenable to hierarchical or consensual decision-making.") (internal quotation marks and citations omitted).

The court need not reach Defendants' challenges to the remaining RICO elements. All Defendants are entitled to judgment as a matter of law on Counts II and III.

**V.      Count IV: Fraudulent Concealment (against Corporate Defendants, Dunne, and Borys only)**

The court turns next to Plaintiffs' common law claims, beginning with their claims of fraudulent concealment against Dunne, Borys, and the corporate Defendants. To prove such a claim under Illinois law, Plaintiffs must show

> (1) the concealment of a material fact; (2) that the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) that the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) that the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury.

*Trustees of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002). Circumstances creating a duty to speak include "the existence of a special or fiduciary relationship . . . ." *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 573, 692 N.E.2d 812, 817 (1st Dist. 1998).

**A.      Borys and Dunne**

Plaintiffs' fraudulent concealment claims against Borys and Dunne substantially overlap with their breach of fiduciary duty claims. As set forth above, there is evidence that Borys and Dunne failed to inform Plaintiffs about the true nature of CLG's debt to ECH, the real reason additional grants were being sought, or the actual way the money received was being spent. By failing to reveal these facts, Defendants gave Plaintiffs a false sense that plans to develop the Technology were proceeding as planned. Reliance on their representations was therefore justifiable: "Where

37

a plaintiff's inquiries are inhibited by a defendant's statements which create a false sense of security, the plaintiff's failure to investigate further is not fatal." *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 166, 510 N.E.2d 409, 416 (1st Dist. 1986). Plaintiffs argue that, because of these deceptions, they trusted Defendants and entered into the series of expanding license agreements, giving ECH increasing control over the Technology. As a result, they did not pursue other options for commercializing the Technology, or seek additional information about ECH's operations and progress. This evidence is sufficient to prove fraudulent concealment, so long as Plaintiffs are able to demonstrate the resultant injury necessary to maintain a claim.

### C. Corporate Defendants

To the extent Borys or Dunne fraudulently concealed information while acting in the course of their authority or as an agent for one of the Corporate Defendants, that entity may be held liable for the tort. *Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 962 (N.D. Ill. 2002) (a corporation acts through its agents, directors, and officers and thus is liable for their intentional torts when they are acting within the scope of their authority). Again, the parties do not discuss this issue in any detail, and, accordingly, the court will not determine which corporate Defendants, if any, may be liable.

## VI. Count V: Fraudulent Misrepresentation (against Corporate Defendants, Dunne, and Borys only)

The elements of common law fraud are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996). Reliance upon the truth of the statement must be justifiable. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370 (7th Cir. 1988). Plaintiffs must prove each of these elements by clear and convincing evidence. *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 852 (7th Cir. 2007).

## A.    Borys

Plaintiffs contend that Borys made a false statement at the March 24, 1999 meeting, when he announced that ECH was short of funds.  (Borys JNOV Resp. [546] at 28-29.)  At trial, they presented sufficient evidence that Borys's misrepresentation was, indeed, false, and that Borys knew it to be so.

As explained above, Borys attended a CLG Partners Meeting on March 24, 1999; Serge, Ravi, Kao, Mell, Rehmat, and Lee were also there. (GTI X 183.)  At the meeting, there was a representation that ECH was $3 million short, and would not be able to meet its payments to vendors by the end of May 1999.  (*Id.*)  Mell testified, and the jury was entitled to believe, that it was Borys who said that ECH was $3 million "short."  (Trial Tr. 1469:9-18.)  One month earlier, however, Dunne had sent Borys an e-mail suggesting that GTI could loan ECH $3 million to buy land, as GTI "has the cash."  (PX 909.)  As Borys notes, it is clear from the context that this statement was made with reference to a proposed land purchase. (Borys JNOV Reply [582] at 20.)  Still, Dunne's suggestion that GTI had cash available is not expressly limited to the context of that land purchase, and there is ample room to infer that GTI was a funding source for other needs as well, such as paying its vendors.  Indeed, soon after the meeting, on April 1, 1999, ECH received $913,560 from GRI, and Borys signed the accompanying promissory note.  (PX 219.)  Kenneth Wicherek, Treasurer of GTI and ECH, concluded that ECH now had over $2.6 million to support the project and would be able to cover payments until August 1999.  (PX 221.)  Borys's intent to deceive CLG can be inferred from the facts and circumstances surrounding the license-expanding scheme. *Washington Courte Condominium Ass'n-Four v. Washington-Golf Corp.*, 267 Ill. App. 3d 790, 815, 643 N.E.2d 199, 216 (1st Dist. 1994); *Warren v. Le May*, 142 Ill. App. 3d 550, 573, 491 N.E.2d 464, 478 (5th Dist. 1986) ("Intent may be shown by circumstantial evidence.").  Plaintiffs have presented evidence that Borys were engaged in a scheme to horde licensing rights for ECH, which would enable it to obtain grant money from its various funding sources.  Emphasizing to CLG that ECH

needed to recover the money it was owed immediately, and could not afford to offer them a line of credit or share the expenses, could have been part of this scheme, and the circumstantial evidence that the scheme existed is sufficient to prove Borys's intent.

The question, then, is whether Plaintiffs relied on this statement and took action in reliance upon it. In light of the elaborate scheme described, and the inequality of knowledge between the parties, the court concludes that a reasonable juror might have believed that the misrepresentation induced Plaintiffs to agree to expanded licensing, and to trust that ECH was using its rights under the licenses to develop and commercialize the Technology. As set forth above, representations made about the financial affairs of the various companies involved was, in fact, the only justification given for expansion of the license agreements in question. While Plaintiffs' obligation to prove causation will ultimately depend on the injury they are able to prove at trial, if any, the evidence was sufficient to permit the fraudulent misrepresentation claim against Borys to proceed to trial.

### B.    Dunne

Dunne will be liable for fraudulent misrepresentation only if Plaintiffs show that he made a false statement of material fact. *Lewis v. Lead Indus. Ass'n, Inc.*, 342 Ill. App. 3d 95, 103-04, 793 N.E.2d 869, 875 (1st Dist. 2003) (to state a claim for fraud, plaintiff must identify specific party who made allegedly false misrepresentations). The *Lewis* court dismissed a plaintiff's fraud claim where "the plaintiffs' failure to identify the specific defendant who made a false statement upon which they relied" rendered the claim "insufficient to state an action in fraud." *Id.* Here, similarly, because Plaintiffs' fraudulent misrepresentation claims against Dunne rely entirely on statements they cannot prove Dunne made, the court concludes he is entitled to judgment on Count V.

Plaintiffs contend, first, that Dunne made fraudulent misrepresentations at a December 1997 meeting, in which CLG and ECH were formed. (Pl.'s' Opp'n [555] at 21.) The excerpt from Serge's testimony on which they rely for this proposition, however, does not mention Dunne at all. (*Id.,* citing Trial Tr. 3316:8-3321:3; 3352:13-3353:10.) At most, Serge testified that "the discussions were

around the fact that ECH would be setting up a 100,000 tons a year plant in the New Jersey/New York area to treat dredge sediments." (Trial Tr. 3352:18-24.) Serge also testified that at that meeting, the parties discussed their intent of creating the two entities to commercialize the Technology. (Trial Tr. 3352:25-3353:4.) But when asked "who said what?" Serge never identified a statement made by any individual, and his cited testimony does not so much as mention Dunne's name.

Plaintiffs also contend that Dunne made fraudulent misrepresentations at an April 2003 meeting. (Pl.'s.' Opp'n [555] at 22.) Here they cite to Ravi's testimony that at the meeting, Lau updated the CLG members on the status of the plant in New Jersey and represented that the project was ongoing. (Trial Tr. at 452:6-20; Trial Tr. 451:18-453:2; GTI X 476.) Ravi recalled Lau's estimation that the plant would be ready to start up in mid-July. (*Id.* at 452:25-453:2.) Again, there is no evidence of any statement made by Dunne. Plaintiffs also note the fact that participants at the April 2003 agreement recognized that a license with Unitel, a business controlled by Ravi, would not conflict with the ECH license. (Trial Tr. 3421:14-3422:6.) This does not appear to have involved a misrepresentation of any sort; and to the extent Plaintiffs believe the jury could have concluded that Dunne somehow concealed the conflict between the licenses, the court notes that there is no affirmative evidence even of this.

It is undisputed that Dunne attended both of these meetings; but there is no evidence of what, if any, statements he may have made. Dunne's mere presence is not sufficient to identify "the specific defendant who made a false statement" by clear and convincing evidence. *Lewis*, 342 Ill. App. 3d at 103-04, 793 N.E.2d at 875; *Ass'n Benefits.*, 493 F.3d at 852. Without evidence that Dunne, himself, made a representation that was false, Plaintiffs cannot sustain a fraud claim against him based on his mere presence at the meeting. The court grants Dunne's motion for judgment as a matter of law on Count V.

### C. Corporate Defendants

To the extent Borys made fraudulent misrepresentations while acting in the course of his authority as an agent for one of the Corporate Defendants, that entity may be held liable for his tort. *Shapo*, 246 F. Supp. 2d at 962; RESTATEMENT (THIRD) OF AGENCY § 7.07. Again, the parties do not discuss this issue in any detail, and, accordingly, the court will not determine which corporate Defendants, if any, may be held liable.

### VII. Count VII: Unjust Enrichment (against Corporate Defendants only)

As the court held in *Cement-Lock III*, under Illinois law, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989). Where, as here, a party seeks to recover a benefit conferred by a third party, unjust enrichment is proper under three limited circumstances: "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id.* at 161-62, 545 N.E.2d at 679 (citations omitted); *see also Ass'n Benefit Services,* 493 F.3d at 854 (same). Plaintiffs suggest that Defendants procured the research funding, which they claim is the benefit in question, through wrongful conduct. (Pl.'s.' Opp'n [555] at 123.)

As explained in the court's earlier opinion, this showing is insufficient:

> Even under the "wrongful conduct" circumstance, Plaintiffs must show some entitlement to the increased salaries and bonuses allegedly enjoyed by the individual Defendants, which they have not done. *See Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00 C 3290, 2003 WL 22232801, *7 (N.D. Ill. Sept. 26, 2003). There is no authority for applying "*HPI [Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989)]*'s wrongful conduct exception where a plaintiff is attempting to recover money to which it is not entitled."

> *Id.* While the *Asch* court found that the defendant had "engaged in wrongful conduct that resulted in inflated fees," it nevertheless held that only a party with entitlement to those fees would be entitled to recover them under an unjust enrichment theory. *Id.* "The court cannot conclude that the Illinois Supreme Court intended to create a claim for unjust enrichment where a plaintiff claims damages that rightfully belong to a third party." *Id.* Thus, the *Asch* court granted summary judgment for the defendants on the unjust enrichment claim. Likewise, in *Paolino v. Hussain Egan Bendersky & Franczyk, L.L.C.*, No. 06 C 611, 2006 WL 1980200, *2-3 (N.D. Ill. July 11, 2006), this court dismissed without prejudice an unjust enrichment claim where the plaintiff alleged that the defendant was unjustly enriched by the amount of consideration he received from participation in a scheme to defraud. *Id.* at *2. The court found that defendant ought to have been sued for conspiracy to commit conversion rather than unjust enrichment. *Id.* at *2.

*Cement-Lock III*, 523 F. Supp. 2d at 863. Plaintiffs note that the research funding was intended to benefit CLG (Pl.'s.' Opp'n [555] at 122), but this is not the showing that Illinois courts require. As the court explained at trial, Defendants are liable to CLG only if Plaintiffs can show CLG was itself entitled to the research funding. Plaintiffs never attempt to make this showing, nor could they. The Funding was earmarked for development and commercialization of the Technology. CLG did not perform this work and it is beyond question that the individual Plaintiffs also did not. The corporate Defendants are entitled to judgment as a matter of law on Count VII.

## VIII.    Proper Derivative Action

A derivative action brought under Rule 23.1 allows corporate shareholders to assert a cause of action on behalf of the corporation. "The derivative form of action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties. Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 95 (1991) (internal quotation marks and citation omitted). Defendants Borys and GTI argue that Plaintiffs lack standing to bring a derivative action on behalf of CLG, that Plaintiffs are improper derivative plaintiffs, and that the doctrine of unclean hands should bar recovery because plaintiffs participated in, acquiesced in or ratified the alleged misconduct. For

the reasons explained here, Defendants' objections to this form of proceeding are overruled.

## A. Standing

First, Defendants suggest that Plaintiffs lacked standing because CLG suffered no cognizable injury. The court has expressed concerns about the validity of Plaintiffs' damages calculations, but stands by its earlier conclusion that, to the extent it can be proved, diminution in value of the Technology due to the misappropriation of funds intended to commercialize the Technology is indeed compensable. *See Cement-Lock III*, 523 F. Supp. 2d at 839-40 (citing *Cement-Lock I*, 2005 WL 2420374, at *13-16). Plaintiffs have made an adequate showing of injury to CLG to meet the requirements for standing. *See Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 761 (7th Cir. 2008).

## B. Adequate Representation

Defendants further contend that CL and Mell are not proper derivative plaintiffs. Rule 23.1 provides that "the derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." FED R. CIV. P. 23.1. Whether a plaintiff fairly and adequately represents those interests is a matter within the trial court's discretion, on which Defendants bear the burden of proof. *Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177, 179 (N.D. Ill. 1987).

It is not always necessary that the minority shareholders bringing a derivative suit represent the interests of the majority shareholder; were the court to hold otherwise, derivative actions would be logically impossible to bring. *Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 90 F.R.D. 21, 25 (N.D. Ill. 1980). Instead, the plaintiff in a derivative action must be capable of advancing the interests of "similarly situated" shareholders–not all or even a majority of shareholders. *Id.* Plaintiff Mell is a minority owner of CLG and Manager on CLG's Operating Board and as such qualifies as a proper plaintiff bringing suit on behalf of CLG. Plaintiff CL, a limited liability company, has been a minority

44

shareholder in CLG throughout this litigation.  CL's members include managing members Surjit ("Serge") Randhava, Surabjit ("Ravi") Randhava, and Richard Kao and non-managing members Wayne & Associates and Jinnet Hemani.  (Operating Agreement PX 36.)

Defendants contend that CL is an improper derivative plaintiff because it is a "sham" entity with no real interest in this litigation.  The court finds this argument unpersuasive.  Under Illinois law, courts will disregard the corporate form[9] only where the corporation and the individual share "such unity of interest and ownership" that they no longer have separate identities and the continued observance of separate identities would "sanction fraud or promote injustice."  *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 520-21 (7th Cir. 1991) (quoting *Van Dorn Co. v. Future Chem. and Oil Corp.*, 753 F.2d 565, 570 (7th Cir. 1985)).  Illinois courts look to four factors in considering whether to disregard a corporation's identity: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own."  *Id.* at 521.  Defendants cite testimony by Serge and Ravi Randhava that CL did not maintain bank accounts, hold meetings, file tax returns or engage any employees.  (Trial Tr. 585:24-586:24, 3620:2-8.)  Even if taken as true, these omissions would satisfy at most one of the above four factors.  Defendants have failed to make an adequate showing that piercing the corporate veil is necessary or appropriate here.

### C.    Unclean Hands

Defendants repeatedly argue that Plaintiffs acted with unclean hands and are therefore not proper derivative plaintiffs.  Although the doctrine of unclean hands is an equitable remedy, the parties agreed during trial that the unclean hands defense should be submitted to the jury.  (*See*

---

[9]    CL is a limited liability company and not a corporation, but Illinois courts generally apply state law governing corporations in veil-piercing actions against limited liability companies. *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 912 (N.D. Ill. 2007).

Docket Entry No. 496 at 90.) Accordingly, the court reviews the evidence under the Rule 50 standard, asking "whether the evidence presented, combined with the reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Harbor Motor Co., Inc. v. Arnell Chevrolet-Geo, Inc.* 265 F.3d 638, 644 (7th Cir. 2001). Because the jury rejected Defendants' unclean hands defense, the court considers the evidence in the light most favorable to Plaintiffs. *Id.*

When invoked in the context of a derivative action, the doctrine of unclean hands will bar the plaintiff from recovering if he engaged in, acquiesced in or benefited from the conduct at issue. *See Forkin v. Cole*, 192 Ill. App. 3d 409, 425, 548 N.E.2d 795, 805 (4th Dist. 1989). The doctrine is intended to prevent a party from benefiting from its own wilful bad acts. *See Thomson Learning, Inc. v. Olympia Properties, LLC*, 365 Ill. App. 3d 621, 634, 850 N.E.2d 314, 325 (2d Dist. 2006). As such, mere negligence is insufficient, and the doctrine will only apply "if there has been fraud or bad faith." *La Salle Nat'l Bank v. 53rd-Ellis Currency Exchange, Inc.*, 249 Ill. App. 3d 415, 437, 618 N.E.2d 1103, 1119 (1st Dist. 1993). Further, the acts forming the basis of the defense must be related to the subject matter of the litigation. *Thomson Learning*, 365 Ill. App. 3d at 634, 850 N.E.2d at 325; *see also American Hosp. Supply Corp. v. Hospital Prods. Ltd.*, 780 F.2d 589, 601 (7th Cir. 1986) (emphasizing that the unclean hands doctrine "is not to be used as a loose cannon, depriving plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct"). The defense will not bar relief absent "a showing of misconduct on behalf of plaintiff in connection with the very transaction at issue." *RIV VIL, Inc. v. Tucker*, 979 F. Supp. 645, 659-60 (N.D. Ill. 1997) (quoting *Ellis v. Photo America Corp.*, 113 Ill. App. 3d 493, 498, 447 N.E.2d 852, 856 (1st Dist. 1983)).

Defendants identify seven instances of misconduct they argue should bar Plaintiffs from recovering in this action:

1. GTI employees Tony Lee and Amir Rehmat wrongfully assigned their interests in the Technology to CL in 1996.
2. CL concealed Rehmat and Lee's ownership interests in CL.
3. CL is a "sham" entity with no real interest in this action.
4. Lee and Rehmat were involved in a kickback scheme involving GTI funds.
5. Plaintiffs participated in the issuance of licenses in conflict with CLG's agreement with ECH.
6. Plaintiffs acquiesced in the transactions and decisions complained of in this action.
7. The Randhavas continued their relationship with Lee and Rehmat even after learning of their participation in the BLR Fraud.

The court has already determined that CL is not a "sham entity" for standing purposes and thus should not be barred from recovery on that basis. Defendants' six remaining allegations of Plaintiffs' misconduct rely in part on the imputation of certain acts and knowledge of Tony Lee and Amir Rehmat to CL. In Defendants' view, Lee's conduct should be imputed to CL through his control of non-managing member Wayne & Associates, and Rehmat's conduct should be imputed through Jinnet Hemani, Rehmat's sister-in-law who holds a non-managing interest in CL. Put another way, Wayne & Associates and Hemani were mere proxies for Lee and Rehmat's interests in CL, and on this basis Lee and Rehmat's conduct should be imputed to CL and disqualify CL as a derivative Plaintiff.

Plaintiffs maintain that neither Illinois statutory nor common law supports the imputation of Lee and Rehmat's conduct to CL. Plaintiffs cite 805 ILCS 180/13-5 for the proposition that a member of a limited liability company is not an agent of the company merely by virtue of his membership, nor are his actions binding without the authorization of other members.[10] Defendants

---

[10] Section 180/135 reads in pertinent part:

§ 13-5. Agency of members and managers.

(a) Subject to subsections (b) and (c):

...

(2) An act of a member that is not apparently for carrying on, in the ordinary course, the company's business or business of the kind carried on by the company binds the company only if the act was authorized by the other

(continued...)

counter that § 13-5 has only been in effect as of January 1, 1998 and does not apply unless CL has affirmatively adopted to be governed by it:  Under Illinois law, a limited liability company formed before January 1, 2000 may elect to be governed by the 1997 amendments to the Limited Liability Company Act ("Act") through amendment of its operating agreement or through any other manner authorized by its operating agreement.  805 ILCS 180/55-15; *see Arnest v. Audino*, 332 Ill. App. 3d 468, 476, 773 N.E.2d 202, 209 (2nd Dist. 2002) (noting entities in existence before January 1, 2000 were required to adopt the 1997 amendments to be governed by the amended provisions of the Act).  The CL operating agreement was entered into on November 18, 1996, and nothing in the record indicates it has been modified or amended since that date. (CL Operating Agreement, PX 36.)  Any statutory authority governing the acts of CL members therefore comes from the Act as it existed before the 1997 amendments.

Defendants themselves do not cite the provision of the pre-amendment Act they believe should control here.  The court's research shows that the earlier version of the statute governing the management of limited liability companies reads as follows:

> Management of the limited liability company shall be vested in its members; however, if the articles of organization so provide, the management of the limited liability company may be vested, in whole or in part, in a manager or managers who shall be elected by the members in the manner prescribed by the operating

---

[10](...continued)
members.
(b) Subject to subsection (c), in a manager-managed company:
(1) A member is not an agent of the company for the purpose of its business solely by reason of being a member. Each manager is an agent of the company for the purpose of its business, and an act of a manager, including the signing of an instrument in the company's name, for apparently carrying on, in the ordinary course, the company's business or business of the kind carried on by the company binds the company, unless the manager had no authority to act for the company in the particular matter and the person with whom the manager was dealing knew or had notice that the manager lacked authority.
805 ILCS § 180/13-5

agreement or articles of organization of the limited liability company. A manager or managers shall have the authority and responsibility accorded to them by the operating agreement or articles of organization, and the members shall not have the authority and responsibility accorded to the managers, unless specifically retained by them in the operating agreement or the articles of organization. If the articles of organization do not provide for the management of the limited liability company by a manager or managers, instruments and documents shall be valid and binding upon the limited liability company if executed by any one or more of the members unless otherwise provided in the articles of organization.

805 ILCS 180/15-1(1997). Under these provisions, the terms of CL's Operating Agreement control the scope of CL members' authority. The CL Operating Agreement grants to managing members the "exclusive authority to act for and bind the Company in all matters." (Operating Agreement § 5.1(a) PX 36.) That authority may be delegated, but Defendants have presented no evidence that any manager delegated his authority to a non-managing member or to Lee or Rehmat. Further, the agreement states, "[N]o Member who is not also a Managing Member shall have any right to participate in, or have any power or authority over the management and control of, the business or affairs of the Company or to act for or bind the Company." (*Id.*)

Thus, under the terms of the CL Operating Agreement, even if CL members Wayne & Associates and Hemani were mere proxies for Lee and Rehmat, there is no basis in statute or in the Operating Agreement for imputing their acts to CL. Nothing in the record indicates that Wayne & Associates or Hemani were at any time authorized to act or in fact did act on behalf of CL. They remained throughout the relevant time period non-managing members of CL, and misconduct attributable to them will not be imputed to CL.

Defendants also suggest that Lee and Rehmat's knowledge or conduct must be imputed to CL at common law. Again, the court is unpersuaded. Under Illinois common law, the knowledge of an officer, director, or agent is imputed to the corporation only if the person with knowledge is acting within the scope of his employment at the time and "at least in part with the intent to benefit the corporation." *United States v. One Parcel of Land Located at 7326 Highway 45 N.*, 965 F.2d 311, 316 (7th Cir. 1992). Defendants themselves contend that Lee and Rehmat's interests in CL

49

remained hidden throughout the relevant time period; they could not under those circumstances have been acting as apparent agents of CL. Further, the fact that Lee apparently used Wayne & Associates to help perpetrate the BLR Fraud does not satisfy the court that Lee's conduct must be imputed to CL. (Tr. 3575:14-25.) *See Cement-Lock v. Gas Tech. Inst.*, No. 05 C 0018, 2007 WL 4246888, at *2 (N.D. Ill. Nov. 30, 2007). As Plaintiffs correctly note, where an officer or agent is acting adversely to his principal or committing a fraudulent act for his own benefit, his knowledge will not automatically be imputed to the principal. *See Williams Electronic Games, Inc. v. Garrity*, 366 F.3d 569 (7th Cir. 2004). Defendants have pointed to no evidence that Lee or Rehmat were acting to benefit CL in perpetrating the BLR Fraud or that managing members of CL had knowledge of or acquiesced in the fraud when it was perpetrated.

In short, this court will not impute to CL the bad acts of Lee or Rehmat either in their own capacities or through their proxies Wayne & Associates and Hemani. Instead, in considering whether unclean hands bars this derivative action, the court focuses on the conduct of Plaintiff Richard Mell and CL managing members Ravi Randhava, Serge Randhava, and Richard Kao., again giving appropriate deference to the jury's verdict in favor of Plaintiffs on this issue.

### 1.    Lee and Rehmat's assignment of their interests in the Technology

Defendants assert that Lee and Rehmat wrongfully transferred their ownership interests in the Technology to CL, in violation of their employment agreements with GTI. As discussed above, however, Lee and Rehmat's conduct, either on their own or through Wayne & Associates and Hemani, is not fairly attributable to CL. Instead, in order for Defendants' unclean hands defense to succeed, it must rest on the conduct of CL's managing members themselves.

There is evidence that the managing partners were aware of the assignment of Lee and Rehmat's interests: Serge admitted that Lee and Rehmat assigned their interests in violation of their responsibilities to their employer. (Trial Tr. 3764:7-16; 3769:4-19.) Michael Mensinger, another IGT employee, also did so, at Rehmat's direction. (Trial Tr. 2576:23-2577:17.) And Ravi

admitted that he knew that Lee and Rehmat did not hold individual rights in the Technology and that CL had not compensated IGT for the assignments. (Trial Tr. 535:24-536:2.) Serge and Ravi's involvement in these assignments, however improper, are unrelated to the transactions at issue in this litigation, however, and therefore do not constitute misconduct that would bar CL from bringing suit on behalf of CLG. The court declines to overturn the jury's determination on this basis.

## 2. CL's concealment of Lee and Rehmat's ownership interests in CL

Defendants argue that Serge, Ravi, and Kao knew of Lee and Rehmat's interests in CL through Wayne & Associates and Hemani, that they intentionally concealed these interests, and that CL benefited from their concealment. The purported benefit to CL is not entirely obvious to the court; it apparently rests on Defendants' insistence that IGT would have fired Lee and Rehmat upon learning of the their hidden ownership interests in CL, which would constitute a violation of IGT's conflict-of-interest policy. With Lee and Rehmat out of the picture, Defendants urge, the entire fraud on CLG—indeed, all of Lee and Rehmat's wrongdoing–would have been prevented. (Defs.' Mem. at 21.) How precisely Plaintiffs were advantaged by their failure to bring this about is not clear to the court. In any event, the court is unwilling to disturb the jury's determination on this issue.

In reaching its decision, the jury knew that, as Ravi admitted, he had never dealt personally with any member of Wayne & Associates, including principals Charles Wayne Jones and Kathy Lee, Lee's son-in-law and daughter. (Trial Tr. 396:3-10.) In fact, his only contact with Wayne & Associates were through Lee. (Trial Tr. 396:11-16.) Serge similarly testified that he communicated with Wayne & Associates exclusively through Lee. (Trial Tr. 3564:6-18.) In his deposition, read into the record at trial, Lee acknowledged that the only dealings between Wayne & Associates and the Randhavas was through Lee. (Trial Tr. 4942:22-25, 4992:15-4993:8.) Finally, Ravi testified that he had never met Hemani and had set up an interest in CL in her name at the instruction of Rehmat. (Trial Tr. 369:14-21, 370:14-18.) Neither Wayne & Associates nor Hemani contributed

any funds or labor to CL or development of the Technology. (Trial Tr. 391:17-19, 3671:7-18, 4165:7-9, )

Despite this evidence that the Randhavas knew about Lee and Rehmat's relationship to Wayne & Associates and Hemani, a jury could reasonably have rejected Defendants' unclean hands theory. Mere knowledge of the relationship, without more, does not amount to the kind of fraud or bad faith contemplated by the unclean hands doctrine. None of the evidence admitted at trial shows that the Randhavas or Kao knew of the BLR Fraud or any other wrongdoing by Lee and Rehmat. Ravi testified that he did not know of Lee and Rehmat's intention to use Wayne & Associates and Hemani to conceal their interest in CL and that he remained ignorant of the BLR Fraud until 2003. (Trial Tr. 245:2-7, 519:3-7.) Serge also testified that he was unaware of any unlawful connection between Lee and Rehmat and the non-managing CL members, and that he, too, only became aware of the BLR Fraud in 2003. (Trial Tr. 3669:24-3670:11, 4149:24-4151:1.) In his deposition, Lee confirmed that he concealed the fraud from the Randhavas and Kao. (4995:3-4997:7, 4998:13-24.) A reasonable jury could thus have concluded that CL did not affirmatively conceal Lee and Rehmat's interests because either the managing members did not know about their wrongful use of the non-managing members as proxies, or if they did, they were unaware of the BLR Fraud before 2003 and therefore could not have concealed it for CL's benefit.

### 3. Lee and Rehmat's involvement in a kickback scheme involving GTI funds

As discussed above, Lee and Rehmat's involvement in the BLR Fraud will not be imputed to CL. Defendants point to no evidence that any CL members other than Lee and Rehmat were involved in the kickback scheme, and that scheme is therefore is not a basis for barring CL's recovery.

## 4. Licenses that conflicted with the CLG/ECH agreements

Plaintiffs voted to issue eight licenses on CLG's behalf, seven of which were later determined to conflict with the three licenses CLG had previously issued to ECH. (*See* CLG Meeting Minutes, April 18, 2003 at 2, BX 135EE.) As explained earlier, ECH had exclusive licenses to process waste in exchange for a total of $500,000 in funding to CLG: In 1997, CLG granted ECH a license to build a processing plant capable of processing 100,000 tons of waste per year in either New York or New Jersey. (BX 41.) In 1999, CLG expanded these rights, granting ECH an exclusive, royalty-bearing license, which included the right to sub-lease the Technology and the right to process up to 600,000 tons of waste per year, in exchange for $150,000. (PX 248.) In February 2001, CLG issued a third license, this time granting ECH the right to treat an additional 500,000 tons per year and an exclusive, worldwide license, including subleasing rights, again in exchange for $150,000. (PX 485.) In June 2002, this third license was amended to grant ECH the right to process a total of 1.6 million tons per year.

At CLG meetings on May 14, 2001 and September 7, 2001, Ravi, Serge, and Kao on behalf of CL, Lee and Rehmat on behalf of ESI, and Richard Mell agreed to issue six of the ultimately seven conflicting licenses. (BX 69, BX 69.) Ravi, Serge, Kao, Mell, Lee, and Barone attended a meeting on April 19, 2002, at which there was a disclosure of the fact that a total of eight licenses had been issued, including a non-conflicting license to Unitel. (BX 75/PX 615, Trial Tr. 3421:16-25.) None of the companies was required to pay CLG consideration up front. (BX 75; Tr. 1630:1-12.) CL managing member Ravi held a disclosed interest in Unitel; Defendants claim this interest was undisclosed, but Ravi himself signed the license as Unitel's president. (BX 141D.) Several other CLG board members also had interests in licensee companies that Defendants claim were intentionally concealed, in breach of the voting CLG members' duty of loyalty. Specifically, Barone held an interest in TEFES (Trial Tr. 4056:11-14), and Rehmat and Lee held an interest in

RT, Inc. (Trial Tr. 660:21-23).[11]  Finally, Mell admitted at trial that he did not examine the licenses before agreeing to issue them, nor did he attempt to determine whether they conflicted with any preexisting licenses.  (Trial Tr. 1630:13-20.)

Defendants claim that the issuance of these licenses demonstrates self-dealing and breach of each voting member's duty of loyalty to CLG.   The charge of self-dealing fails, as none of the alleged self-dealing parties included Mell or the managing members of CL, and there is no evidence Plaintiffs wrongfully benefited from issuing these licenses.  The alleged non-disclosure presents a slightly closer issue.  The minutes from the April 19, 2002 CLG board meeting (which were not admitted against Borys) identify the eight companies to which CLG members issued licenses.  (PX 615.)  Borys, who was absent from the 2002 meeting, repeatedly denied any knowledge of these licenses prior to the April 18, 2003 board meeting.  Borys did attend that 2003 meeting, at which Lau and Thomas O'Laughlin submitted a report concerning the conflicts between the ECH licenses and the seven licenses issued to other companies.  (PX 718.)  The court sustained an objection to testimony that the CLG board purportedly informed Borys of these licenses before the 2003 meeting.  (Trial Tr. 4758:18-4762:2.)  Nonetheless, the delayed disclosure of the licenses to Borys does not, without some showing of bad faith, amount to unclean hands.  Defendants argue that Plaintiffs were motivated to conceal the hidden interests of the other CLG members, but point to no evidence that Ravi, Serge, Kao, or Mell were themselves aware of these interests.  Further, they do not demonstrate any affirmative duty on the part of Plaintiffs to disclose their knowledge of the licenses to Borys before the April 2003 meeting, nor do they explain how Plaintiffs stood to benefit from their knowledge of these licenses at the expense of CLG.  The mere failure to disclose the

---

[11]      Defendants contend that Kao had an interest in licensee Greenland, but they have apparently confused Greenland Engineering Consultants, a Taiwanese company, with Greenland Engineering USA.   Kao and Lee testified that Kao did not own an interest in the Greenland Engineering Consultants, the recipient of the CLG license.  (Trial Tr. 3076:24-3078:15, 4976:21-4977:2.)

existence of the licenses for a period of twelve months simply does not mandate a finding that Plaintiffs acted with unclean hands.

Finally, Defendants assert that at least six of the licenses were in conflict with existing ECH licenses, but they have offered no evidence that the CLG members knew about those conflicts before the April 18, 2003 board meeting, when Lau and O'Laughlin issued their report. The jury was entitled to infer that all CLG board members were ignorant of any conflicts with the ECH licenses before the report was issued.

### 6.    Plaintiffs' acquiescence in the transactions at issue in this case

Defendants next complain that Plaintiffs at the very least acquiesced in the issuance of the ECH licenses they challenge in this lawsuit. In making this argument, Defendants rely entirely on the expert testimony of Dr. Robert Hamada. Defendants retained Dr. Hamada to testify, among other things, about the corporate structures and management of the various companies involved in this case and the extent of Plaintiffs' involvement in CLG board decisions. Dr. Hamada testified that board members, including Plaintiffs, are responsible to stay apprised of the company's financial health, make sure they understand major transactions and dissent from those with which they do not agree, and ask questions about the specific terms of major transactions and their repercussions. (Trial Tr. 5281:15-22, 5367:23-4368:8.) In addition, he opined that he had not seen in his review of CLG meeting materials any evidence that Plaintiffs dissented from decisions to issue the ECH licenses. (Trial Tr. 5411:15-22.) In considering Defendants' clean hands defense, the jury was free to disregard Dr. Hamada's opinions, including what he believed to be CLG board members' responsibilities or what he perceived to be serious omissions on the part of Plaintiffs as CLG board members. What an after-the-fact witness may have surmised about Plaintiffs' actions or knowledge based on his review of company minutes does not satisfy the court that the unclean hands defense warrants judgment in Defendants' favor as a matter of law.

### 7.    The Randhavas' continued relationship with Lee and Rehmat

Finally, Defendants argue that CL's continued relationship with Lee and Rehmat even after learning of the BLR Fraud constitutes unclean hands. The parties dispute when the Randhavas first learned of the BLR Fraud: Defendants suggest it was as early as 2002, while Plaintiffs insist it was no earlier than the January 30, 2003 CLG board meeting, when Defendant Borys announced his findings regarding the BLR Fraud. (Defs.' Mem. at 28, Pl.'s Resp. at 17). Defendants offer no direct evidence of Plaintiffs' knowledge of the fraud before January 30, 2003, whereas Serge Randhava testified that he at least did not know of the fraud until 2003. (Trial Tr. 3575:14-17, 3669:24-3670:11.) The jury was entitled to believe Serge on this point. Defendants contend that Plaintiffs gave Lee and Rehmat preferential treatment long after the January 2003 board meeting, but the jury could reasonably have concluded that Plaintiffs' conduct toward Lee and Rehmat during this time period did not manifest fraud or bad faith.

It is undisputed that Serge allowed Rehmat to maintain an office at Unitel until Rehmat's indictment in 2007. (Trial Tr. 339:1-11, 3985:2-11.) Defendants intimate that permitting Rehmat to remain at Unitel somehow inculpates the Randhavas, but they have not established that Rehmat's pre-indictment use of the Unitel offices relates to the transactions at issue in this case. At most, Defendants manage to link the Randhavas with Rehmat through Rehmat's use of a business card listing Rehmat as vice president of Unitel and through correspondence almost entirely predating the January 2003 board meeting. (Defs.' Mem. at 28-29.) The business card is undated, but Serge admitted on cross that he was aware of Rehmat's use of the card. (BX 148, Trial Tr. 3987:24-3991:9.) Defendants also point to two pieces of correspondence that post-date the January 2003 board meeting, when Plaintiffs claimed they first became aware of Rehmat's involvement in the BLR Fraud: a February 3, 2006 e-mail message, a copy of which Ravi received, in which Rehmat holds himself out as a Unitel employee; and a June 13, 2006 letter from Ravi in which he refers to Rehmat as "currently working with Unitel." (GTIX 468, GTIX 563.) This evidence, at most, shows that the Randhavas continued to allow Rehmat to work at Unitel after

56

learning he had been accused of fraud in connection with GTI. What it does not show is how CL wrongfully benefited from the transactions at issue in *this* case involving the misuse of the Cement-Lock Technology. Serge defended his decision to allow Rehmat to remain at the Unitel offices on the basis of Rehmat's willingness to provide information about the transactions that gave rise to this litigation. (Trial Tr. 3410:16-3412:10, 3512:18-24.) His failure to disclose this fact to the rest of the CLG board does not, despite Defendants' contentions to the contrary, show that Plaintiffs must have acquiesced in or benefited from transactions that occurred several years prior. A reasonable jury could therefore have found that Rehmat's use of the Unitel offices had no connection with the misconduct alleged in this case.

Finally, Defendants note undisputed evidence that Wayne & Associates and Hemani each continues to hold a ten-percent interest in CL and observe that their continued membership in CL is at odds with Ravi and Serge's claimed loss of trust in Rehmat. (Defs.' Mem. at 29.) Ravi testified at trial, however, that he wanted to recover Wayne & Associates' and Hemani's shares and would have done so but for the difficulty involved. (Trial Tr. 392:23-13.) However persuasive that testimony may be, the jury could reasonably have determined that failure to terminate Lee and Rehmat's interests in CL does not amount to manifest evidence of fraud or deceit in connection with the transactions at issue in this litigation. Similarly, the fact that Plaintiffs chose to sue Defendants but not Lee, Rehmat, or Barone does not show that CL or Mell were acting contrary to CLG's interests or were in any way party to the claims they brought against Defendants.

## CONCLUSION

For the foregoing reasons, the court concludes that Defendants are entitled to judgment as a matter of law as to Counts II (RICO), III (RICO conspiracy), and VII (unjust enrichment). In addition, GTI, IGT, and ECH are entitled to judgment as a matter of law on Count I. The parties are entitled to a new trial on all remaining counts.

Plaintiffs' motion to bar the GTI Defendants' proposed Rule 1006 summaries [475] is stricken without prejudice.

Borys's motion for judgment on Counts I (fiduciary duty), IV (fraudulent concealment), V (fraudulent misrepresentation), and VI (negligent misrepresentation) [479] is denied with respect to Counts I, IV, and V. The court previously dismissed Count VI against all parties and, accordingly, the motion is denied as moot with respect to Count VI. Borys's motion for judgment on Counts II and III (RICO) [480] is granted. Borys's motion for judgment on Count VIII (accounting) [492] is denied as moot; the court previously dismissed Count VIII against all parties. Borys's motion to bar Plaintiffs' derivative claims [495] is denied. Borys's renewed motion to bar Plaintiffs' derivative claims and for judgment on Count VIII [505] is denied for the reasons stated in this opinion.

Defendants' remaining oral motions for judgment as a matter of law and notwithstanding the verdict are granted in part and denied in part.

ENTER:

Dated:  March 30, 2009

_____

REBECCA R. PALLMEYER
United States District Judge